# MASTERCARD SAVINGS PLAN

(Amended and Restated as of January 1, 2023, Unless Otherwise Provided)

EXHIBIT
A

**TABLE OF CONTENTS**


ARTICLE I ..... 1

INTRODUCTION ..... 1

1.1 Name. ..... 1

1.2 Purpose. ..... 1

1.3 Effective Date. ..... 1

1.4 Prior Plan Terms. ..... 1

1.5 Termination Prior to Effective Date. ..... 2

1.6 Type of Plan. ..... 2

ARTICLE II ..... 3

DEFINITIONS AND RULES OF CONSTRUCTION ..... 3

2.1 Definitions. ..... 3

2.2 Rules of Construction. ..... 21

ARTICLE III ..... 22

ELIGIBILITY AND PARTICIPATION ..... 22

3.1 Eligibility for Participation. ..... 22

3.2 Participation Limited to Eligible Employees. ..... 22

3.3 Eligibility for Match Contributions. ..... 22

3.4 Commencement of Participation. ..... 22

3.5 Cessation of Participation. ..... 22

ARTICLE IV ..... 23

PARTICIPANT CONTRIBUTIONS ..... 23

4.1 Elective Deferrals. ..... 23

4.2 After-Tax Contributions. ..... 25

4.3 Contribution Percentage Limits. ..... 25

4.4 Catch-Up Contributions. ..... 26

4.5 Salary Reduction Agreement. ..... 27

4.6 Timing, Posting and Tax Considerations. ..... 27

4.7 Rollover Contributions. ..... 27

4.8 In-Plan Roth Conversion Contributions. ..... 28

ARTICLE V ..... 29

EMPLOYER CONTRIBUTIONS ..... 29

5.1 Employer Match Contributions. ..... 29

5.2 Allocation and Deposit of Match Contributions. ..... 29

5.3 Company Contributions. ..... 29

5.4 QNECs and QMACs. ....30
5.5 Contributions for Participants Returning from Military Leave. ....30
ARTICLE VI ....32
LIMITATIONS ON ALLOCATIONS AND CONTRIBUTIONS ....32
6.1 Compliance with Section 402(g) of the Code. ....32
6.2 Compliance with Section 401(k)(3) of the Code. ....33
6.3 Compliance with Section 401(m)(2) of the Code. ....35
6.4 Changes Effected by the Plan Administrator. ....38
6.5 Compliance with Section 415 of the Code. ....38
6.6 Special Definitions. ....39
ARTICLE VII ....42
VESTING ....42
7.1 Employee Account and Rollover Contributions. ....42
7.2 Match Contributions and Company Contributions. ....42
7.3 Profit Sharing Contributions. ....42
7.4 Additional Vesting. ....42
7.5 Special Vesting Provisions Related to Certain Divestitures. ....43
7.6 Forfeitures. ....43
7.7 Restorals. ....43
7.8 Vested Percentage. ....44
ARTICLE VIII ....46
DISTRIBUTIONS ....46
8.1 Distribution of Vested Account Balance. ....46
8.2 Cash-Outs and Automatic Rollovers. ....46
8.3 Distribution Options, Valuation and Timing. ....47
8.4 Notice of and Consent to Distribution. ....49
8.5 QDROs. ....50
8.6 Reemployment. ....51
8.7 Minimum Required Distributions. ....51
8.8 Death of a Participant. ....52
8.9 Rollovers. ....53
ARTICLE IX ....54
IN-SERVICE WITHDRAWALS AND LOANS ....54

9.1 Withdrawals of After-Tax Contributions; Rollover Account; Profit Sharing Account. .....54
9.2 Withdrawals Due to Attainment of Age Fifty-Nine and One-Half. .....54
9.3 Withdrawals on Account of Financial Hardship. .....54
9.4 Withdrawal Due to Birth or Adoption. .....55
9.5 Plan Loans. .....56
9.6 Disability in Service. .....61
9.7 Participant Deemed to Be In-Service. .....61
9.8 Additional Rules and Requirements .....61
ARTICLE X .....63
ADMINISTRATION OF THE PLAN .....63
10.1 In General. .....63
10.2 The Mastercard Savings Plan Employee Benefits Committee. .....63
10.3 Meetings. .....63
10.4 Quorum and Voting. .....63
10.5 Expenses. .....63
10.6 Allocation of Fees and Expenses. .....64
10.7 Powers and Duties of The Mastercard Savings Plan Employee Benefits Committee. .....64
10.8 Powers and Duties of the Administrative Committee. .....65
10.9 Powers and Duties of the Investment Committee (U.S.). .....66
10.10 Powers and Duties of the Plan Administrator. .....67
10.11 Delegation of Authority. .....69
10.12 Benefit Claims and Appeals. .....69
10.13 Indemnification. .....70
10.14 Reliance on Reports and Certificates. .....70
10.15 Participants' Own Participation. .....71
10.16 Qualified Domestic Relations Orders. .....71
ARTICLE XI .....72
TRUST FUND; INVESTMENT FUNDS .....72
11.1 Trust Agreement. .....72
11.2 Investment of Trust Fund. .....72
11.3 Investment of Account. .....72
11.4 Investment of Future Contributions. .....73

11.5 Valuation of Accounts. ....74
11.6 Non-Reversion. ....74
11.7 Return of Certain Contributions. ....74
11.8 Source of Benefits. ....74
ARTICLE XII ....75
AMENDMENT OR TERMINATION ....75
12.1 Amendment to the Plan. ....75
12.2 Termination. ....75
12.3 Vesting; Accounts; Distribution. ....76
12.4 Plan Participation by Employers. ....76
12.5 Mergers, Consolidations and Transfers. ....77
ARTICLE XIII ....78
GENERAL PROVISIONS ....78
13.1 No Guarantee of Employment. ....78
13.2 Limitation of Rights. ....78
13.3 Payments to Minors and Incompetents. ....78
13.4 Nonalienation of Benefits. ....78
13.5 Evidence of Survivor. ....79
13.6 Reimbursement to Plan for Certain Payments. ....79
13.7 Limitation of Liability and Legal Actions. ....79
13.8 Interest in Assets. ....80
13.9 Severability. ....80
13.10 Titles and Headings. ....80
13.11 Electronic Media. ....80
13.12 Governing Law. ....80
ARTICLE XIV ....81
TOP-HEAVY PLAN REQUIREMENTS ....81
14.1 Top-Heavy Plan. ....81
14.2 Top-Heavy Ratio. ....81
14.3 Minimum Employer Contribution. ....81
14.4 Minimum Vesting. ....82
14.5 Definitions. ....82
APPENDIX A - EMPLOYERS ....A
APPENDIX B - Participants Employed by Watch Hill Partners ("Watch Hill") ....B
APPENDIX C - Truaxis, Inc. 401(k) Profit Sharing Plan ....C

APPENDIX D - Orbiscom, Inc. 401(k) Plan .......... D
APPENDIX E - Employees of Applied Predictive Technologies .......... E
APPENDIX F - Brighterion, Inc. 401(k) Profit Sharing Plan and Trust .......... F
APPENDIX G - Ethoca LLC 401(k) Profit Sharing Plan and Trust .......... G
APPENDIX H - Insperity, Inc. 401(k) Plan (Transactis Participants) .......... H
APPENDIX I - Session M, Inc. 401(k) Plan .......... I
APPENDIX J - Coronavirus Aid, Relief and Economic Security Act ("CARES Act") Provisions .......... J
APPENDIX K - Traina Interactive Corp. 401(k) Plan .......... K
APPENDIX L - Insperity, Inc. 401(k) Plan (RiskRecon Participants) .......... L
APPENDIX M - Trans-Fast Remittance LLC 401(k) Profit Sharing Plan .......... M
APPENDIX N - Ekata, Inc. 401(k) Plan .......... N
APPENDIX O - Helpside Inc. 401(k) Plan (Finicity Participants) .......... O
APPENDIX P - TriNet 401(k) Plan (CipherTrace Inc. Participants) .......... P

# ARTICLE I

## INTRODUCTION

1.1 Name. The name of the Plan is the MasterCard Savings Plan. MasterCard International Incorporated previously established the MasterCard International Incorporated Savings Plan as of September 1, 1974 for the benefit of eligible employees of the Company and its participating affiliates.

1.2 Purpose. The purpose of the Plan is to attract and retain qualified individuals by providing them with an opportunity to accumulate assets for their retirement.

1.3 Effective Date. Except as otherwise provided in the Plan, the effective date of this amendment and restatement of the Plan is January 1, 2023 (the "*Effective Date*"). The Plan is amended and restated to incorporate previously adopted amendments and to make certain technical and conforming changes. Effective as of the Effective Date, the Plan amends and restates the Prior Plan Terms.

1.4 Prior Plan Terms.

(a) Previously, the Plan was amended and restated:

(i) effective as of January 1, 1995 (or such other date as specified in the Plan), to comply with the Tax Reform Act of 1986 and subsequent legislation and governmental regulations.

(ii) effective as of January 1, 2001 (or such other date as specified in the Plan), the Plan was amended and restated to comply with certain legislative changes and to make other desired revisions, including, without limitation the so-called "GUST" amendments to comply with the General Agreement on Tariffs and Trade (1994), the Uniformed Services Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, the Internal Revenue Service Restructuring and Reform Act of 1998 and the Community Renewal Tax Relief Act of 2000.

(iii) effective as of January 1, 2002 (or such other date as specified in the Plan), to reflect certain provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001 ("*EGTRRA*"). Such amendments are intended as good faith compliance with the requirements of EGTRRA and are to be construed in accordance with EGTRRA and guidance issued thereunder. The January 1, 2002 amendment and restatement also provides that effective as of January 1, 2003, the Company's contributions to the Plan are restructured into a separate matching contribution and profit sharing contribution. Certain other desired revisions in conjunction with the revised contribution structure are included in the Plan and the Plan was renamed the "MasterCard Shared Profit and Savings Plan."

(iv) effective as of January 1, 2007 to incorporate various design changes and certain changes due to the Pension Protection Act of 2006 ("*PPA*").

(v) effective January 1, 2008 (or such other date as specified in the Plan) to incorporate statutory and regulatory amendments under PPA, and various technical and conforming amendments.

(vi) effective January 1, 2013 to incorporate various design changes and changes required by applicable law.

(vii) Effective January 1, 2018 to incorporate various design changes and changes required by applicable law.

1.5 Termination Prior to Effective Date. Except as required by law or otherwise provided herein, Participants who incurred a Termination from Service Date prior to the Effective Date and the Spouses and Beneficiaries of such Participants shall be governed by the terms of the Plan in effect at the time of their retirement or termination.

1.6 Type of Plan. The Plan is intended to be a "profit sharing plan" for all purposes of the Code. The Plan and Trust Agreement adopted as part of the Plan are intended to qualify as a plan and trust that meet the requirements of Code Sections 401(a) and 501(a) or any other applicable provisions of law.

## ARTICLE II

## DEFINITIONS AND RULES OF CONSTRUCTION

2.1 Definitions. Wherever used in the Plan, the following words and phrases shall have the following meanings unless a different meaning is plainly required by the context.

"*Account*" means, with respect to a Participant, the portion of the Trust Fund which is attributable to such Participant, as follows:

Basic Tax-Deferred Account – Account to which Pre-Tax Contributions that are matched by Match Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Pre-Tax Contributions, shall be credited.

Supplemental Tax-Deferred Account – Account to which Pre-Tax Contributions that are not matched by Match Contributions and Catch-Up Contributions that are tax-deferred, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Pre-Tax Contributions, shall be credited.

Basic After-Tax Account – Account to which After-Tax Contributions that are matched by Match Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such After-Tax Contributions, shall be credited.

Prior Plan Contributions Account – Account to which pre-01/01/95 contributions (other than contributions allocable to the Pre-01/01/95 Basic After-Tax Account) under a predecessor plan, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such contributions, shall be credited.

Pre-01/01/95 Basic After-Tax Account – Account to which After-Tax Contributions for periods on or before December 31, 1994 and which were matched by Match Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such After-Tax Contributions, shall be credited.

Supplemental After-Tax Account – Account to which After-Tax Contributions that are not matched by Match Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such After-Tax Contributions, shall be credited.

Rollover Account – Account comprised of the following Accounts:

Before-Tax Rollover Account – Account to which amounts attributable to before-tax Rollover Contributions, together with the income and expenses

and realized and unrealized gains and losses of the Trust Fund allocable to such Rollover Contributions shall be credited.

After-Tax Rollover Account – Account to which amounts attributable to after-tax Rollover Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Rollover Contributions shall be credited.

Roth Rollover Account – Account to which amounts attributable to Rollover Contributions of Roth elective deferrals, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Rollover Contributions shall be credited.

In-Plan Roth Conversion Account – Account to which amounts attributable to In-Plan Roth Conversion Contributions, together with income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such In-Plan Roth Conversion Contributions, shall be credited.

Pre-Tax Match Account – Account to which Match Contributions attributable to Pre-Tax Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Match Contributions, shall be credited.

After-Tax Match Account – Account to which Match Contributions attributable to After-Tax Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Match Contributions, shall be credited.

Profit Sharing Account – Account to which Profit Sharing Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Profit Sharing Contributions, were credited. Effective January 1, 2007, Profit Sharing Contributions are no longer made under the Plan.

Basic Roth Account – Effective January 1, 2008, the account to which Roth Contributions that are matched by Match Contributions, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Roth Contributions, shall be credited.

Supplemental Roth Account – Effective January 1, 2008, the account to which Roth Contributions that are not matched by Match Contributions and Catch-Up Contributions of Roth elective deferrals, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Roth Contributions, shall be credited.

Roth Match Account – Effective January 1, 2008, the account to which Match Contributions attributable to Roth Contributions, together with the income and

expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Match Contributions, shall be credited.

Company Contribution Account –The account to which Company Contributions, if any, together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable to such Company Contributions, were credited. Effective July 1, 2018, Company Contributions are no longer made under the Plan.

"*Account Balance*" means the total amount credited to the Account of a Participant as of a Valuation Date.

"*Administrative Committee*" means the committee appointed by the Mastercard Savings Plan Employee Benefits Committee with the powers, duties and responsibilities described in Article X or its delegate.

"*Affiliated Company*" means the Company and (i) any corporation which is a member of a controlled group of corporations (as defined in Section 414(b) of the Code), which includes the Company, (ii) any trade or business (whether or not incorporated), which is under common control (as defined in Section 414(c) of the Code) with the Company, (iii) any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Section 414(m) of the Code) which includes the Company and (iv) any other entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o). For purposes of determining limitations under Code Section 415, the term Affiliated Company shall be determined in accordance with the previous sentence, except that, to the extent required by Code Section 415(h), the words "more than fifty percent" shall be substituted for the words "at least eighty percent" where such term appears in Code Sections 414(b) and 414(c).

"*After-Tax Contributions*" means contributions made by a Participant pursuant to Section 4.2.

"*Alternate Payee*" (under a QDRO), with respect to a Participant, has the meaning set forth in Code Section 414(p).

"*Appropriate Procedure*" means the form, procedure or method (including, without limitation, any procedure accomplished by telephonic or other electronic means) provided or prescribed by the Plan Administrator for achieving the particular purpose of the relevant provision of the Plan.

"*Base Pay*" means, with respect to any Plan Year, the amount of the base salary or hourly pay, shift differential pay, premium pay (effective January 1, 2012), pay in lieu of accrued but unused vacation time, and pay during a period of notice of termination paid to a Participant by an Employer. Base Pay shall also include, for each Plan Year, the amount, if any, of a Participant's base salary, hourly pay, or shift differential pay that the Participant elects to defer pursuant to the terms of any compensation or benefit plan of an Employer under Code Sections 125, 132(f) (for Plan Years beginning after 2000) 401(k), 402(h), 403(b) or 457(b), which amount shall be considered Base Pay for purposes of the Plan only at the time it would have been paid to the

Participant by the Employer but for the Participant's deferral election. Except as set forth in this definition, effective January 1, 2008, Base Pay shall not include (i) any amount that a Participant elects to defer to a deferred compensation plan of an Employer that is not includable in the Participant's income in the year deferred or (ii) any such amount deferred under any such plan of deferred compensation and paid at a later date. Notwithstanding anything in this definition to the contrary, Base Pay shall also include an Eligible Employee's differential wage payments (including payments within the meaning of Section 3401(h) of the Code) (if any) paid after December 31, 2008 by the Employer to the Eligible Employee during a Military Leave. Also, notwithstanding anything in this definition to the contrary, effective as of the 2016 Plan Year, Base Pay shall include difficulty of care payments under the Social Security Act.

"*Beneficiary*" means any individual or entity designated in accordance with the provisions of Sections 8.4(c) and 8.4(d) or as a result of a QDRO to receive any death benefits payable under the Plan.

"*Benefit Starting Date*" means the first day of the first period with respect to which a Participant's vested Account is payable.

"*Board of Directors*" means the Global Board of Directors of the Company.

"*Break in Service*" means, with respect to Plan Years beginning before January 1, 2002, each Period of Termination of twelve (12) consecutive months.

"*Business Day*" means each day in New York City on which the New York Stock Exchange is open for the trading of securities.

"*Cash-Out Amount*" means $5,000 or such greater amount as may be specified by Section 411(a)(11) of the Code.

"*Catch-Up Contribution*" means contributions made on behalf of a Participant pursuant to Section 4.4.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the rulings and regulations promulgated thereunder.

"*Committee*" means, as the context requires, the Mastercard Savings Plan Employee Benefits Committee, the Administrative Committee or the Investment Committee (U.S.) or any combination of such committees, each with the powers, duties and responsibilities described in Article X, or such other committee established by the Company for purposes of the Plan or the delegate of the Mastercard Savings Plan Employee Benefits Committee, Administrative Committee or Investment Committee (U.S.) or such other committee.

"*Company*" means MasterCard International Incorporated, a Delaware corporation, or any entity that may succeed to all or substantially all of its business.

"*Company Contribution*" means the contributions made by an Employer after

January 1, 2012 and before July 1, 2018 pursuant to Section 5.3.

"*Compensation*" means, with respect to any Plan Year,

(a) For purposes of Articles IV and Article V, an amount limited to a Participant's Base Pay in accordance with Sections 4.1(e) and 4.2(c). Compensation shall exclude any other cash or noncash compensation paid to the Participant for the year, including, without limitation, overtime pay, bonuses, cash or non-cash long-term incentive compensation, severance pay (whether paid in regular payroll installments or in a lump sum), signing bonuses, payments made pursuant to the Executive Incentive Plan or the Superior Performance and Outstanding Teamwork Plan, housing subsidies, child-care subsidies, relocation payments or allowances, expense allowances, welfare benefits, or stock-based compensation (including, without limitation, restricted stock and options). The Compensation for a Plan Year taken into account under the Plan shall not exceed the limitation applicable to that Plan Year under Code Section 401(a)(17), which limitation is incorporated into the Plan by reference, as such limitation may be adjusted from time to time for increases in the cost of living in accordance with the Code;

(b) For purposes of Article VI, except for Section 6.5 therein, the definition of Compensation specified by the Plan Administrator for a Plan Year that satisfies the requirements of Code Section 414(s);

(c) For purposes of each of Section 6.5 and Section 14.3, Compensation shall have the meaning specified therein.

"*Contribution Percentage Limits*" has the meaning set forth in Section 4.3.

"*Direct Rollover*" means a payment by the Plan to an Eligible Retirement Plan specified by the Distributee.

"*Disability*" means a "disability" as such term or a similar term is defined under the long-term disability plan of the Employer applicable to the Participant at the time of determination.

"*Distributee*" means (a) an Employee or a former Employee, (b) the surviving Spouse of an Employee or a former Employee, (c) the Spouse or former Spouse of an Employee or a former Employee, but only to the extent such Spouse or former Spouse is an Alternate Payee under a QDRO and only with regard to the interest of such Spouse or former Spouse and (d) effective as of January 1, 2008, a non-Spouse Beneficiary of the Employee or former Employee, but only with regard to the interest in the Plan of such non-Spouse Beneficiary and only to the extent that such interest is distributed as a Direct Rollover.

"*Effective Date*" means, except as otherwise specifically provided herein, January 1, 2018.

"*Elective Deferrals*" means the aggregate of (a) Pre-Tax Contributions contributed by an Employer on behalf of a Participant and (b) effective January 1, 2008, Roth Contributions contributed by a Participant.

"*Eligible Employee*" means an Employee of an Employer who is classified by the Employer as eligible to become a Participant in the Plan, for whom the Employer pays Base Pay in U.S. dollars, and whom the Employer treats as subject to federal wage withholding by the Employer for purposes of Code Section 3401. Notwithstanding the previous sentence, Eligible Employees shall not include:

(a) individuals who (i) perform services for an Employer under an agreement or arrangement (which may be written, oral or evidenced by the payroll practices of the Employer), with the individual or with another organization that provides the services of the individual to the Employer, under which the individual is treated as an independent contractor or consultant or is otherwise treated as an employee of an entity other than the Employer (such as a leasing organization), irrespective of whether the individual is treated as an employee of the Employer under common law employment principles, (ii) are paid or compensated by an entity which is not an Affiliated Company and (iii) all leased employees (including Statutory Leased Employees within the meaning of Code Section 414(n)), even where such individuals perform services under the direction or control of one or more Employers, regardless of whether or not the classification by an Employer of an individual described in clause (i), (ii) or (iii) of this definition as a leased employee, independent contractor or consultant is subsequently upheld by a court or other authority having jurisdiction over such matters;

(b) individuals who performed services in the United States at the business location of an Employer but who are paid by an Affiliated Company that is not participating in the Plan;

(c) individuals covered by a collective bargaining agreement or who are represented by a labor union or other agent for collective bargaining;

(d) Employees (i) who are not on a U.S.-dollar-denominated payroll, (ii) who are U.S. expatriates on the payroll of a non-U.S. Affiliated Company, (iii) who are non-U.S. expatriates on the payroll of an Affiliated Company that is not an Employer or (iv) who are participating in a retirement plan or arrangement of a non-U.S. Affiliated Company;

(e) individuals who are nonresident alien individuals with no United States source of income;

(f) directors and ad hoc committee participants who are not otherwise Eligible Employees;

(g) interns, including special interns and summer interns and seasonal or project workers;

(h) nurses, gym assistants, maintenance employees and security guards who are not paid by an Affiliated Company and whom the Affiliated Company does not treat as subject to wage withholding by the Affiliated Company under Code Section 3401;

(i) effective January 1, 2010, any individual who is classified by an Employer as other than a common law employee (such as an independent contractor or consultant); provided, that, if such individual is subsequently reclassified by reason of administrative, judicial, regulatory or other governmental action as a common law employee of an Employer for any reason and on any basis, such individual shall be treated as a common law employee only from the date that reclassification occurs and shall not retroactively be reclassified as an Eligible Employee for any purpose of this Plan;

(j) an Employee who participates in the social security system of another country or is receiving credit for benefit accruals under the terms of a retirement plan of an employer located in a foreign country; and

(k) an Employee of an affiliated service group (as that term is defined by Code Section 414(m)) or a person who is treated as an Employee under Code Section 414(o).

"*Eligible Retirement Plan*" means, except as otherwise provided, (a) an individual retirement account described in Code Section 408(a), (b) an individual retirement annuity described in Code Section 408(b) (other than an endowment contract), (c) an annuity plan described in Code Section 403(a), (d) an annuity contract or custodial account described in Code Section 403(b), (e) a qualified trust described in Code Section 401(a) that is exempt from taxation under Code Section 501(a) that accepts a Distributee's Eligible Rollover Distribution, (f) an eligible plan under Code Section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan and (g) effective January 1, 2008, a Roth IRA described in Code Section 408A, subject to the income limitation set forth therein. In the case of a distribution to (i) a Spouse, Eligible Retirement Plan shall have the meaning set forth in this definition and (ii) effective as of January 1, 2008, a non-Spouse Beneficiary, Eligible Retirement Plan means solely an individual retirement account described in Code Section 408(a) or an individual retirement annuity described in Code Section 408(b) (other than an endowment contract) established for purposes of receiving a distribution on behalf of an individual who is a non-Spouse Beneficiary or effective January 1, 2008, a Roth IRA described in Code Section 408A, subject to any income limitation set forth therein. Solely with respect to an in-Service withdrawal of Profit-Sharing Contributions pursuant to Section 9.1(c), Eligible Retirement Plan means an individual retirement account or annuity under Code Section 408(a) or 408(b) and the Pension Plan, *provided* that the Participant's account in the Pension Plan is fully vested.

"*Eligible Rollover Distribution*" means any distribution of all or any portion of the balance to the credit of the Distributee, except that an Eligible Rollover Distribution shall not include (a) any distribution that is (i) one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's Beneficiary or (ii) for a specified period of ten years or more; (b) any distribution to the extent such distribution is required under Code Section 401(a)(9); (c) except as set forth in this definition, the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and (d) any distribution made

upon the hardship of the Employee. A portion of a distribution shall not fail to be an Eligible Rollover Distribution merely because such portion consists of after-tax contributions that are transferred (A) in a Direct Rollover to a qualified trust or an annuity contract described in Code Section 403(b), *provided* that such trust or contract account provides for separate accounting for amounts so transferred (and earnings thereon), including separately accounting for the portion of such distribution attributable to the after-tax contributions and the portion attributable to contributions includible in the Participant's gross income, (B) to an individual retirement account described in Code Section 408(a) or an individual retirement annuity described in Code Section 408(b) (other than an enrollment contract) or (C) a qualified plan loan offset (as defined in section 13613 of the Tax Cuts and Jobs Act of 2017, P.L. 115-97) that is contributed to an individual retirement account described in Code Section 408(a) or an employer plan (including this Plan) no later than the Distributee's tax return due date (including extensions) for the tax year in which the offset occurs.

"*Employee*" means any person who is a common-law employee of an Affiliated Company.

"*Employee Account*" means with respect to a Participant, the Basic Tax-Deferred Account, Supplemental Tax Deferred Account, Basic After-Tax Account, Pre-01/01/95 Basic After-Tax Account, Supplemental After-Tax Account and Rollover Account and, effective as of January 1, 2008, Roth Contribution Account.

"*Employer*" means the Company and any Affiliated Company which adopts the Plan with the approval of the Board of Directors. Appendix A contains a list of each Employer. An Employer listed in Appendix A ceases to be an Employer at the time said Employer (a) ceases to be an Affiliate, unless the Committee provides express, written permission for the former Affiliated Company to continue as an Employer for the purposes of the Plan, (b) is removed from Appendix A by the Committee or (c) withdraws from participation in the Plan, subject to the consent of the Committee.

"*Employer Account*" means with respect to a Participant, the Pre-Tax Match Account, After-Tax Match Account, Profit-Sharing Account and, effective January 1, 2008, the Roth Match Account.

"*Employer Contributions*" means contributions made by an Employer pursuant to Article V.

"*Employment Commencement Date*" means the first date on which an Employee performs an Hour of Service. For purposes of former employees of NBD Bank who became Employees on January 1, 1999 in connection with the acquisition of NBD Bank by the Company on that date, Employment Commencement Date shall mean the date of their original employment with NBD Bank. For purposes of former employees of Cirrus Systems Inc. ("Cirrus") who first became Employees of the Company on the date of the Company's acquisition of Cirrus, Employment Commencement Date shall mean the date of original employment with Cirrus. For purposes of former employees of Money Transfer System, LLC ("MTS") who first became Employees of the Company on the date of the Company's acquisition of MTS, Employment

Commencement Date shall mean the date of original employment with MTS.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rulings and regulations promulgated thereunder.

"*Executive Incentive Plan*" means the Senior Executive Annual Incentive Plan ("SEAICP").

"*Financial Hardship*" means an immediate and heavy financial need due to:

(a) unreimbursable expenses for (or necessary to obtain) medical care that would be deductible under Code Section 213(d) (determined without regard to whether the expenses exceed 7.5% of adjusted gross income), including, effective as of January 1, 2008, expenses incurred by the primary Beneficiary designated by the Participant who has an unconditional right to some or all of the Participant's Account upon this death;

(b) costs directly related to the purchase of a principal residence for the Participant (excluding mortgage payments);

(c) payment of unreimbursable tuition, related educational fees, and room and board expenses for up to the next 12 months of post-secondary education of the Participant or the Participant's Spouse, children or dependents or, effective as of January 1, 2008, the primary Beneficiary designated by the Participant who has an unconditional right to some or all of the Participant's Account upon his or her death;

(d) payments necessary to prevent the eviction of the Participant from the Participant's principal residence or foreclosure on the mortgage of the Participant's principal residence;

(e) payments for burial or funeral expenses for a Participant's deceased parents, Spouse, children, or dependents (and, prior to January 1, 2006, also for the Participant's grandparents, siblings, in-laws and step/half relatives of the relationship stated herein) or, effective as of January 1, 2008, the primary Beneficiary designated by the Participant who has an unconditional right to some or all of the Participant's Account upon his or her death;

(f) effective as of January 1, 2006, expenses for the repair of damage to the Participant's principal residence that would qualify for the casualty deduction under Code Section 165 (determined without regard to whether the loss exceeds 10% of adjusted income); and

(g) any other situation which the Internal Revenue Service deems through the issuance of any ruling, notice or other pronouncement to constitute an "immediate and heavy financial need".

In each of paragraphs (a) to (g) above, the immediate and heavy financial need shall include any amounts necessary to pay any federal, state, and local income taxes or penalties reasonably anticipated to result from such hardship withdrawal. Notwithstanding anything in the

Plan to the contrary, a "dependent" for purposes of a Financial Hardship shall mean a dependent as defined in Code Section 152, and for taxable years beginning on or after January 1, 2005, shall be determined without regard to Code Sections 152(b)(1), (b)(2), and (d)(1)(B).

"*Five Percent Owner*" means an Employee who at any time during the Plan Year was a five percent owner as defined in Code Section 416(i)(1).

"*Highly Compensated Employee*" means any Employee who (a) was a five-percent owner (within the meaning of Code Section 416(i)(1)) at any time during the Plan Year or the preceding Plan Year or (b) for the preceding Plan Year, received compensation from the Employer in excess of $115,000 (as indexed). For purposes of this definition, compensation has the meaning set forth in Code Section 414(q)(4) and, effective January 1, 2009, includes an Eligible Employee's differential wage payments (within the meaning of Section 3401(h) of the Code) (if any) paid after December 31, 2008 by the Employer to the Highly-Compensated Employee during a Military Leave.

"*Hour of Service*" means an "hour of service" with an Affiliated Company within the meaning of 29 C.F.R. Section 2530.200b-2(a)(1). With respect to Plan Years beginning prior to January 1, 2002:

(a) Hour of Service means each hour up to a maximum of 501 hours during a single continuous period for which an Employee was paid by an Affiliated Company on account of a period of time during which no duties are performed as the result of vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence.

(b) Hour of Service means each hour not otherwise credited for which back pay, irrespective of mitigation of damages, has been either awarded or agreed to by an Affiliated Company. These hours were credited for the period or periods to which the award or agreement pertains rather than the period in which the award, agreement, or payment was made.

(c) An Employee was also credited with Hours of Service with respect to such period of employment with a business entity, all or part of the assets of which were acquired by an Employer, as the Board of Directors in its sole discretion shall determine.

(d) Hour of Service means each hour for which an Employee is entitled to no payment, but was on a Leave of Absence. These hours were based upon his or her normally scheduled hours per week or a 40-hour week if there was no regular schedule).

(e) An Employee was credited with an Hour of Service at the time the duties for the Affiliated Company are performed, regardless of when payment for such duties was received by the Employee. If an Affiliated Company does not maintain hourly records with respect to any Employee employed by it, such Employee was credited with 45 Hours of Service for each week in which he or she is entitled to be credited with an Hour of Service.

(f) Hours credited prior to a Break in Service were included.

"*In-Plan Roth Conversion Contributions*" means the vested portion of an Account (other than a Roth Rollover Account, Basic Roth Account, Supplemental Roth Account or Roth Match Account) which a Participant, a Former Participant, a surviving Spouse Beneficiary or an alternate payee pursuant to the terms of a QDRO who is a current or former Spouse of a Participant or Former Participant elects at any time in accordance with the Appropriate Procedure to contribute in a Direct Rollover to his or her In-Plan Roth Conversion Account in accordance with Code Section 402A(c)(4) and guidance thereunder.

"*Investment Committee (U.S.)*" means the committee appointed by the Mastercard Savings Plan Employee Benefits Committee with the powers, duties and responsibilities described in Article X or its delegate.

"*Investment Funds*" means the various investment options designated from time to time by the Investment Committee (U.S.) for the investment of the assets of the Trust Fund.

"*Late Retirement Date*" means April 1 of the calendar year immediately following the calendar year during which the later of the following occurs: (a) the Participant attains age seventy and one-half and (b) the Participant incurs a Termination from Service Date; provided, however, that clause (b) shall not apply to a Participant who either attained age seventy and one-half prior to January 1, 1997 or is a Five-Percent Owner. Provided, that effective January 1, 2020 for Participants who attain age 70 ½ after December 31, 2019, "Late Retirement Date" means April 1 of the calendar year immediately following the calendar year during which the later of the following occurs: (a) the Participant attains age seventy-two and (b) the Participant incurs a Termination from Service Date; provided, however, that clause (b) shall not apply to a Participant who is a Five-Percent Owner.

"*Leave of Absence*" means a paid or unpaid leave of absence which is approved in advance by an Affiliated Company, including any leave which an Affiliated Company is required to treat as a Period of Service for purposes of USERRA, such as a Military Leave.

"*Mastercard Savings Plan Employee Benefits Committee*" or "*Benefits Committee*" means the committee with the powers, duties and responsibilities described in Article X or its delegate.

"*Match Contributions*" means contributions made by an Employer pursuant to Section 5.1.

"*Military Leave*" means an absence from employment with an Employer due to the performance of duty, on a voluntary or involuntary basis, in a uniformed service of the United States under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty and a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty. An individual shall not be deemed to have been absent due to Military Leave unless (a) such person has given advance notice of such uniformed service to his or her Employer, (b) the cumulative length of the absence and all previous Military Leaves from the Employer does not exceed five years or such other period of time permitted by

USERRA, and (c) such individual reports to, or submits an application for reemployment to, the Employer in accordance with Sections 4312(e) and (f) of USERRA. Notwithstanding anything contained herein to the contrary, the Committee may, on a uniform and nondiscriminatory basis, deem an individual's absence to be a Military Leave if such absence would qualify for a Military Leave but for the fact that the time period exceeds the maximum period of Military Leave set forth in clause (b) above.

"*Non-Highly Compensated Employee*" means an Employee who is not a Highly Compensated Employee.

"*Normal Retirement Date*" means the first day of the calendar month coincident with or next following the Participant's attainment of age 65.

"*Parental Leave*" means an absence from work by reason of the (a) pregnancy of the Employee, (b) birth of a child of the Employee, (c) placement of a child with the Employee in connection with the adoption of such child by the Employee or (d) caring for such child for a period immediately following such birth or placement. An Employee will not be deemed to be absent from work for Parental Leave unless the Employee furnishes to the Committee such timely information as the Committee may reasonably require to establish that the absence is for one of reasons specified and the number of days for which there was such an absence.

"*Participant*" means an individual who has commenced participation in the Plan pursuant to Article III and who continues to have an Account under the Plan.

"*Pension Plan*" means the MasterCard Accumulation Plan, as it may be amended from time to time.

"*Period of Service*" means the total period of an Employee's Service. For Plan Years commencing prior to January 1, 2002, a Period of Service of one year was referred to as a "Year of Service" and meant a twelve consecutive month period ending on the last day of a Plan Year in which an Employee was credited with at least 1,000 Hours of Service. Notwithstanding the foregoing, if an Employee who was a Participant with an Account Balance on December 31, 2001 was credited with 1,000 Hours of Service during calendar year 2002, such Employee was credited with a Year of Service with respect to such year regardless of whether the person would otherwise have been credited with a Year of Service with respect to such year. For Plan Years commencing on or after January 1, 2002, a one-year Period of Service is each one-year period of employment with the Company or an Affiliated Company beginning on (i) January 1, 2002, or, if later, the date the Employee first completes an Hour of Service and (ii) each anniversary of such date, and ending on the Employee's Termination from Service Date.

"*Period of Termination*" means effective (i) January 1, 2002, the period commencing on an Employee's Termination from Service Date and ending on such individual's Reemployment Date and (ii) prior to January 1, 2002, a Break in Service.

"*Plan*" means (a) prior to January 1, 2007, the MasterCard Shared Profit and Savings Plan (including all appendices thereto) and (b) after December 31, 2007, the MasterCard

Savings Plan (including all appendices thereto), in each case, as herein set forth, and as it may hereafter be amended from time to time.

"*Plan Administrator*" means the Group Head, Global Workforce Programs, or such other individual as may be designated from time to time by the Company as the Plan Administrator.

"*Plan Loan*" means a loan granted in accordance with Section 9.4.

"*Plan Year*" means a calendar year.

"*Pre-Tax Contributions*" means contributions made on behalf of a Participant pursuant to Section 4.1.

"*Prior Plan Terms*" means the terms and provisions of the Plan as in effect immediately prior to the Effective Date.

"*Profit Sharing Contributions*" means contributions made by an Employer pursuant to Section 5.3 of the Plan.

"*Qualified Domestic Relations Order*" or "*QDRO*" means a domestic order issued by a court of competent jurisdiction that the Plan Administrator determines complies with the requirements of Code Section 414(p).

"*QMACs*" or "*Qualified Matching Contributions*" means Match Contributions which are subject to the distribution and nonforfeitability requirements under Code Section 401(k) when made.

"*QNECs*" or "*Qualified Non-Elective Contributions*" means contributions (other than Match Contributions or Qualified Matching Contributions) made by the Employer and allocated to a Participant's Account that (a) the Participant may not elect to receive in cash until distributed from the Plan, (b) are nonforfeitable when made and (c) are distributable only in accordance with the distribution provisions that are applicable to Pre-Tax Contributions.

"*Reemployment Date*" means the date on which an individual who has incurred a Termination from Service Date subsequently performs an Hour of Service.

"*Returning Veteran*" means a Participant or former Participant who is absent due to a Military Leave and thereafter performs an Hour of Service.

"*Rollover Contribution*" means a before-tax or after-tax amount or Roth elective deferral contributed by an Eligible Employee which the Plan Administrator determines qualifies as an Eligible Rollover Distribution. Such before-tax amounts, after-tax amounts and Roth elective deferrals shall each be separately accounted for. Amounts held in an individual retirement account ("*IRA*") that is not a "conduit" IRA shall not be Rollover Contributions. Effective as of January 1, 2015, an Eligible Rollover Distribution from the Pension Plan that a current or former Participant requests to contribute to the Plan shall be a Rollover Contribution.

"*Roth Contributions*" means, effective January 1, 2008, elective contributions made by a Participant that are:

(a) designated irrevocably by the Participant at the time of the deferral election as Roth Contributions that are being made in lieu of all or a portion of the Pre-Tax Contributions the Participant is otherwise eligible to make under the Plan; and

(b) treated by an Employer as includible in the Participant's income at the time the Participant would have received that amount in cash if the Participant had not made an election to contribute such amount to the Plan.

"*Section 402(g) Limit*" means, for each Plan Year, $17,500 (or such greater amount as may be permitted by reason of the application of the applicable dollar amount set forth in Code Section 402(g)(1) (without consideration of Code Section 402(g)(1)(C)), as adjusted in accordance with Code Section 402(g)(4)).

"*Service*" means all of the following:

(a) The period measured in completed years and months beginning on the later of the Employee's Employment Commencement Date or Reemployment Date, whichever is applicable, and continuing until the Employee's next following Termination from Service Date. Service shall not include: any period during which a former Employee is receiving severance or similar-type payments from an Affiliated Company, unless such former Employee incurs a Reemployment and such period of time is required to be taken into account under the Plan in accordance with paragraph (d) of this definition. Notwithstanding the foregoing, the Service of an Employee who incurs a Period of Termination shall include:

(i) the Service credited to the Employee as of the date he or she incurs a Termination from Service Date to the extent not disregarded as Service pursuant to this definition; and

(ii) the Service credited with respect to each month of service completed subsequent to the Employee's Reemployment Date.

(b) Solely for purposes of determining a Participant's Vested Account Balance (but, notwithstanding anything in the Plan to the contrary, not for purposes of determining benefit accruals), Service shall include the period of time during which an Employee worked as a Statutory Leased Employee, without regard to the one-year service requirement set forth in Code Section 414(n)(2)(B) for an Affiliated Company.

(c) Solely to the extent authorized by the Committee, in accordance with Section 12.1, any period of service with any company acquired by an Affiliated Company.

(d) If an Employee incurs a Termination from Service Date by reason of a resignation, discharge or retirement and the Employee is rehired within twelve months of such

Termination from Service Date, the period between his or her Termination from Service Date and the Employee's subsequent Reemployment Date shall be included in his or her Service.

(e) An Employee's service with a predecessor or acquired company shall only be counted in the determination of his or her Service for eligibility and/or vesting purposes if (i) the Company directs that credit for such service be granted, or (ii) a qualified plan of the predecessor or acquired company is subsequently maintained by any Employer or Affiliated Company, as follows:

(i) The Company directed that with regard to a former employee of Credit Systems Incorporated in St. Louis who became an Employee on or before April 1, 1979, his or her service credited under the CSI Pension Plan would be counted in the determination of his or her Hours of Service for eligibility and vesting under the Plan.

(ii) The Company directed that with regard to a former employee of Cirrus System, Inc. who became an Employee on January 8, 1988, his or her service with Cirrus System, Inc. would be counted in the determination of his or her Hours of Service for eligibility and vesting under the Plan.

(iii) The Company directed that with regard to a former employee of Monetary Transfer System who became an Employee on February 1, 1995, his or her service with Monetary Transfer System would be counted in the determination of his or her Hours of Service for eligibility and vesting under the Plan.

(iv) The period measured in completed years and months beginning on the date an employee commences employment with Mondex International Limited and continuing until the earlier of the date the employee's service with Mondex International Limited is terminated or June 29, 2001 for purposes of determining a participant's vested interest with respect to an employee of Mondex International Limited on June 29, 2001 who was offered and who accepted an offer of employment with the Company and became an Employee of the Company on July 2, 2001.

(v) Years of service credited prior to the closing of the acquisition of Europay International by the Company (the "*Closing*") under the Assurance- Group plan for purposes of determining a participant's vested interest with respect to an individual who is an employee of Europay International immediately prior to the Closing and who continues as an Employee immediately after such Closing or who became an Employee prior thereto in connection with the acquisition.

(vi) Effective as of April 15, 2005, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Participant who was an employee of Watch Hill Partners Group immediately prior to the closing of the acquisition of Watch Hill Partners Group by the Company (the "*Watch Hill Closing*") and who continues as an Employee immediately after such Watch Hill Closing, years of service credited to such Participant by the Watch Hill Partners Group prior to the Watch Hill Closing; *provided*, *however*, that, effective as of the date on which the assets and liabilities of the Watch Hill 401(k) Plan and trust thereunder are merged into the Plan and Trust Fund, Years of Service shall include, solely for purposes of determining the vested portion of the Account (but

not for purposes of determining benefit accruals), years of service credited to such Participant by Watch Hill Partners Group prior to the Watch Hill Closing.

(vii) Effective January 15, 2011, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Participant who was an employee of Card Services USA, Inc. immediately prior to the closing of the acquisition of Card Services USA, Inc. by the Company or an Affiliated Company and who continues as an Employee immediately after such closing, years of service credited to such Participant by Card Services USA, Inc. prior to such closing.

(viii) Effective January 1, 2013, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) service with DataCash Group plc.

(a) Notwithstanding anything in Section (e) of this definition of Service to the contrary, effective January 1, 2013, Service shall include, solely for purposes of determining the vested portion of an Account (but not for purposes of determining benefit accruals), an Employee's service with a predecessor or acquired company; *provided, however*, that if the predecessor or acquired company maintained an employee benefit plan subject to Section 401(a) of the Code that is not subsequently maintained by the Employer or an Affiliated Company, the individual must be an employee of the predecessor or acquired company immediately preceding the closing of the corporate transaction and an Employee of the Employer or an Affiliated Company immediately following the closing of the corporate transaction.

(b) Nothing in the Plan shall be construed as requiring the double counting of any period of time as Service under the Plan.

"*Spousal Consent*" means a Spouse's consent to the Participant's election to designate someone other than his or her Spouse as his or her Beneficiary; provided, however, that (a) the Spouse's consent to such election is in writing, knowing, and voluntary, (b) the Participant's election designates a specific Beneficiary (including any class of Beneficiaries) or any contingent Beneficiaries, which may not be changed without the Spouse's consent (or the Spouse expressly permits a change in designation by the Participant without any further consent by the Spouse), (c) the Spouse's consent acknowledges the effect of the Participant's election and (d) the Spouse's consent is witnessed by the Plan Administrator, another authorized Plan representative or a notary public. Any consent by a Spouse will be effective only with respect to such Spouse. Similarly, any establishment that the consent of a Spouse cannot be obtained will be effective only with respect to the designated Spouse.

"*Spouse*" means, effective June 26, 2013, a person legally married to a Participant under applicable state law at the earlier of the date of the Participant's death or the commencement of benefit payments; *provided* that between June 26, 2013 and September 15, 2013 (inclusive), Spouse shall mean a same-sex spouse of a Participant only if the Participant was domiciled in a state that recognized same-sex marriage. For purposes of the Plan, a Participant will not be deemed to have a Spouse if it is established to the reasonable satisfaction of the Plan Administrator that there is no Spouse or that there is a Spouse but the Spouse cannot be located. If a Spouse is legally

incompetent to file any consent or take any other action required of a Spouse under the Plan, the Spouse's guardian (including, without limitation, a guardian who is a Participant) may give any required consent or take any such other action under the Plan required of a Spouse. If a Participant and a Spouse are legally separated or the Spouse has abandoned the Participant and the Participant has a court order to that effect, the Participant shall be treated as not having a Spouse for purposes of the Plan, unless a QDRO provides otherwise.

"*Statutory Leased Employee*" means any person (other than an employee on the payroll of the Company) who, pursuant to an agreement between the Company and any other person, has performed services for the Company (or for the Company and related persons, determined in accordance with Code Section 414(n)(6)) on a substantially full-time basis for a period of at least one year, and such services are performed under the primary direction or control by the Company.

"*Superior Performance and Outstanding Teamwork Plan*" means Recognizing You.

"*Termination from Service Date*" means the earlier of the following dates:

(a) the date on which an Employee quits, retires, is discharged or dies (including the date on which he or she incurs a severance from employment within the meaning of Code Section 401(k)(2)(B)(i)(I)); or

(b) the first anniversary of the first date of a period in which the Employee remains absent from the service of an Affiliated Company for any reason other than quit, retirement, discharge or death, such as vacation, holiday, sickness, disability, leave of absence (other than a leave granted for military service) or lay-off; *provided*, *however*, that in the event an Employee shall quit, retire, die or be discharged prior to said first anniversary, the Employee's Termination from Service Date shall be the first day of such period of absence unless the Employee shall return to employment prior to such anniversary date.

"*Trust Agreement*" means the trust agreement between the Company and the Trustee, established for the purpose of funding benefits under the Plan, or any successor trust agreement or agreements.

"*Trustee*" means the trustee or trustees appointed by the Committee to hold and manage the assets of the Plan in accordance with the provisions of the Plan and the Trust Agreement.

"*Trust Fund*" means all assets of the Plan which are held by the Trustee pursuant to the terms of the Trust Agreement.

"*U.S.*" means United States.

"*USERRA*" means the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended from time to time, and any regulations thereunder.

"*Valuation Date*" means each business day on which the New York Stock Exchange is open for business.

"*Vested Account Balance*" means, as of each Valuation Date, the sum of the value of a Participant's Employee Account and the portion of the Employer Account that has vested in accordance with Article VII.

2.2 Rules of Construction. The use of the masculine gender herein shall be deemed to encompass the feminine gender and the singular form of a word shall be deemed to encompass the plural form, unless the context requires otherwise. Unless otherwise noted, references to sections and articles refer to sections and articles of the Plan.

## ARTICLE III

## ELIGIBILITY AND PARTICIPATION

3.1 Eligibility for Participation.

(a) Participant on Effective Date. Each Eligible Employee on the Effective Date who was participating under the Prior Plan Terms immediately prior to the Effective Date shall be a Participant in the Plan on the Effective Date.

(a) Former Participants. An Eligible Employee who was a Participant on his or her Termination from Service Date shall be eligible to commence participation in the Plan on his or her Reemployment Date.

(b) Other Eligible Employees. Each other Eligible Employee who incurs an Employment Commencement Date or Reemployment Date after the Effective Date shall be eligible to become a Participant in the Plan on his or her Employment Commencement Date or Reemployment Date, as applicable.

3.2 Participation Limited to Eligible Employees. Only Eligible Employees shall be eligible to participate in and to earn benefits under the Plan. An individual who is an Employee but who does not qualify as an Eligible Employee shall not participate in or earn benefits under the Plan.

3.3 Eligibility for Match Contributions. Participants shall be eligible to receive Match Contributions in accordance with the provisions of Sections 3.1 and 5.1.

3.4 Commencement of Participation. Except as otherwise provided in Section 4.1(b), an Eligible Employee described in Section 3.1 may begin participating in the Plan effective as of the first day of the first payroll period coinciding with or immediately following the date on which he or she is both eligible to participate and has elected, in accordance with Section 4.5, to make Pre-Tax Contributions, catch-up contributions, After-Tax Contributions or, effective January 1, 2008, Roth Contributions.

3.5 Cessation of Participation. An individual shall cease being a Participant as of the date on which an Account is no longer maintained for such individual.

## ARTICLE IV

## PARTICIPANT CONTRIBUTIONS

4.1 Elective Deferrals.

(a) Election.

(i) Each Eligible Employee may elect to have the Employer contribute to the Trust Fund as Pre-Tax Contributions (subject to the provisions of Article VI) such amounts as the Eligible Employee has designated in a salary reduction agreement in accordance with Section 4.5 which amounts, when expressed as a percentage of Compensation (determined pursuant to Section 4.1(c)) payable each payroll period, combined with the whole percentage by which the Participant's Compensation payable during such payroll period is reduced pursuant to Sections 4.1(a)(ii), 4.1(b) and 4.2, is not in excess of the Contribution Percentage Limits set forth in Section 4.3.

(ii) Effective January 1, 2008, each Eligible Employee may elect to contribute to the Trust Fund as Roth Contributions (on an after-tax basis) (subject to the provisions of Article VI) such amounts as the Eligible Employee has designated in a salary reduction agreement in accordance with Section 4.5, which amounts, when expressed as a percentage of Compensation (determined pursuant to Section 4.1(c)) payable each payroll period combined with the whole percentage by which the Participant's Compensation payable each payroll period is reduced pursuant to Sections 4.1(a)(i), 4.1(b) and 4.2, is not in excess of the Contribution Percentage Limits set forth in Section 4.3.

(b) Automatic Enrollment.

(i) Notwithstanding anything in Section 4.1 or 4.5 to the contrary, each Eligible Employee who (A) is eligible to participate in the Plan pursuant to Article III, (B) incurs an Employment Commencement Date or Reemployment Date on or after July 5, 2005 and (C) does not make an election pursuant to Section 4.1(a) or 4.2 shall be deemed to have elected to make Pre-Tax Contributions in the amount of (A) three percent of his or her Compensation payable each payroll period, if his or her Employment Commencement Date or Reemployment Date is prior to January 1, 2008 and (B) six percent of his or her Compensation payable each payroll period if his or her Employment Commencement Date or Reemployment Date is after December 31, 2007 in each case, unless such Eligible Employee has affirmatively elected within 30 days after his or her Employment Commencement Date or Reemployment Date, as the case may be, not to have the operation of this Section 4.1(b)(i) apply to him or her. Such affirmative election must be made by completion of the Appropriate Procedure. Effective January 1, 2008, the default elective deferrals described in clauses (A) and (B) of the first sentence of this Section 4.1(b)(i) shall cease as soon as administratively feasible after the Eligible Employee makes an affirmative election.

(ii) Each Eligible Employee who becomes a Participant pursuant to this Section 4.1(b) may elect to increase or decrease his or her Pre-Tax Contributions, to make Roth Contributions (effective January 1, 2008) or After-Tax Contributions or to discontinue such

Pre-Tax Contributions. Any election pursuant to this Section 4.1(b) shall be in accordance with Sections 4.3 and 4.5.

(c) Special Automatic Enrollment and Escalation.

(i) Notwithstanding anything in Section 4.1 or 4.5 to the contrary, each Eligible Employee who (A) is eligible to participate in the Plan pursuant to Article III and (B) as of July 1, 2018, does not have an election in place pursuant to Section 4.1(a), 4.1(b) or 4.2 to make Contributions in the amount of at least six percent of his or her Compensation each payroll period shall be deemed to have elected to make Pre-Tax Contributions or additional Pre-Tax Contributions, as the case may be, such that the Eligible Employee shall contribute six percent of his or her Compensation each payroll period, unless such Eligible Employee has affirmatively elected within 30 days after July 1, 2018, not to have the operation of this Section 4.1(c)(i) apply to him or her. Such affirmative election must be made by completion of the Appropriate Procedure. The default elective deferral described in this Section 4.1(c)(i) shall cease as soon as administratively feasible after the Eligible Employee makes an affirmative election.

(ii) Any Eligible Employee who becomes automatically enrolled and/or has his or her Pre-Tax Contributions escalated to six percent pursuant to this Section 4.1(c) may elect to increase or decrease his or her Pre-Tax Contributions, to make Roth Contributions or After-Tax Contributions or to discontinue such Pre-Tax Contributions. Any election pursuant to this Section 4.1(c)(ii) shall be in accordance with Sections 4.3 and 4.5.

(d) Annual Automatic Enrollment and Escalation.

(i) Notwithstanding anything in Section 4.1 or 4.5 to the contrary, each Eligible Employee who (A) is eligible to participate in the Plan and (B) as of the first payroll period occurring in March 2019 and, thereafter, as of the first payroll period occurring each March, does not have an election in place pursuant to Section 4.1(a), 4.1.(b), 4.1(c) or 4.2 to make Contributions in the amount of at least six percent of his or her Compensation each payroll period shall be deemed to have elected to make Pre-Tax Contributions or additional Pre-Tax Contributions, Roth Contribution or After-Tax Contributions as the case may be, such that the Eligible Employee is contributing six percent of his or her Compensation to the Plan each payroll period, unless such Eligible Employee has affirmatively elected within 30 days of the end of the applicable payroll period each March not to have the operation of this Section 4.1(d)(i) apply to him or her. Such affirmative election must be made by completing of the Appropriate Procedure. The default elective deferral described in this Section 4.1(d)(i) shall cease as soon as administratively feasible after the Eligible Employee makes an affirmative election.

(ii) Notwithstanding anything in Section 4.1 or 4.5 to the contrary, each Eligible Employee who (A) is eligible to participate in the Plan and (B) as of the first payroll period occurring in March 2019 and, thereafter, as of the first payroll period occurring each March, has an election in place pursuant to Section 4.1(a), 4.1(b), 4.1(c), 4.1(d)(i) or 4.2 to make Contributions of at least six percent but no more than nine percent of his or her Compensation each payroll period shall be deemed to have elected to contribute an additional one percent of Compensation as Pre-Tax Contributions, Roth Contributions or After-Tax Contributions, as the

case may be, to the Plan each payroll period, up to a maximum of ten percent of Compensation, unless such Eligible Employee has affirmatively elected within 30 days of the end of the applicable payroll period each March not to have the operation of this Section 4.1(d)(ii) apply to him or her. Such as affirmative election must be made by completing the Appropriate Procedure. The default elective deferral described in this Section 4.1(d)(ii) shall cease as soon as administratively feasible after the Eligible Employee makes an affirmative election.

(iii) Any Eligible Employee who becomes automatically enrolled and/or has his or her Pre-Tax Contributions escalated pursuant to this Section 4.1(d) may elect to increase, decrease or discontinue his or her Pre-Tax Contributions and/or to make, increase, decrease or discontinue his or her Roth Contributions and/or After-Tax Contributions. Any election pursuant to this Section 4.1(d) shall be in accordance with Sections 4.3 and 4.5.

(e) Compensation. A Participant shall be permitted to make Elective Deferrals from Compensation and, in no event shall a Participant's Elective Deferrals and After-Tax Contributions for any Plan Year exceed the percentage of such Participant's Compensation permitted by the Contribution Percentage Limits. Notwithstanding the foregoing, for purposes of Sections 4.1 and 4.2, the amount available to, or on behalf of, a Participant during any payroll period for purposes of Elective Deferrals and After-Tax Contributions shall be the amount that would be Compensation for the Plan Year in the absence of Code Section 401(a)(17) divided by the number of payroll periods during which Base Pay shall be paid during a Plan Year.

4.2 After-Tax Contributions.

(a) Election. Each Eligible Employee may elect to contribute to the Plan for each Plan Year as After-Tax Contributions (subject to Article VI) a whole percentage of his or her Compensation (determined pursuant to Section 4.2(c)) payable each payroll period which percentage, combined with the whole percentage by which his or her Compensation payable during such payroll period is reduced pursuant to Section 4.1, is not in excess of the applicable limits described in the Contribution Percentage Limits set forth in Section 4.3.

(b) Changes in Election. The effective date of an election and the ability of a Participant to increase or decrease his or her rate of After-Tax Contributions or to elect to discontinue his or her After-Tax Contributions shall be governed by the rules set forth in Sections 4.5(b) and 4.5(c).

(c) Compensation. A Participant shall be permitted to make After-Tax Contributions from amounts available to such Participant determined in accordance with Section 4.1(c).

4.3 Contribution Percentage Limits.

(a) General Rule. The Committee may establish and change from time to time, in writing, without the necessity of amending this Plan, the separate minimum, if applicable, and maximum Contribution Percentage for Elective Deferrals and After-Tax Contributions, and/or a maximum combined Contribution Percentage for Elective Deferrals and After-Tax Contributions, prospectively or retrospectively (for the current Plan Year). In addition,

the Committee may establish any lower Contribution Percentage limits for Highly Compensated Employees as it deems necessary to satisfy the tests described in Sections 6.2 and 6.3.

(b) Limits Effective January 1, 2018.

(i) Subject to Section 6.4, effective January 1, 2018, the maximum Contribution Percentages are:

| Contribution Type | Highly Compensated Employees | Non-Highly Compensated Employees |
|---|---|---|
| Elective Deferrals | 40% | 40% |
| After-Tax Contributions | 40% | 40% |
| Sum of Both | 40% | 40% |

(ii) The Plan Administrator shall determine a Participant's status for a Plan Year as a Highly Compensated Employee or Non-Highly Compensated Employee as of the December 31 immediately preceding such Plan Year. Such determination by the Plan Administrator shall remain in effect for the entire Plan Year.

(b) Compensation. For purposes of this Section 4.3, "Compensation" shall mean Compensation as defined in Article II, but only to the extent earned during each separate payroll period.

4.4 Catch-Up Contributions.

(a) Election. Effective with respect to Plan Years beginning on and after January 1, 2002, a Participant who (i) is eligible to make Elective Deferrals, (ii) will attain age 50 before the close of a Plan Year and (iii) may not make any additional Elective Deferrals to the Plan for such Plan Year due to the application of any limitation imposed by the Code or the Plan shall be eligible to elect make catch-up contributions in accordance with, and subject to the limitations of, Code Section 414(v) with respect to such Plan Year. For any Plan Year, such Participant may elect to make catch-up contributions in a specified amount each payroll period from amounts that would be Compensation in the absence of the limitation under Code Section 401(a)(17) in any whole dollar combination of Pre-Tax Contributions and, effective January 1, 2008, Roth Contributions. All elections pursuant to this Section 4.4 shall be in accordance with the Appropriate Procedure.

(b) Application of Code Limits. Such catch-up contributions shall not be taken into account for purposes of the required limitations of Code Sections 402(g) and 415. The Plan shall not be treated as failing to satisfy the provisions of the Plan implementing the requirements of Code Sections 401(k)(3), 401(k)(11), 401(k)(12), 410(b) and 416, as applicable, by reason of the making of such catch-up contributions.

(c) No Match. An Employee shall not be eligible to receive Match Contributions on catch-up contributions made to the Plan.

4.5 Salary Reduction Agreement.

(a) General Rule. Each Eligible Employee who desires to have Pre-Tax Contributions made on his or her behalf or who wishes to make After-Tax Contributions or Roth Contributions shall enter into a salary reduction agreement by following the Appropriate Procedure, whereby such Eligible Employee elects to reduce his or her future Compensation by a whole percentage of such Compensation, which percentage, after consideration of the contributions made by such Eligible Employee pursuant to Sections 4.1 and 4.2 does not exceed the limitation in Section 4.3. An election pursuant to this Section 4.5(a) shall cease to be in effect when the Participant incurs a Termination from Service Date for any reason.

(b) Revisions to Salary Reduction Agreement. A Participant may revise his or her salary reduction agreement to increase or decrease reductions in his or her Compensation at any time by entering into a revised salary reduction agreement by following the Appropriate Procedure. Any such revised salary reduction agreement shall be effective on a prospective basis as soon as is administratively practicable thereafter.

(c) Election to Discontinue Contributions. A Participant may elect to discontinue Pre-Tax Contributions, Roth Contributions and After-Tax Contributions at any time by following the Appropriate Procedure. Such discontinuance shall be effective on a prospective basis as soon as administratively practicable thereafter.

4.6 Timing, Posting and Tax Considerations.

(a) General Rule. Participants' contributions pursuant to this Article IV, other than Rollover Contributions, may only be made through payroll deduction. Such amounts shall be paid to the Trustee in cash and posted to each Participant's Account(s) as soon as such amounts can reasonably be separated from the Employer's general assets and balanced against the specific amount made on behalf of each Participant, but in no event later than fifteen business days following the end of the month in which such amounts would otherwise have been payable to the Participant as Compensation.

(b) Rules Applicable to Roth Contributions. A Participant's Roth Contributions will be allocated to a separate Roth Contribution Account. Contributions and withdrawals of Roth Contributions shall be credited and debited to the Participant's Roth Contribution Account. The Plan Administrator shall maintain a record of the amount of Roth Contributions in each Participant's Roth Contribution Account. Gains, losses, and other credits or charges shall be separately allocated on a reasonable and consistent basis to each Participant's Roth Contribution Account. No contributions other than Roth Contributions and properly attributable earnings thereon will be credited to a Participant's Roth Contribution Account.

4.7 Rollover Contributions.

(a) General Rule. The Committee in its sole discretion may permit any Participant to transfer (or have transferred as a Direct Rollover from another retirement plan) to the Trustee, a Rollover Contribution from an Eligible Retirement Plan, subject to Sections 4.7(b) and 4.7(c). A Rollover Contribution described in this Section 4.7 shall be posted to the applicable

Employee's Rollover Account as of the date received by the Trustee. The Committee may require such evidence as it deems appropriate to ensure that any amounts transferred to the Plan shall not adversely affect its tax-qualified status.

(b) Source. A Rollover Contribution shall include amounts distributed from an Eligible Retirement Plan, excluding a plan described in Code Section 403(a) and a Roth IRA described in Code Section 408A.

(c) Roth Contributions. Notwithstanding anything contained herein to the contrary, effective January 1, 2008, the Plan will accept a Rollover Contribution of Roth elective deferrals only if it is a Direct Rollover from another Roth elective deferral account under a qualified plan described in Code Section 401(a) or an annuity contract or custodial account described in Code Section 403(b) and only to the extent the rollover is permitted under the rules contained in Code Section 402(c). Such rollover shall be credited to the Participant's Roth Contribution Account.

4.8 In-Plan Roth Conversion Contributions. Effective January 24, 2020, the Plan will provide for In-Plan Roth Conversion Contributions subject to the following rules:

(a) Such contributions may consist of otherwise distributable amounts or otherwise nondistributable amounts that are vested. To the extent such a contribution consists of an otherwise distributable amount, such contribution must be an Eligible Rollover Distribution.

(b) Such contributions may only be made by Direct Rollover.

(c) Notwithstanding anything herein to the contrary, such a contribution is not a Rollover Contribution for purposes of the Plan.

## ARTICLE V

## EMPLOYER CONTRIBUTIONS

5.1 Employer Match Contributions.

Effective July 1, 2018, each Participant who elects to make Pre-Tax Contributions, After-Tax Contributions or Roth Contributions shall have Match Contributions contributed to the Trust Fund on behalf of such Participant in an amount equal to 167 percent of the sum of such Participant's Pre-Tax Contributions, Roth Contributions and After-Tax Contributions to the Plan for a Plan Year; provided that in no event shall such Match Contributions for the Plan Year exceed six percent of such Participant's Compensation for such Plan Year.

5.2 Allocation and Deposit of Match Contributions.

(a) If a Participant makes Pre-Tax Contributions and After-Tax Contributions or Roth Contributions during any payroll period, the Match Contributions for such payroll period shall first be deemed made on the Participant's Pre-Tax Contributions, then, effective January 1, 2008, on Roth Contributions and then on After-Tax Contributions, in accordance with the amounts set forth in Section 5.1.

(b) The Employer shall deposit Match Contributions in the Trust Fund as soon as practicable following the month to which such contributions relate, but in no event later than March 31 of the Plan Year following the Plan Year to which such Match Contributions relate.

5.3 Company Contributions.

(a) General. Effective for Plan Years beginning on and after January 1, 2012, the Company may, in its sole discretion, make a Company Contribution to the Company Contribution Account of each Eligible Employee in an amount that shall not exceed 1.25 percent of such Eligible Employee's Base Pay for the Plan Year (or such other percentage as the Board of Directors or its delegee shall determine). Company Contributions, if any, made in respect of a Plan Year, shall be allocated to the Company Contribution Account of an Eligible Employee by no later than March 31 of the subsequent Plan Year.

(b) Notwithstanding anything in this Section 5.3 to the contrary:

(i) If, after commencement of a Plan Year, an Eligible Employee becomes eligible, or ceases to be eligible, to have a Company Contribution allocated to his or her Account, the amount of such Eligible Employee's Company Contribution for such Plan Year shall be determined using the Base Pay earned for the portion of the Plan Year during which the Eligible Employee is eligible for a Company Contribution.

(ii) An Eligible Employee shall not be eligible for a Company Contribution for a Plan Year if such Eligible Employee ceases to be an Employee prior to the last day of the applicable Plan Year for any reason, except the death such Eligible Employee. For this purpose, an Eligible Employee on a Leave of Absence on the last day of a Plan Year shall be deemed to be an Employee as of such date.

(c) Effective July 1, 2018, all Eligible Employees shall cease to be eligible for a Company Contribution. For the 2018 Plan Year, an Eligible Employee who otherwise satisfies the provisions of this Section 5.3 shall receive a Company Contribution on Base Pay earned from January 1, 2018 through June 30, 2018.

5.4 QNECs and QMACs. The Employer may contribute for a Plan Year QNECs and QMACs in order to permit the Plan to comply with the applicable provisions of Article VI.

5.5 Contributions for Participants Returning from Military Leave.

(a) General Rule. Notwithstanding any other provisions of the Plan, a Returning Veteran shall be entitled to make Pre-Tax Contributions, catch-up contributions, After-Tax Contributions and effective January 1, 2008, Roth Contributions and to receive Matching Contributions in accordance with Code Section 414(u). The provisions of this Section 5.5 shall apply only to the extent required by USERRA and Code Section 414(u).

(b) Compensation of a Returning Veteran. A Returning Veteran shall be treated as having received Compensation during such Military Leave in an amount equal to the Compensation such Returning Veteran would have received from an Employer, but for the Military Leave, less any differential wage payments within the meaning of Code Section 3401(h) actually paid to such Participant by an Employer after December 31, 2008 and during the Military Leave. If a Returning Veteran's Compensation during the Military Leave would not have been reasonably certain, such Returning Veteran shall be treated as having received Compensation during such Military Leave based upon the Returning Veteran's average Compensation from the Employer either (i) during the twelve-month period preceding the Military Leave or if shorter, (ii) the Returning Veteran's Service preceding the Military Leave, less any such differential wage payments.

(c) Amount of Pre-Tax Contributions, Catch-Up Contributions, After-Tax Contributions and Roth Contributions. A Returning Veteran may make Pre-Tax Contributions, catch-up contributions, After-Tax Contributions and Roth contributions without regard to any limitations that would otherwise apply in the year such contributions are actually made. The Pre-Tax Contributions, catch-up contributions, After-Tax Contributions and Roth Contributions must meet the applicable limitations for the year with respect to which such contributions relate. Subject to such applicable limitations, the Company shall permit the Returning Veteran to make additional Pre-Tax Contributions, catch-up contributions, After-Tax Contributions and Roth Contributions to the Plan during the period which begins on the date of reemployment and ends on the earlier of (i) three times the period of qualified military service and (ii) five years.

(d) Amount of Matching Contributions and Earnings. The Company shall make contributions which satisfy any obligation of the Plan to provide an accrued benefit within the meaning of Code Section 411(a)(7) to a Returning Veteran. For this purpose, make-up Match Contributions shall be allocated on behalf of the Returning Veteran with respect to each Plan Year or portion thereof in which the Returning Veteran was absent on Military Leave and would have complied with Article III but for the Military Leave. Except as otherwise provided in Section 5.1, such make-up Match Contributions shall not be subject to any limitations that would otherwise apply in the years that such Matching Contributions are made. The Company shall neither be required to credit earnings to the Returning Veteran with respect to Before-Tax Contributions, catch-up contributions, After-Tax Contributions, Roth Contributions or Match Contributions before such contributions are made, nor to allocate forfeitures which occurred during the period of qualified military service to a Returning Veteran.

(e) Annual Additions. Make-up contributions in accordance with Sections 5.5(c) and 5.5(d) on behalf of a Returning Veteran shall not be considered Annual Additions for the Plan Year in which such make-up contributions are made but shall be considered Annual Additions for the Plan Year to which the contributions relate. Catch-up contributions shall not be subject to this Section 5.5(e).

(f) No Duplicating Payments. Nothing in this Section 5.5 shall in any way be construed as obligating the Company to make any duplicate contributions in respect of any Returning Veteran or any other person.

## ARTICLE VI

## LIMITATIONS ON ALLOCATIONS AND CONTRIBUTIONS

6.1 Compliance with Section 402(g) of the Code.

(a) Limitation. Except to the extent permitted by Section 4.4 and Section 414(v) of the Code, no Eligible Employee shall be permitted to have Elective Deferrals made on his or her behalf under the Plan if those Elective Deferrals, when added to elective deferrals (as defined in Code Section 402(g)(3)) under any other plans for such calendar year, would cause the Eligible Employee to exceed the Section 402(g) Limit.

(b) Correction.

(i) Subject to Section 4.4 and Code Section 414(v), if any amount of Elective Deferrals in excess of the Section 402(g) Limit is made for any Eligible Employee in any calendar year, notwithstanding any provisions of the Plan to the contrary:

(A) not later than the March 1st following the close of the calendar year, the Eligible Employee may allocate the amount of such excess elective deferrals among the Plan and, as applicable, any other plans under which the elective deferrals were made, and shall notify the Plan Administrator, and, as applicable, the plan administrator of each other plan, of the portion allocated to it; and

(B) not later than the April 15th following the close of the calendar year, the Plan and, as applicable, each such other plan shall distribute to the Participant any amount allocated to it under Section 6.1(b)(i)(A), together with the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable thereto on such amount through the close of the calendar year in respect of which the deferrals were made and, solely with respect to the 2007 Plan Year, to the extent that such Elective Deferrals are or would be credited with income and expenses and realized and unrealized gains and losses for the Gap Period if the total Account were to be distributed, such allocable income and expenses and realized and unrealized gains and losses for the Gap Period.

(ii) The notice required pursuant to Section 6.1(b)(i)(A) shall be made in writing to the Plan Administrator in such form as the Plan Administrator shall require; *provided*, *however*, that if the elective deferrals in excess of the Section 402(g) Limit arise solely under plans maintained by the Company, the Participant shall be deemed to have notified the Plan Administrator of any such excess Elective Deferrals.

(iii) Excess amounts shall be distributed from a Participant's Account in the following order: (A) first, from unmatched Pre-Tax Contributions (B) second, from unmatched Roth Contributions, (C) third, from matched Pre-Tax Contributions and (D) fourth, from matched Roth Contributions. Any Match Contributions attributable to refunded excess Elective Deferrals as described in this Section shall be forfeited.

6.2 Compliance with Section 401(k)(3) of the Code.

(a) Requirements of the Average Actual Deferral Percentage Tests. For each Plan Year, the Plan shall comply with, in a manner consistent with the applicable provisions of the Code, one of the following ADP Tests with respect to Elective Deferrals made to the Plan:

(i) the Average Actual Deferral Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year shall not exceed the Average Actual Deferral Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees for the Plan Year multiplied by 1.25; or

(ii) the Average Actual Deferral Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year shall not exceed the Average Actual Deferral Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees for the Plan Year multiplied by two; provided, however, that the Average Actual Deferral Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year does not exceed the Average Actual Deferral Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees by more than two percentage points; *provided*, *however*, the Company shall, pursuant to Code Section 401(k)(3)(F), separately test Participants who have not completed the minimum age and service requirements of Code Section 410(b)(4)(B). The ADP Test shall be conducted in accordance with Treasury Regulation Section 1.401(k)-2(a)(1)(iii).

(b) Method of Complying with the ADP Test. In a manner that is in accordance with Section 4.4 and Code Section 414(v), the Plan Administrator shall cause the Plan to comply with the ADP Test for a Plan Year by undertaking, as necessary, any one or more of the following measures:

(i) The Plan Administrator may recharacterize Excess Elective Deferrals, pursuant to Section 6.2(c).

(ii) The Plan Administrator may reduce Elective Deferrals of Highly Compensated Employees and then distribute any Excess Elective Deferrals and earnings thereon, pursuant to Section 6.2(d).

(iii) The Company may make QNECs or QMACs that are treated as Pre-Tax Contributions for purposes of the ADP Test and that, when combined with other Pre-Tax Contributions, cause the ADP Test to be satisfied, pursuant to Section 6.2(e).

(c) Recharacterization. To the extent that the Plan Administrator chooses to recharacterize Excess Elective Deferrals as After-Tax Contributions, pursuant to the requirements of Treasury Regulations Section 1.401(k)-2(b)(3), such Excess Elective Deferrals shall remain nonforfeitable, in accordance with the following provisions:

(i) Excess Elective Deferrals shall not be recharacterized to the extent that such amount, in combination with the Highly Compensated Employee's Elective Deferrals and After-Tax Contributions, exceeds the maximum amount of contributions permitted under the Plan.

(ii) Excess Elective Deferrals that are recharacterized shall be treated as After- Tax Contributions in connection with the ACP Test for the relevant Plan Year.

(iii) Recharacterization of Elective Deferrals shall occur not later than two and one-half months after the last day of the Plan Year in which such Excess Elective Deferrals arose and shall be deemed to occur no earlier than the date on which the last Highly Compensated Employee is informed in writing of the amount recharacterized and the consequences thereof.

(iv) Recharacterized amounts are taxable to the Highly Compensated Employee for the taxable year in which the Highly Compensated Employee would have received such amounts in cash.

(d) <u>Distribution of Excess Elective Deferrals</u>.

(i) To the extent that the Plan Administrator chooses to distribute Excess Elective Deferrals to comply with the ADP Test for a Plan Year, then the Plan Administrator shall reduce Excess Elective Deferrals and the earnings thereon through the end of the Plan Year (*provided*, *however*, that for distributions relating to Plan Years beginning after December 31, 2005 and before January 1, 2008, earnings also shall be calculated for the Gap Period, pursuant to Section 6.2(d)(iii)) for which such Excess Elective Deferrals were made, as may be necessary to reduce the Deferral Percentages of the Highly Compensated Employees with the largest amounts of Elective Deferrals. Effective January 1, 1997, such Excess Elective Deferrals shall be distributed to the Highly Compensated Employees with the largest amounts of Elective Deferrals taken into account in calculating the ADP Test for the year in which the excess arose, beginning with the Highly Compensated Employee with the largest dollar amount of such Elective Deferrals and continuing in descending order until all of the Excess Elective Deferrals have been distributed. For purposes of the preceding sentence, the largest dollar amount is determined after distribution of any Excess Elective Deferral.

(ii) To the extent practicable, any distribution shall be made from a Participant's Account (including earnings) in the following order: (A) first, from amounts attributable to unmatched Pre-Tax Contributions; (B) second, from amounts attributable to unmatched Roth Contributions, (C) third, from amounts attributable to matched Pre-Tax Contributions and (D) fourth, from matched Roth Contributions. Any distributions, together with the earnings thereon, shall be distributed, to the extent feasible, within two and one-half months after the end of the Plan Year to which such Excess Pre-Tax Contributions relate, but no later than twelve months thereafter.

(iii) The earnings on Excess Elective Deferrals are the amount of the income and expenses and realized and unrealized gains and losses of the Trust Fund allocable

thereto for the Plan Year. The method used to determine earnings on Excess Elective Deferrals shall be consistently used for all Participants and for all corrective distributions and shall not violate Code Section 401(a)(4). For Plan Years beginning after December 31, 2005 and before January 1, 2008, earnings also shall include the amount of income and expenses and realized and unrealized gains and losses of the Trust Fund allocable for the Gap Period. The Plan Administrator may use any reasonable method to compute earnings allocable to Excess Elective Deferrals permitted pursuant to Treasury Regulations Section 1.401(k)-2(b)(2)(iv).

(e) QNECs and QMACs.

(i) If the Company chooses to make QNECs and QMACs, the Company shall do so before the end of the twelve-month period immediately following the Plan Year to which the contributions relate.

(ii) Effective for Plan Years commencing after December 31, 2005, except as otherwise permitted under the Treasury Regulations, for purposes of the ADP Test:

(A) QNECs shall not be taken into account for a Plan Year for a Non- Highly Compensated Employee to the extent such contributions exceed the product of the Non-Highly Compensated Employee's Compensation and the greater of 5% and two times the Plan's Representative Contribution Rate, and

(B) QMACs shall not be taken into account for a Plan Year for a Non-Highly Compensated Employee to the extent such contributions exceed the greatest of (x) 5% of the Non-Highly Compensated Employee's Compensation, (y) the sum of the Non-Highly Compensated Employee's Pre-Tax Contributions and After-Tax Contributions for such Plan Year and (z) the product of two times the Plan's Representative Matching Rate for such Plan Year and the sum of the Non-Highly Compensated Employee's Pre-Tax Contributions and After-Tax Contributions for such Plan Year.

(iii) Any such QNECs or QMACs, that are treated as Elective Deferrals pursuant to this Section 4.1, shall not be withdrawable unless a Participant has attained age 59-1/2.

6.3 Compliance with Section 401(m)(2) of the Code.

(a) Requirements of the Average Actual Contribution Percentage Tests.

(i) For each Plan Year, the Plan shall comply with, in a manner consistent with the applicable provisions of the Code, one of the following ACP Tests with respect to any Matching Contributions and any After-Tax Contributions made to the Plan:

(A) the Average Actual Contribution Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year shall not exceed the Average Actual Contribution Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees for the Plan Year multiplied by 1.25; or

(B) the Average Actual Contribution Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year shall not exceed the Actual Contribution Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees for the Plan Year multiplied by two; *provided*, *however*, that the Average Actual Contribution Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year does not exceed the Average Actual Contribution Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees by more than two percentage points.

*provided*, *however*, that the Company shall, pursuant to Code Section 401(m)(5)(C), separately test Participants who have not completed the minimum age and service requirements of Code Section 410(b)(4)(B). The ACP Test shall be conducted in accordance with Treasury Regulation Section 1.401(m)-2(a)(1)(iii).

(ii) Effective for Plan Years beginning after December 31, 2005, a Matching Contribution with respect to a Pre-Tax Contribution for a Participant who is a Non-Highly Compensated Employee shall not be taken into account under the ACP Test to the extent it exceeds the greatest of (A) five percent of such Participant's Compensation, (B) the sum of such Participant's Pre-Tax Contributions and After-Tax Contributions for the Plan Year, and (C) the product of two times the Plan's Representative Matching Rate and the sum of such Participant's Pre-Tax Contributions and After-Tax Contributions for the Plan Year.

(b) Compliance with the ACP Test. In a manner that is consistent with Section 4.4 and Code Section 414(v), the Plan Administrator shall cause the Plan to comply with the ACP Test for a Plan Year by undertaking, as necessary, any one or more of the following measures:

(i) The Plan Administrator may treat Elective Deferrals as Matching Contributions for purposes of the ACP Test, which, when combined with After-Tax Contributions and Matching Contributions, cause the ACP Test to be satisfied, pursuant to Section 6.3(c).

(ii) The Plan Administrator may reduce After-Tax Contributions of Highly Compensated Employees and distribute such After-Tax Contributions and earnings thereon, pursuant to Section 6.3(d).

(iii) The Plan Administrator may cause Excess Contributions, to the extent attributable to nonvested Matching Contributions, to be forfeited, pursuant to Section 6.3(e).

(iv) The Company may make QNECs that are treated as Matching Contributions for purposes of the ACP Test which, when combined with After-Tax Contributions and Matching Contributions, cause the Plan to comply with the ACP Test, pursuant to Section 6.3(f).

(c) Use of Elective Deferrals. The Company may elect to use Elective Deferrals to calculate Contribution Percentages and determine compliance with the ACP Test, provided that such Elective Deferrals shall not be taken into account in determining compliance with the ADP Test.

(d) Distribution.

(i) To the extent that the Plan Administrator chooses to distribute After-Tax Contributions to comply with the ACP Test, the Plan Administrator shall reduce After-Tax Contributions and the earnings thereon through the end of the Plan Year (*provided, however* that for distributions relating to Plan Years beginning after December 31, 2005 and before January 1, 2008, earnings also shall be calculated for the Gap Period pursuant to Section 6.3(d)(iii)) for which such After-Tax Contributions were made, as may be necessary to reduce the Contribution Percentages of the Highly Compensated Employees with the largest amounts of After-Tax Contributions. Such After-Tax Contributions shall be distributed to the Highly Compensated Employees with the largest dollar amounts of After-Tax Contributions taken into account in calculating the ACP Test for the year in which the excess arose, beginning with the Highly Compensated Employee with the largest After-Tax Contributions and continuing in descending order until all the Excess Contributions have been allocated. For purposes of the preceding sentence, the "largest amount" is determined after distribution of any Excess Contributions.

(ii) To the extent practicable, any distribution shall be made from a Participant's Account in the following order: first, from unmatched After-Tax Contributions and second, from matched After-Tax Contributions. Any distributions and the earnings thereon shall be distributed, to the extent feasible, within two and one-half months after the end of the Plan Year to which such Excess Contributions relate, but no later than twelve months thereafter.

(iii) The earnings on Excess Contributions shall be determined in accordance with Section 6.2(d)(iii); *provided*, *however*, that the Plan Administrator may use any reasonable method to compute earnings allocable to Excess Contributions pursuant to Treasury Regulation Section 1.401(m)-2(b)(2)(iv). The method used to determine earnings on Excess Contributions shall be consistently used for all Participants and for all corrective distributions and shall not violate Section 401(a)(4) of the Code.

(e) Forfeitures. If the Plan Administrator chooses to cause the forfeiture of Excess Contributions attributable to nonvested Matching Contributions, then the Plan Administrator shall either allocate forfeitures of Excess Contributions to the Accounts of Non-Highly Compensated Employees or apply the forfeitures to reduce future Matching Contributions for the Plan Year in which the forfeiture is determined.

(f) QNECs. If the Company chooses to make QNECs, the Plan Administrator shall allocate such QNECs as Matching Contributions in a nondiscriminatory manner. Effective for Plan Years commencing after December 31, 2005, except as otherwise permitted under the Treasury Regulations, QNECs shall not be taken into account for purposes of the ACP Test for a Plan Year for a Non-Highly Compensated Employee to the extent such QNECs exceed the product

of the Non-Highly Compensated Employee's Compensation and the greater of 5% and two times the Plan's Representative Contribution Rate.

6.4 Changes Effected by the Plan Administrator. Notwithstanding the preceding provisions of this Article VI, the Plan Administrator shall be authorized to take such action with respect to Elective Deferrals, After-Tax Contributions and Matching Contributions of any Participant or groups of Participants as may be necessary to avoid the disqualification of the Plan, the loss of any tax deduction or the imposition of any excise tax; including, without limitation, reducing future Elective Deferrals and After-Tax Contributions that may be made by a Participant who is a Highly-Compensated Employee; *provided*, *however*, that any such action shall generally be applied in a uniform and nondiscriminatory manner.

6.5 Compliance with Section 415 of the Code.

(a) Correction. Except to the extent permitted by Section 4.4 and Section 414(v) of the Code, if the Annual Additions for a Plan Year with respect to a Participant would cause the limits of Section 415(c) of the Code (as adjusted pursuant to Section 415(d)) applicable to that Participant to be exceeded, the excess amount over the maximum Annual Addition shall be disposed of in accordance Revenue Procedure 2008-50 (prior to April 1, 2013) and Revenue Procedure 2013-12 (after March 31, 2013) or the successor thereto, and shall not be deemed an Annual Addition.

(b) Unallocated Account. If an unallocated account is in existence at any time during a Plan Year pursuant to Revenue Procedure 2008-50 (prior to April 1, 2013) and Revenue Procedure 2013-12 (after March 31, 2013) or the successor thereto, such account shall be (i) invested in the money market or equivalent Investment Fund and shall participate in the allocation of the Trust's investment gains and losses in such Investment Fund and (ii) all amounts held in such unallocated account shall be allocated in succeeding periods in accordance with Revenue Procedure 2008-50 or Revenue Procedure 2013-12 (or the successor thereto), as applicable. While any amount remains in such unallocated account, the Employer shall not make additional contributions to the Plan.

(c) Prohibition on Distribution. Except as otherwise provided in Section 6.5(a), excess amounts above the maximum Annual Addition shall not be distributed to Participants or former Participants.

(d) Crediting Rule. For purposes of this Section 6.5, an Annual Addition shall be credited to a Participant's Account for a Plan Year if it is allocated to the Participant's Account under the terms of the Plan as of any date within that Plan Year. Such amount shall not be deemed allocated as of any date within a Plan Year if such allocation is dependent upon participation in the Plan as of any date subsequent to such date. For purposes of this Section 6.5(c), Pre-Tax Contributions and Match Contributions shall not be deemed credited to a Participant's Account for a particular Plan Year, unless said contributions are made to the Plan no later than thirty days after the end of the period described in Code Section 404(a)(6) applicable to the taxable year within which the particular Plan Year ends.

(e) Compensation. For purposes of this Section 6.5 and Section 14.3, compensation shall have the meaning assigned to such term under Section 415(c)(3) of the Code, and, effective January 1, 2008, Treasury Regulation Sections 1.415(c)-2(d)(4) and 1.415(c)-2(e), each of which is incorporated herein by reference. Deferrals of compensation by reason of Section 132(f) of the Code shall be considered compensation for purposes of this Section 6.5, effective for Plan Years beginning after December 31, 2000. For avoidance of doubt, compensation for purposes of Sections 6.5 and 14.3 shall include differential wage payments within the meaning of Section 3401(h) of the Code (if any) paid after December 31, 2008 by the Employer to the Participant during a Military Leave.

6.6 Special Definitions.

(a) "*ACP Test*" means the Average Actual Contribution Percentage Tests of Section 6.3(a).

(b) "*ADP Test*" means the Average Actual Deferral Percentage Tests of Section 6.2(a).

(c) "*Annual Addition*" means the sum of the following amounts credited to a Participant's Account for the Plan Year:

(i) Pre-Tax Contributions, if any;

(ii) After-Tax Contributions, if any;

(iii) Roth Contributions, if any;

(iv) Matching Contributions, if any;

(v) Profit-Sharing Contributions, if any;

(vi) QNECs and QMACs, if any; and

(vii) forfeitures, if any.

(d) "*Applicable Contribution Rate*" means, for purposes of (i) the ADP Test, for an Eligible Employee who is a Non-Highly Compensated Employee, the sum of the QMACs taken into account under Section 6.2(e) for the Plan Year for such Non-Highly Compensated Employee and the QNECs made for such Non-Highly Compensated Employee for the Plan Year, divided by such Non-Highly Compensated Employee's Compensation for the Plan Year; (ii) the ACP Test, for an Eligible Employee who is a Non-Highly Compensated Employee, the sum of the Matching Contributions taken into account under section 6.3 for the Plan Year for such Non-Highly Compensated Employee and the QNECs made for such Non-Highly Compensated Employee for the Plan Year, divided by such Non-Highly Compensated Employee's Compensation for the Plan Year.

(e) "*Average Actual Contribution Percentage*" means the average of the Contribution Percentage of each of the Participants of any designated group of Participants determined by using the data for the Plan Year in reference.

(f) "*Average Actual Deferral Percentage*" means the average of the Deferral Percentage of each of the Participants of any designated group of Participants determined by utilizing the data for the Plan Year in reference.

(g) "*Contribution Percentage*" means the ratio, expressed as a percentage, of the sum of After-Tax Contributions, Match Contributions and any Pre-Tax Contributions, QNECs and QMACs which are treated as Match Contributions and any Roth Contributions that are treated as After-Tax Contributions within the meaning of Code Section 401(m) on behalf of an Eligible Employee for a Plan Year to the Employee's Compensation for any portion of such Plan Year during which the Employee was a Participant.

(h) "*Deferral Percentage*" means the ratio, expressed as a percentage, of the amount of Elective Deferrals made to the Plan on behalf of an Eligible Employee for a Plan Year and any QNECs and QMACs treated as Elective Deferrals for such Plan Year to the Eligible Employee's Compensation for any portion of such Plan Year during which the Eligible Employee was a Participant.

(i) "*Excess Elective Deferrals*" means, for a Highly Compensated Employee, the amount by which the Elective Deferrals of a Highly Compensated Employee must be decreased so that the Deferral Percentage of the Highly Compensated Employee shall cause the ADP Test to be satisfied.

(j) "*Excess Contribution*" means, for a Highly Compensated Employee, the amount by which the After-Tax Contributions and Match Contributions of a Highly Compensated Employee must be reduced so that such employee's Contribution Percentage shall cause the ACP Test to be satisfied.

(k) "*Gap Period*" means the period beginning immediately after the end of the Plan Year and prior to a date selected by the Plan Administrator that shall be no more than seven days prior to the date the distribution is made pursuant to Section 6.1(b), 6.2(d) or 6.3(d).

(l) "*Representative Contribution Rate*" means the lowest applicable contribution rate of any Eligible Employee who is a Non-Highly Compensated Employee among a group of Eligible Employees who are Non-Highly Compensated Employees that consists of half of all such eligible Non-Highly Compensated Employees for the Plan Year (or, if greater, the lowest Applicable Contribution Rate of any Eligible Employee who is a Non-Highly Compensated Employee in the group of all such eligible Non-Highly Compensated Employees for the Plan Year and who is employed by the Employer on the last day of the Plan Year.

(m) "*Representative Matching Rate*" means the lowest matching rate for any Eligible Employee who is a Non-Highly Compensated Employee among a group of Eligible Employees who are Non-Highly Compensated Employees that consists of half of all such eligible

Non-Highly Compensated Employees in the Plan for the Plan Year who make Pre-Tax Contributions for the Plan Year (or, if greater, the lowest matching rate for all eligible Non-Highly Compensated Employees in the Plan who are employed by the Employer on the last day of the Plan Year and who make Elective Deferrals for the Plan Year).

## ARTICLE VII

## VESTING

7.1 Employee Account and Rollover Contributions. A Participant shall be 100% vested at all times in his or her Employee Account.

7.2 Match Contributions and Company Contributions. A Participant's Pre-Tax Match Account, After-Tax Match Account, Roth Match Account and Company Contribution Account shall become vested in accordance with the following schedule:

| Years of Service | Vested Percentage |
|---|---|
| Less than 1 | 0% |
| 1 but less than 2 | 40% |
| 2 but less than 3 | 60% |
| 3 but less than 4 | 80% |
| 4 or more | 100% |

Notwithstanding anything else in this Section 7.2, any Participant who performs an Hour of Service on or after July 1, 2020 shall be 100% vested in his or her Pre-Tax Match Account, After-Tax Match Account, Roth Match Account and Company Contribution Account.

7.3 Profit Sharing Contributions. A Participant's Profit-Sharing Account shall become vested in accordance with the following schedule:

| Years of Service | Vested Percentage |
|---|---|
| Less than 3 | 0% |
| 3 or more | 100% |

Notwithstanding anything else in this Section 7.3, any Participant who performs an Hour of Service on or after July 1, 2020 shall be 100% vested in his or her Profit-Sharing Account.

7.4 Additional Vesting. Notwithstanding Sections 7.2 and 7.3, a Participant who is employed by an Affiliated Company on the applicable date shall become 100% vested in his or her Employer Account upon the earliest of the Participant's:

(a) 65th birthday;

(b) Disability (including, effective January 1, 2010, a Disability that occurs on Military Leave);

(c) Death (including, effective January 1, 2007, a Participant's death while on Military Leave); and

(d) Termination or partial termination of the Plan or a complete discontinuance of contributions to the Plan (but only if the Participant is affected by the partial termination or discontinuance).

7.5 Special Vesting Provisions Related to Certain Divestitures. In accordance with an agreement between the Company and National Data Corporation dated April 1, 1996, each Participant who was an Employee and participating in the Pension Plan and who was transferred to Global Payments Systems, a joint venture between the Company and National Data Corporation, was fully vested in his or her entire Account effective March 31, 1996.

7.6 Forfeitures. Following a Participant's Termination from Service Date, that portion of the Participant's Employer Account in which he or she is not vested shall become a forfeiture and shall be subtracted from the Participant's Account upon the earlier to occur of (a) the distribution of the Participant's Vested Account Balance, and (b) such time as the Participant has incurred a Period of Severance of five consecutive years. A Participant who incurs a Termination from Service Date, has not made any contributions to his or her Employee Account and has no vested interest in his or her Employer Account shall be deemed to have received a zero distribution of his or her Employer Account on his or her Termination from Service Date for purposes of the first sentence of this Section 7.6. The value of the forfeited amount shall be determined as of the Valuation Date coincident with or preceding the event causing the forfeiture to arise or at such other date as the Committee may determine. Any forfeiture shall be applied to reduce succeeding Match Contributions made by the Employer and reasonable expenses of Plan administration and to make restorations to Participant Accounts, as required.

7.7 Restorals.

(a) Period of Termination Less than Five Years. Subject to Sections 7.7(b) and (c), if a Participant who incurred a Termination from Service Date incurs a subsequent Reemployment Date prior to incurring a Period of Termination of five consecutive years, the Company shall contribute, as applicable, to such Participant's Employer Account as an additional Match Contribution and, if applicable, Profit Sharing Contribution, an amount equal to the value of the forfeiture, as determined under Section 7.6, without any adjustment for changes in the value of investments in the Trust Fund subsequent to the date of forfeiture.

(b) Period of Termination Less Than One Year and Reemployment Date Prior to January 1, 2008. Subject to Sections 7.7(c)(i) and (iii), if a Participant who incurred a Termination from Service Date incurs a subsequent Reemployment Date prior to January 1, 2008 and also prior to incurring a Period of Termination of twelve consecutive months, the Company shall contribute, as applicable, to such Participant's Employer Account, as an additional Match Contribution and, if applicable, Profit Sharing Contribution, an amount equal to the value of the forfeiture, as determined under Section 7.6. Such restoration pursuant to this Section 7.7(b) shall include the investment gain attributable to the amount forfeited while held in the Trust Fund subject to the investment direction of the Committee from the date forfeited until the date restoration of the amount is restored.

(c) Conditions of Restoral. Notwithstanding anything in this Section 7.7 to the contrary:

(i) As of the Participant's Reemployment Date, any amount restored pursuant to Section 7.7(a) or 7.7(b) and this Section 7.7(c), shall be allocated to the Participant's Employer Account, as appropriate, and shall be invested in accordance with the provisions of Article XI and the investment elections (if any) of the Participant at the time of such restoral; *provided*, *however*, that if the Plan Administrator determines that no such investment elections are in effect, the restored amount shall be invested in the default fund designated by the Plan Administrator.

(ii) Effective for Reemployment Dates after December 31, 2007, if a Participant received a distribution of the vested portion of his or her Account following his or her Termination from Service Date, such Participant shall be required to repay to the Plan the full amount of such distribution by no later than the date that is five years following his or her Reemployment Date in order to have any forfeited amount restored pursuant to Section 7.7(a). A Participant who wishes to make a repayment pursuant to this Section 7.7(c)(ii) shall, at the time of repayment, provide to the Plan Administrator supporting documentation that the Plan Administrator determines is sufficient to verify the taxable or nontaxable nature of the repayment. In the absence of such supporting documentation, a Participant's repayment shall not be accepted and the forfeited portion of his Employer Account shall not be restored. Notwithstanding anything in Section 7.5(c) to the contrary, the forfeited portion of a Participant's Employer Account shall not be restored until such Participant repays the full amount of any distribution in accordance with this Section 7.7(c)(ii). Such forfeited portion shall not be restored if the Participant does not repay the full amount of any distribution in accordance with this Section 7.7(c)(ii).

(iii) If a Participant who forfeited a portion of his or her Employer Account pursuant to Section 7.6 has a Reemployment Date after the completion of a Period of Termination of five or more consecutive years, the forfeited amounts shall not be restored.

7.8 Vested Percentage.

(a) General Rule. Upon restoration of a forfeited amount pursuant to Section 7.7 following a distribution of all or a portion of the vested balance in a Participant's Employer Account, a Participant's vested Employer Account shall then be equal to:

V% times (AB+D) - D

where:

V%= current vested percentage
AB= current balance in the Employer Account
D= amount previously distributed from the Employer Account

(b) Service. If a former Employee incurs a Reemployment Date, the Period of Service credited at the time of his most recent Termination from Service Date shall be counted in determining his or her Vested Account Balance.

(c) Reemployment Date On or After July 1, 2020. Notwithstanding anything else in this Section 7.8, an Employee with a Reemployment Date on or after July 1, 2020 shall be 100% vested in any forfeited amount restored to his or her Employer Account in accordance with Section 7.7.

# ARTICLE VIII

## DISTRIBUTIONS

8.1 Distribution of Vested Account Balance.

(a) General Rule. Following the occurrence of a Participant's Termination from Service Date for any reason other than death, the Participant shall be entitled to receive a distribution of his or her Vested Account Balance in accordance with this Section 8.1.

(b) Right to Defer.

(i) A Participant (A) who is eligible for a distribution under Section 8.1(a) above and (B) whose Vested Account Balance exceeds the Cash-Out Amount may elect to defer distribution of his or her Vested Account Balance until the last day of any month selected by the Participant after the month in which his or her Termination from Service Date occurs, but in no event later than his Late Retirement Date.

(ii) A Participant who elects to receive his distribution in the form of installments, in accordance with Section 8.3(a), may defer receipt of the first installment until not later than his or her attainment of age sixty-five. Notwithstanding the foregoing, a Participant may not elect an installment period extending beyond the longest of (A) the life expectancy of the Participant, (B) if the Participant's designated Beneficiary is his or her Spouse, the life expectancy of the Participant and his or her Spouse and (C) if the Participant's Beneficiary is not his or her Spouse, the life expectancy determined using the applicable table contained in the applicable Treasury Regulation under Code Section 401(a)(9).

(iii) Notwithstanding anything in Section 8.1(b) to the contrary, a Participant may elect at any time to accelerate the payment of all remaining installments and receive payment of such remaining amount as a single lump sum payment, valued as of the last day of the month in which such election is received by the Plan Administrator and distributed as soon as practicable thereafter.

8.2 Cash-Outs and Automatic Rollovers.

(a) General Rule. Any other provision in the Plan to the contrary notwithstanding, if, as of a Valuation Date (that is determined by the Plan Administrator in its sole discretion) after a Participant's Termination from Service Date, the Participant's Vested Account Balance (including the balance in his Rollover Account) does not exceed the Cash-Out Amount, then the Participant shall not be eligible to make an election to delay payment as described in Section 8.1(b) or to receive a distribution of the Participant's Vested Account Balance in an optional form pursuant to Section 8.3(a)(i), and the Participant's Vested Account Balance shall be distributed in accordance with this Section 8.2.

(b) Prior to March 28, 2005. Effective for Benefit Starting Dates prior to March 28, 2005, if, as of such Valuation Date described in Section 8.2, the Participant's Vested Account Balance does not exceed the Cash-Out Amount, the entire Vested Account Balance shall be distributed in a lump sum as soon as practicable following such Valuation Date.

(c) On or After March 28, 2005. Effective for Benefit Starting Dates on or after March 28, 2005, if, as of the Valuation Date described in Section 8.2(a), the Participant's Vested Account Balance:

(i) does not exceed $1,000, if payable to the Participant or his or her surviving Spouse, or $5,000, if payable to a non-Spouse Beneficiary, then the vested Account Balance shall be paid in a lump sum as soon as feasible following the Valuation Date; or

(ii) exceeds $1,000 (determined in accordance with Section 8.2(d)) and does not exceed $5,000, if payable to the Participant or his or her surviving Spouse, then the Participant's vested Account Balance shall be distributed as soon as feasible following the Valuation Date in a Direct Rollover to an individual retirement plan previously designated by the Plan Administrator, unless the Participant or his or her surviving Spouse has elected that such amount be distributed (A) in a Direct Rollover to an Eligible Retirement Plan specified by the Participant or his or her surviving Spouse or (B) in a lump sum directly to the Participant or his or her surviving Spouse.

8.3 Distribution Options, Valuation and Timing.

(a) Options.

(i) A Participant may irrevocably elect to receive his or her distribution either (A) a single sum distribution of the Participant's entire Vested Account Balance, (B) substantially equal monthly, quarterly or semi-annual installments payable over a period that does not extend beyond the longest period described in Section 8.1(b)(ii) and (C) effective January 1, 2008, a partial lump sum distribution subject to the terms and conditions set forth in Section 8.3(b). A Participant may make a separate election with respect to the form of payment of his or her Roth Contribution Account. If a Participant elects to receive a distribution but does not elect a payment option within the period prescribed by the Plan Administrator, the value of his or her entire Vested Account Balance shall be paid to the Participant in a lump sum. All distributions shall be paid in cash, in accordance with this Section 8.3(a).

(ii) Any election made under this Section 8.3(a) may be changed at any time prior to the Participant's Benefit Starting Date, but may not be changed thereafter, except as provided in Section 8.1(b)(iii).

(b) Restrictions on Partial Lump Sum Distributions. Effective January 1, 2008, the partial lump sum distribution pursuant to Section 8.3(a)(i) shall be subject to the following terms and conditions:

(i) A Participant who wishes to take a partial lump sum distribution shall be required to elect the contributions from which such distribution shall be taken in accordance with Section 8.3(b)(i)(A), (B), (C) or (D), subject to Section 8.3(b)(iv):

(A) Partial distribution of after-tax contributions and before-tax contributions, in the following order of priority:

(I) After-Tax Contributions taken pro-rata from the Basic After- Tax Account, Pre-01/01/95 Basic After-Tax Account, Supplemental After-Tax Account and After-Tax Rollover Account; then

(II) Pre-Tax Contributions taken pro-rata from the Basic Tax- Deferred Account, Supplemental Tax Deferred Account, Before-Tax Rollover Account, Profit-Sharing Account, Pre-Tax Match Account, After-Tax Match Account and Roth Match Account; or

(B) Distribution of all amounts in the Accounts set forth in Section 8.3(b)(i)(A); or

(C) Partial distribution of Roth elective deferrals in the following order of priority: (1) Roth Rollover Account, (2) Supplemental Roth Account and (3) Basic Roth Account; or

(D) Distribution of all amounts in the Accounts set forth in Section 8.3(b)(i)(C).

(ii) For avoidance of doubt, a partial lump sum distribution pursuant to Section 8.3(b)(i) shall include a pro-rata portion of the income and realized and unrealized gains allocable to each type of contribution distributed.

(iii) If, as of a Valuation Date determined by the Plan Administrator following a partial lump sum distribution from a Participant's Account, the remaining total Account Balance does not exceed $5,000, such Account Balance shall be distributed to the Participant without his or her consent in accordance with Section 8.2(c)(i) or 8.2(c)(ii), as applicable.

(iv) A Beneficiary or Alternate Payee shall not be permitted to elect a partial lump sum distribution.

(v) A Participant's election to receive payment of his or her Account Balance in the partial lump sum optional form of distribution shall apply to the Participant's entire Account Balance. A Participant shall not be permitted to elect to receive the remaining portion of his or her Account Balance in another optional form.

(c) Valuation and Timing.

(i) The Valuation Date of each distribution under this Article VIII shall be the Valuation Date next following the Business Day on which the Plan Administrator receives notice, in accordance with the Appropriate Procedure, of a Participant's election regarding a current distribution or the Valuation Date coincident with or next following the date to which a distribution is deferred, whichever is applicable. For purposes of this Section 8.3(b), no interest or other earnings shall be credited on the amount of the distribution from such Valuation Date to the date that the proceeds of the distribution are received by the Participant or transferred to an Eligible Retirement Plan designated by the Participant. The Plan Administrator shall make a distribution as soon as practicable after receipt of notice regarding a Participant's distribution election.

(ii) All Accounts distributable in installments, in accordance with Section 8.3(a), shall remain in the Trust until paid and shall be subject to periodic revaluation with the attendant risk of market loss in the Investment Fund or Investment Funds selected by the Participant pursuant to his or her investment election.

(d) Order of Liquidation of Investment Funds. In connection with each installment payment or partial lump sum distribution under this Article VIII, a Participant's investments in each Investment Fund shall be liquidated pro rata from each Investment Fund as of the applicable Valuation Date.

8.4 Notice of and Consent to Distribution.

(a) General Rule.

(i) No less than thirty days and no more than ninety days prior to the commencement of a distribution, a Participant shall receive a notice (the "*Notice*"), as contemplated by Treasury Regulations under Code Section 411(a)(11), explaining the Plan distribution options pursuant to Section 8.3, such Participant's right to defer his or her distribution, the consequences of taking an immediate distribution pursuant to Section 8.1 and the consequences of failing to defer distribution.

(ii) Except as provided in Sections 8.2 and 8.7, a Participant's Vested Account Balance shall not be immediately distributed to such Participant without his or her consent. A distribution shall not commence before the expiration of the thirty-day period beginning on the date that the Participant is provided with the Notice, unless the requirements of Section 8.4(b) are satisfied.

(b) Waiver of Thirty-Day Notice. Notwithstanding Section 8.4(a), if (i) the Plan Administrator informs the Participant that the Participant has the right to a period of at least thirty days after receiving the Notice to consider the decision of whether to elect a distribution and (ii) the Participant, after receiving the Notice, affirmatively elects to receive an immediate distribution and to waive the thirty-day period, then a distribution of the Participant's Vested Account Balance may commence at any time following the expiration of the seven-day period beginning on the date that the Notice was first delivered to the Participant.

(c) Beneficiary Designation. Subject to Sections 8.4(d), a Participant shall have the right to designate the Beneficiary who shall receive the unpaid portion of his or her Vested Account Balance upon the death of the Participant. Subject to Section 8.4(d), a Participant may, from time to time, revoke or change his or her Beneficiary designation without the consent of any prior Beneficiary by filing a new beneficiary designation form with the Plan Administrator. The last such designation received by the Plan Administrator shall be controlling; *provided*, *however*, that no designation form, or change or revocation thereof, shall be effective unless received by the Plan Administrator prior to the Participant's death, and in no event shall it be effective as of any date prior to such receipt. In the absence of any such designation or if there shall be no designated person living at the time a benefit becomes payable, Beneficiary shall mean, in the order listed, the surviving Spouse of the Participant, the Participant's children, in equal shares (or if a child does not survive the Participant, and that child leaves issue, the issue shall be entitled to that child's share, by right of representation) or the Participant's estate. The Plan shall be deemed the Beneficiary with respect to any amount otherwise payable in respect to a deceased Participant if such amounts cannot be paid because no person otherwise entitled to such benefits can be located.

(d) Spouse as Beneficiary. Anything in Section 8.4(c) to the contrary notwithstanding, the designation by a Participant who has a Spouse at the time of such designation of a non-Spouse Beneficiary or Beneficiaries shall be effective only with Spousal Consent. Any such Spousal Consent shall be irrevocable by the Spouse. Any Spousal Consent shall be effective as of the date of such consent and shall be valid only with respect to the Spouse who signs such consent. Spousal Consent shall be deemed satisfied if it is established to the satisfaction of the Plan Administrator that Spousal Consent cannot be obtained because (i) the Participant in fact has no Spouse, (ii) the Participant's Spouse cannot be located or (iii) of other circumstances as the Plan Administrator may determine in accordance with applicable law.

8.5 QDROs.

(a) Account. A separate Account shall be established for an Alternate Payee entitled to any portion of a Participant's Account as of the date and in accordance with the directions specified in the QDRO. In addition, a separate Account may be established during the period of time the Committee, a court of competent jurisdiction or other appropriate person is determining whether a domestic relations order qualifies as QDRO. Such a separate Account shall be valued and accounted for in the same manner as any other Account.

(b) Distribution. Notwithstanding any other provision of the Plan to the contrary, if an amount payable to an Alternate Payee pursuant to a QDRO does not exceed the Cash-Out Amount, such amount shall be paid in a lump sum as soon as practicable following a determination by the Plan Administrator that the domestic relations order is a QDRO. If such amount exceeds the Cash-Out Amount, it may be distributed to the Alternate Payee at any time following a determination that the domestic relations order is a QDRO and without regard to any limitation in the Plan as to the time when such benefits would otherwise have been distributable; *provided*, *however*, that the Alternate Payee consents to such distribution and the domestic relations order provides for such payment; *provided further* that such distribution to the Alternate Payee shall begin not later than the Participant's Late Retirement Date in accordance with Section 401(a)(9) of the Code.

8.6 Reemployment. If a Participant is entitled to a distribution following his Termination from Service Date, but does not receive such distribution prior to his or her Reemployment Date, then no distribution shall be made to him or her as a result of the Participant's prior Termination from Service Date and the distributable amounts shall be retained in his Account.

8.7 Minimum Required Distributions.

(a) General Rule. Notwithstanding any other provision of the Plan to the contrary, in accordance with the minimum distribution and timing requirements of Section 401(a)(9) of the Code (including the incidental death benefit requirements of Section 401(a)(9)(G) of the Code) and, effective as of January 1, 2003, the final regulations thereunder (Treasury Regulations 1.401(a)(9)-2 to 1.401(a)(9)-9) promulgated in 2002 and effective as of January 1, 2003, which are incorporated herein by reference, the Vested Account Balance of a Participant who attains his or her Late Retirement Date shall be distributed (or commence to be distributed) to such Participant as soon as practicable after the Late Retirement Date. If such Participant has not made an election pursuant to Section 8.3(a) prior to such Late Retirement Date, the Vested Account Balance shall be distributed as a lump sum.

(b) 2009 Waivers. Notwithstanding anything in Section 8.7 to the contrary, a Participant or Beneficiary who would have been required to receive required minimum distributions for 2009 but for the enactment of Section 401(a)(9)(H) of the Code ("*2009 RMDs*"), and who would have satisfied that requirement by receiving distributions that are (i) equal to the 2009 RMDs or (ii) one or more payments in a series of substantially equal distributions (that include the 2009 RMDs) made at least annually and expected to last for the life (or life expectancy) of the Participant, the joint lives (or joint life expectancy) of the Participant and the Participant's Beneficiary, or for a period of at least 10 years, will not receive those distributions for 2009 unless the Participant or Beneficiary chooses to receive such distributions. Participants and Beneficiaries described in the preceding sentence shall be given the opportunity to elect to receive the distributions described in the preceding sentence.

(c) 2020 Waivers. Notwithstanding anything in Section 8.7 to the contrary, a Participant or Beneficiary who would have been required to receive required minimum distributions for 2020 (including required minimum distributions for 2019 for a Participant or Beneficiary with a required beginning date of April 1, 2020 that was not paid in 2019 and including required minimum distributions for 2020 for a Participant or Beneficiary with a required beginning date of April 1, 2021 that was not paid in 2020) but for the enactment of Section 401(a)(9)(I) of the Code ("2020 RMDs"), and who would have satisfied that requirement by receiving distributions that are equal to the 2020 RMD will not receive those distributions for 2020 unless the Participant or Beneficiary chooses to receive such distribution. A Participant or Beneficiary who would have been required to receive 2020 RMDs and who would have satisfied that requirement by receiving one or more payments in a series of substantially equal distributions (that include 2020 RMDs) made at least annually and expected to last for the life (or life expectancy) of the Participant, the joint lives (or joint life expectancy) of the Participant and the Participant's Beneficiary, or for a period of at least 10 years, will receive those distributions for 2020 unless the Participant or Beneficiary chooses not to receive such distributions. Participants and Beneficiaries

described in the preceding two sentences shall be given the opportunity to receive or not receive, as applicable, the distributions described in the preceding two sentences.

8.8 Death of a Participant.

(a) Death Before Late Retirement Date or Benefit Starting Date.

(i) If a Participant dies before his or her Benefit Starting Date and before his or her Late Retirement Date, such Participant’s Vested Account Balance shall, subject to Section 8.8(a)(iii), commence to be distributed to his or her Beneficiary no later than December 31 of the calendar year immediately following the calendar year in which the Participant dies and shall be completed by the end of the tenth year following the year of the Participant’s death. Provided, however, in the event the Beneficiary is (A) the Participant’s surviving Spouse, (B) a disabled or chronically ill individual or a trust for same, (C) an individual who is no more than 10 years younger than the Participant as of the Participant’s date of death, or (D) the Participant’s minor child until the date such child reaches the age of majority, the distribution of such Participant’s Vested Account Balance shall be completed over a period that does not exceed the life expectancy of the Beneficiary.

(ii) If a Participant dies after his or her Benefit Starting Date but before his or her Late Retirement Date and his or her Beneficiary is not his or her surviving Spouse, the remaining portion (if any) of the Participant's Vested Account Balance shall be distributed to the Beneficiary in a single lump sum payment as soon as administratively practicable following the Participant's death. If the Participant's sole Beneficiary is his or her surviving Spouse, the remaining portion of the Vested Account Balance shall be distributed in accordance with Section 8.8(a)(iii).

(iii) If the Participant dies at the time described in Section 8.8(a)(i) or (ii) and his or her sole Beneficiary is his or her surviving Spouse, the remaining portion (if any) of the Participant’s Vested Account Balance shall commence to be distributed on or before the later of (A) December 31 of the calendar year immediately following the calendar year in which the Participant dies and (B) December 31 of the calendar year in which the Participant would have attained age seventy and one-half (or age seventy two for Participants who would have attained age seventy and one-half after December 31, 2019) and shall be completed over a period that does not exceed the life or life expectancy of the Spouse; provided, however, that if the surviving Spouse dies after the Participant but before distributions to the surviving Spouse commence, Section 8.8(a)(i) shall apply as if the surviving Spouse were the Participant.

(b) Death After Late Retirement Date and After Benefit Starting Date. If a Participant dies on or after his or her Late Retirement Date and after his or her Benefit Starting date, but before his or her entire Vested Account Balance is distributed to him or her, the unpaid portion of his or her Vested Account Balance shall be distributed in a lump sum to the Participant's Beneficiary as soon as practicable following the date of the Participant's death.

(c) Forms of Payment. Except as otherwise provided in this Section 8.8, a Beneficiary may elect to receive payment of a Participant's Vested Account Balance as a lump sum or in substantially equal semi-annual, monthly or quarterly installment payments. A

surviving Spouse receiving installment payments pursuant to Section 8.8(a)(iii) or 8.8(b) may elect to receive the Participant's remaining Vested Account Balance in a lump sum valued as of the last day of the month in which such election is received by the Plan Administrator and distributed as soon as practicable thereafter.

(d) Compliance with Section 401(a)(9). Notwithstanding anything in the Plan to the contrary, the payment to a Beneficiary pursuant to this Section 8.8 shall be in accordance with the applicable minimum distribution provisions of Code Section 401(a)(9) (and the final and temporary regulations thereunder, effective as of January 1, 2003), including the incidental death benefit requirement of Code Section 401(a)(9)(G), which are incorporated herein by reference. For 2009, the provisions of Section 8.7(b) shall apply to this Section 8.8. For 2020, the provisions of Section 8.7(c) shall apply to this Section 8.8.

(e) Notice Requirement. Notwithstanding anything in Section 8.8 to the contrary, payment of a Participant's Vested Account Balance on account of the death of a Participant under this Section 8.8 shall not be made until due notice of the death of the Participant has been received by the Plan Administrator, in such manner as the Plan Administrator in its sole discretion shall determine.

8.9 Rollovers.

(a) General Rule. Subject to Section 8.9(b) a Distributee may elect, at the time and in accordance with the Appropriate Procedure, to have any portion of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover. The Plan Administrator may establish or change reasonable procedures from time to time to effectuate Direct Rollovers. In 2009, a Direct Rollover shall be offered only for distributions that would be Eligible Rollover Distributions without regard to Section 401(a)(9)(H) of the Code.

(b) Roth Contribution Account. A Direct Rollover from a Participant's Roth Contribution Account or the portion of a Participant's Rollover Account attributable to Roth elective deferrals will only be made to another Roth elective deferral account under a qualified plan described in Section 401(a) of the Code or an annuity contract or custodial account described in Code Section 403(b) that accepts rollovers of Roth Contributions or to a Roth individual retirement account described in Code Section 408A, and only to the extent the rollover is permitted under Code Section 402(c).

# ARTICLE IX

## IN-SERVICE WITHDRAWALS AND LOANS

9.1 Withdrawals of After-Tax Contributions; Rollover Account; Profit Sharing Account.

(a) After-Tax Contributions. In accordance with Code Section 72, a Participant who is in Service may withdraw all or a portion of the After-Tax Contributions credited to his or her Pre 01/01/95 Basic After-Tax Account and the After-Tax Contributions credited to his or her Basic After-Tax Account and Supplemental After-Tax Account. Match Contributions on the After-Tax Contributions described in this Section 9.1 are not available for withdrawal pursuant to this Section 9.1.

(b) Rollover Account. An Eligible Employee who has a Rollover Account shall be permitted to withdraw all or a specified dollar amount from (i) the Roth Rollover Account and (ii) the After-Tax Rollover Account and Before-Tax Rollover Account in a lump sum at any time during a Plan Year. For avoidance of doubt, if a Participant requests a withdrawal pursuant to clause (ii) of this Section 9.1(b), such withdrawal shall be taken first from amounts attributable to after-tax Rollover Contributions and then from amounts attributable to before-tax Rollover Contributions.

(c) Profit-Sharing Contributions. A Participant who is in Service may withdraw from the vested portion of his or her Profit Sharing Account, if applicable, for any reason, provided that amounts withdrawn have been on deposit in the Plan and allocated to the Participant for at least two years.

9.2 Withdrawals Due to Attainment of Age Fifty-Nine and One-Half. Each Participant who is in Service and who has attained age 59-1/2 may request a withdrawal of all or any portion of the Accounts described in Section 9.1(a), 9.1(b) or 9.1(c) and this Section 9.2 as elected by the Participant. There is no restriction on the number of over age 59-1/2 withdrawals permitted to a Participant. The order of withdrawal for distributions pursuant to this Section 9.2 shall be as follows: (a) (i) Basic After-Tax Account, (ii) Supplemental After-Tax Account, (iii) Pre 01/01/95 Basic After-Tax Account, (iv) After-Tax Rollover Account, (v) Before-Tax Rollover Account, (vi) vested contributions from a predecessor plan to the Plan, (vii) Supplemental Tax-Deferred Account and (viii) Basic Tax-Deferred Account; (b) (i) Roth Rollover Account, (ii) In-Plan Roth Conversion Account, (iii) Supplemental Roth Account and (iv) Basic Roth Account; and (c) (i) After-Tax Match Account, (ii) Roth Match Account, (iii) Pre-Tax Match Account and (iv) Company Contribution Account.

9.3 Withdrawals on Account of Financial Hardship.

(a) Contributions Available for Hardship Withdrawal. A Participant who is in Service and who has made all permissible withdrawals under Sections 9.1 and 9.2, who has made all permissible withdrawals under any other plan maintained by an Employer, and who otherwise satisfies the requirements of this Section 9.3, may withdraw in a hardship withdrawal in accordance with this Section 9.3(a) all or any amount, at the election of such Participant, of (i) his or her (A) Tax-Deferred Contributions in the Supplemental Tax-Deferred Account and (B) Tax-

Deferred Contributions in the Basic Tax-Deferred Account; (ii) his or her (A) Supplemental Roth Account and (B) Basic Roth Account; (iii) his or her (A) Pre-Tax Match Account and (B) After-Tax Match Account; (iv) his or her Profit Sharing Account (to the extent not otherwise distributable under the Plan); (v) his or her Roth Match Account; (vi) his or her Company Contributions Account; and (vii) income and realized and unrealized gains on the Accounts listed in clauses (i) through (vi) of this Section 9.3(a); *provided however*, that the maximum distributable amount shall not exceed the sum of clauses (i)(A) and (B), (ii)(A) and (B), (iii)(A) and (B), (iv), (v), (vi) and (vii) of this Section 9.3(a).

(b) Purpose for Hardship Withdrawal. Hardship withdrawals shall be limited to the amount necessary to satisfy the Financial Hardship of the Participant (which may include any amounts necessary to pay all income taxes or penalties reasonably anticipated to result from such withdrawal) and not reasonably available from other resources. For purposes of this Section 9.3(b), a Participant's resources are deemed to include those assets of his or her spouse and minor children that are reasonably available to the Participant, other than property held for the child under an irrevocable trust or under the Uniform Gift to Minors Act. In determining whether a request for a withdrawal from the Plan is necessary to satisfy a Financial Hardship of the Participant, the Plan Administrator shall rely on a written representation by the Participant, unless the Plan Administrator has actual knowledge to the contrary, that the need cannot be reasonably met (i) through reimbursement or compensation by insurance or otherwise, (ii) by liquidation of the Participant's assets and the assets of his or her spouse or minor children that are reasonably available to the Participant, (iii) by distributions from other plans maintained by the Employer or any other employer, and (iv) by borrowing from commercial sources on reasonable commercial terms in an amount sufficient to satisfy the Financial Hardship. For purposes of this Section 9.3(b), a need cannot be reasonably met by one of the actions listed above if the effect would be to increase the amount of the need. Effective for hardship withdrawals on or after January 1, 2020, a Participant's written representation shall be required to include a representation that he or she has insufficient cash or other liquid assets reasonably available to satisfy the need.

(c) Order of Plan Interests. The order of withdrawal from a Participant's Account for purposes of Section 9.3 shall be the order in which the subaccounts are listed in clauses (i) through (vii) of Section 9.3(a), as applicable, in accordance with the Participant's election.

9.4 Withdrawal Due to Birth or Adoption.

(a) Withdrawal. A Participant who is in Service and who has gained a new dependent by birth or adoption may withdraw up to $5,000 from his or her Vested Account Balance, provided that such withdrawal may only be made within one year of such birth or adoption and further provided, that such withdrawal can be made due to adoption only if the adopted individual is under age 18 or physically or mentally incapable of self-support. Such withdrawal shall not be subject to 20% mandatory federal income tax withholding or the 10% additional tax on early distributions.

(b) Recontribution. Using the Appropriate Procedure, a Participant who is in Service and who has received a withdrawal due to birth or adoption may recontribute some or all of the withdrawal to his or her Account under the Plan. Any such recontribution shall be treated

as a direct trustee-to-trustee transfer such that the portion of the withdrawal that is recontributed to the Plan shall not be subject to federal income tax.

9.5 Plan Loans.

(a) Persons Eligible for Plan Loans. Using the Appropriate Procedure, Plan Loans may be granted under the terms of the Plan to the following persons:

(i) each Participant prior to his Termination from Service Date;

(ii) each Eligible Employee who has a balance in his Rollover Account; and

(iii) each former Employee, Beneficiary or alternate payee who (A) maintains an Account under the Plan and (B) is a "party-in-interest" as defined by Section 3(14) of ERISA.

(b) Number of Plan Loans. Subject to Sections 9.4(c)(ii) and 9.4(k), each person who is eligible for a Plan Loan under this Section 9.4 may have a maximum of two Plan Loans (or such other number of Plan Loans as the Committee shall determine) outstanding at any time.

(c) Amount of Plan Loan. The amount of any Plan Loan shall be governed by the following rules:

(i) Each Plan Loan must be for an amount equal to at least $1,000 (or such other amount as shall be determined by the Committee in its sole discretion).

(ii) The amount of any Plan Loan, when added to the outstanding balance of a Participant's other Plan Loan, if any, may not exceed the lesser of:

(A) fifty percent of the value of the Participant's Vested Account Balance as of the date of the last Plan statement sent to such Participant, adjusted for any subsequent withdrawals; and

(B) $50,000, reduced by the excess, if any, of:

(I) the highest outstanding balance of a Participant's Plan Loans during the one-year period ending the day before a new Plan Loan is to be made or a Plan Loan is to be renegotiated, over

(II) the outstanding balance of a Participant's Plan Loans on the day before the day the new Plan Loan is to be made, or a Plan Loan is to be renegotiated, *provided*, *however*, that in the event a Participant has a Plan Loan that is deemed distributed and that has not been repaid, the maximum amount available for a subsequent Plan Loan to such Participant shall be reduced by the unpaid amount, including accrued interest, of the Plan Loan that is deemed distributed.

(iii) For the purpose of determining any outstanding Plan Loan balances, the Plan Administrator may use the amortization schedule included in the Participant's loan agreement, unless the Plan Administrator has reason to know of a material discrepancy between the amount set forth on the amortization schedule and the actual outstanding Plan Loan balance. All qualified plans (including this Plan) of the Employer or of any other Affiliated Company shall be considered as a single plan for purposes of determining the maximum amount of loan permitted in accordance herewith; *provided*, *however*, that the limit set forth in Section 9.4(c)(ii)(B) shall be based only on the Participant's Account in the Plan.

(d) Term and Effective Date. All Plan Loans, other than those for the purpose of purchasing or constructing the dwelling unit which is, or within a reasonable time shall be, the principal residence of the Participant ("*Principal Residence Loans*"), must be repaid over a nonrenewable repayment period of one, two, three, four or five years. A Principal Residence Loan may be repaid over a non-renewable repayment period of up to ten years, as the Plan Administrator in its sole discretion shall determine. For purposes of this Section 9.4(d), effective for Plan Loans granted on or after January 1, 2004, if a Military Leave occurs during the repayment period and such Participant's Plan Loan payments are suspended during the Military Leave pursuant to Section 9.4(i), the duration of such repayment period shall be increased by the period of Military Leave.

(e) Interest Rate. Each Plan Loan granted hereunder shall bear a rate of interest per year equal to the prime rate, as reported in *The Wall Street Journal*, plus one percentage point, or such other rate as the Committee shall determine, which shall remain in effect for the term of the loan (or such other amount as shall be determined by the Committee in its sole discretion). The interest rate shall accrue on the principal amount of a Plan Loan up to and including the date on which the earliest of the following occurs: a prepayment, a deemed distribution, and an offset against an actual distribution, as applicable. Notwithstanding anything in this Section 9.4(e) to the contrary, during a period of Military Leave, the rate of interest on a Plan Loan granted prior to the commencement of the Military Leave shall be reduced to six percent per year solely to the extent that such reduction is required by the Servicemembers Civil Relief Act, effective as of December 19, 2003 and, effective as of December 19, 2003, the interest in excess of six percent per year shall be forgiven and shall not be reflected in any future loan repayments. The foregoing sentence shall apply solely to the extent that the Committee timely receives both a written request from the Participant and a copy of the Participant's orders to report for "military service" within the meaning of the Servicemembers Civil Relief Act of 2003.

(f) Source and Application of Funds.

(i) All Plan Loans shall be made from and considered assets of the Trust. All Plan Loans shall be secured, as of the date of the Plan Loan, by the Participant's Vested Account Balance and by the Participant's executed promissory note.

(ii) A Participant's application for a Plan Loan submitted to the Plan Administrator shall constitute an investment direction to sell or liquidate from Investment Funds in the Participant's Account an amount sufficient to yield the amount of the Plan Loan

approved by the Plan Administrator, regardless of whether the Participant subsequently declines the Plan Loan.

(iii) Until disbursed by the Trustee to the Participant as a Plan Loan, the proceeds of the liquidation of the Investment Funds in a Participant's Account shall be held uninvested. If a Participant declines a Plan Loan after such Plan Loan has been approved by the Plan Administrator, the proceeds of the liquidation shall be reinvested in the Investment Funds in the same proportion as the amounts in the Participant's Account were invested in such Investment Funds immediately before liquidation.

(iv) Upon the disbursement of the Plan Loan to the Participant, the Participant's Account shall be deemed invested (and each Participant's application for a Plan Loan shall constitute an election to invest), to the extent of the unpaid balance of such Plan Loan, in the Plan Loan extended to the Participant. The unpaid balance of any Plan Loan shall not reduce the amount credited to the Participant's Account.

(v) Any Plan Loan made pursuant to this Section 9.4 shall be deemed withdrawn from the vested portion of a Participant's Account as follows. First, on a pro rata basis from the Participant's: (a) Basic Tax-Deferred Account, (b) Roth Conversion Account to the extent attributable to after-tax contributions converted, (c) Roth Conversion Account to the extent attributable to tax-deferred contributions converted, (d) Basic Roth Account, (e) Roth Rollover Account, (f) Roth Conversion Account to the extent attributable to matching contributions converted and (g) Supplemental Roth Account. Second, from the Participant's Supplemental Tax Deferred Account. Third, on a pro rata basis from the Participant's: (a) Pre-Tax Match Account and (b) After-Tax Match Account. Fourth, from the Participant's Company Contribution Account. Fifth, from the Participant's Profit Sharing Account. Sixth, from the Participant's Prior Plan Contributions Account. Seventh, from the Participant's Pre-01/01/95 Basic After-Tax Account. Eighth, on a pro rata basis from the Participant's: (a) Before-Tax Rollover Account and (b) After-Tax Rollover Account. Ninth, from the Participant's Basic After-Tax Account. Tenth, from the Participant's Supplemental After-Tax Account.

(g) Repayment.

(i) The terms of the Plan Loan shall be evidenced by written documentation, including, without limitation, a loan application form, any required truth-in-lending disclosure statement, a payroll deduction authorization and an amortization schedule signed by the Participant specifying the amount of the Plan Loan, the term of the Plan Loan, the repayment schedule, the Participant's consent to a distribution in the event of Default (as defined below), and such other information as the Plan Administrator determines is necessary to describe the terms of the Plan Loan. The Plan Loan check payable to the Participant and the Participant's endorsement of such check shall constitute written evidence of the Participant's agreement to repay the Plan Loan according to the repayment schedule and shall be deemed to be a promissory note signed by the Participant.

(ii) The Plan Loan must be repaid at least monthly in a series of substantially level installments, as determined by the Plan Administrator, in regular payroll

deductions over the term of the Plan Loan, except for the last repayment. Provided, that a Participant who has incurred his or her Termination from Service Date shall continue to repay the Plan Loan at least monthly in a series of substantially level installments, as determined by the Plan Administrator, in cash or by electronic account debit in accordance with the Appropriate Procedure specified by the Plan Administrator over the term of the Plan Loan, except for the last repayment.

(iii) If at the time a Participant's Account is to be distributed under Article VIII there remains an unpaid balance of any Plan Loan made under this Section 9.4, such unpaid balance shall become immediately due and payable in full, and together with any accrued but unpaid interest thereon, shall be deducted from the amount to be distributed to such Participant in complete satisfaction of the Plan Loan obligation. The Committee shall also have the right to call any Participant loan once a Participant's employment with all Affiliated Companies has terminated or if the Plan is terminated.

(iv) Notwithstanding anything in this Section 9.4 to the contrary, the Plan Administrator may, from time to time, establish other terms and conditions for repayment of Plan Loans following a Participant's Termination from Service Date, pursuant to rules applicable to all Participants on a reasonably equivalent basis.

(v) Notwithstanding anything in this Section 9.4 to the contrary, but subject to Section 9.4(i) and 9.4(k), a recipient of a Plan Loan who, subsequent to receiving the Plan Loan (A) ceases to be in Service because of an uncompensated Leave of Absence or (B) is transferred to a work location of an Affiliated Company where payroll deductions are not possible, shall make monthly payments via money order or certified check to the Trustee, or recordkeeper of the plan, in accordance with instructions provided by the Plan Administrator.

(vi) Plan Loan repayments will restore a Participant’s Account in the same manner and in the same order that the Plan Loan was sourced in accordance with Section 9.4(f)(v). Proceeds from the repayment of a Plan Loan (including principal and interest) will be allocated to the same Investment Funds in the same proportion, if any, that the Participant has elected to invest new Plan contributions at the time of such repayment.

(h) <u>Prepayments</u>. A Participant may pre-pay at any time the full amount of an outstanding Plan Loan.

(i) <u>Unpaid Absences.</u>

(i) The Committee may agree to a suspension of Plan Loan payments for a period not to exceed 12 months for a Participant who is on a Leave of Absence without pay; *provided*, *however*, that the Committee's decision shall be made pursuant to procedures uniformly applied to all similarly situated Participants. Interest shall continue to accrue on the outstanding Plan Loan balance during such period of suspension. Effective as of January 1, 2004, at the expiration of the suspension period, all outstanding Plan Loan payments and accrued interest thereon shall be re-amortized to be paid over the remaining term of the Plan Loan. For purposes of this Section 9.4(i), effective for Plan Loans granted on or after January 1, 2004, a Participant's obligation to make Plan Loan repayments shall be suspended in accordance with

Code Section 414(u) for the period during which a Participant is on a Military Leave of Absence; *provided* that the Plan Loan was granted prior to commencement of such Military Leave of Absence.

(ii) Upon the expiration of a period of suspension pursuant to Section 9.4(i)(i), the Participant's outstanding Plan Loan balance, plus all additional interest, shall be reamortized; *provided*, *however*, that the term of a Plan Loan shall not be extended beyond the limits imposed by Section 9.4(d) by reason of Section 9.4(i). To the extent necessary, installments due on a Plan Loan shall be increased proportionately upon expiration of the Participant's Leave of Absence without pay to compensate for the period of suspension and the interest on the Plan Loan that accrued during the suspension. Notwithstanding anything in Section 9.4(i) to the contrary, Plan Loan repayments following a Leave of Absence or Disability shall be no less than the repayments due before the Leave of Absence or Disability.

(j) Defaults. If a Participant fails to comply with this Section 9.4 or fails to make any scheduled repayment of principal and/or interest, the Committee shall have the right to accelerate repayment of the Plan Loan (a "*Default*"), to demand immediate repayment of the entire amount outstanding or to renegotiate the terms of the Plan Loan. Notwithstanding the foregoing, a Participant shall have a cure period to cure the Default before it becomes final. Such cure period shall be for a period that does not extend beyond the last day of the calendar quarter following the calendar quarter in which the scheduled Plan Loan payment was due or such lesser or greater maximum period as may later be authorized by Code Section 72(p).

(k) Remedies.

(i) If a Participant defaults on a Plan Loan and such Participant is not entitled to a distribution from his Account, then the Plan Administrator shall declare a deemed distribution to have occurred with respect to such Plan Loan, effective as of the date of the Default. Such deemed distribution shall be applied toward the satisfaction of the Participant's Plan Loan at the time a distribution is made to the Participant in accordance with the terms of the Plan and the balance of the Participant's Account shall be reduced accordingly at such time. Notwithstanding anything in this Section 9.4 to the contrary, a Plan Loan that is deemed distributed and not repaid (such as by a Plan Loan offset) shall be considered outstanding for purposes of Section 9.4(b), and if such Participant is granted a second Plan Loan on or after January 1, 2004, the second Plan Loan must be repaid solely through payroll deductions and shall be deemed distributed, subject to Sections 9.4(i) and 9.4(k)(ii), effective as of the date that repayment via payroll deduction ceases (if not yet fully repaid).

(ii) If a Participant defaults on a Plan Loan and such Participant is eligible for a distribution from the Participant's Account in accordance with the terms of the Plan, the Plan Administrator shall cause a distribution from the Participant's Account to be applied towards satisfaction of the Participant's Plan Loan Default effective as of the date of Default and the balance of the Participant's Account shall be reduced accordingly.

(l) Plan Loan Application and Processing. Plan Loan applications are made by completing the required forms constituting the Plan Loan agreement and submitting such

completed forms and any additional required documentation to the Plan Administrator in accordance with the Appropriate Procedure. The Plan Administrator may, but shall not be required to, direct the Trustee to make a Plan Loan to such Participant from the Plan. The Plan Administrator may establish or change from time to time the standards or requirements for making any Plan Loan; *provided*, *however*, that the standards or requirements shall be nondiscriminatory, uniformly applicable to all Participants similarly situated and shall permit Plan Loans to be available to all Participants on a reasonably equivalent basis.

(m) No Credit Cards, Debit Cards or Similar Arrangements. No Plan Loan made on or after December 20, 2019 shall be distributed through a credit card, debit card or similar arrangement.

9.6 Disability in Service. A Participant who incurs a Disability while in Service may elect to withdraw his or her entire Vested Account Balance in any of the forms of payment described in Section 8.3(a) as if he or she had incurred a Termination from Service Date as of the date on which the Participant is determined to have incurred a Disability. Notwithstanding anything contained in this Section 9.5 to the contrary, if the Participant does not immediately elect a withdrawal pursuant to the preceding sentence, the Participant may request at any time to withdraw his or her Vested Account Balance pursuant to this Section 9.5; *provided*, *however*, that such Participant's Disability is continuing at the time of the withdrawal. All withdrawal requests pursuant to this Section 9.5 shall be made as soon as practicable after such election is received by the Plan Administrator in accordance with the Appropriate Procedure.

9.7 Participant Deemed to Be In-Service. For purposes of this Article IX, a Participant whose employment with an Employer is terminated but who is an Employee of an Affiliate shall be deemed to be a Participant who has not incurred a Termination From Service Date and who is in Service.

9.8 Additional Rules and Requirements.

(a) General Rule. Each Participant may request a withdrawal or Plan Loan of all or a portion of his or her Vested Account Balance pursuant to the terms and conditions set forth in this Article IX and pursuant to the terms and conditions set forth in Article VIII with regard to an in-service withdrawal made in connection with the Late Retirement Date of a Participant described in clause (b) of the definition of Late Retirement Date in Article II; *provided*, *however*, that the request for withdrawal or Plan Loan is made by the Participant by completion of the Appropriate Procedure.

(b) Amount, Form. Except as otherwise provided in this Article IX, there is no minimum amount for any type of in-Service withdrawal. With regard to the portion of an in- Service withdrawal representing an Eligible Rollover Distribution, a Participant may elect a Direct Rollover for all or a portion of such amount. The form of payment for an in-Service withdrawal shall be a single lump sum and payment shall be made in cash.

(c) Time of Payment. The Committee shall determine the date on which the withdrawal shall be made and shall endeavor to make payment of a withdrawal as soon as is administratively practicable following a Participant's completion of the Appropriate

Procedure.

(d) Order of Liquidation of Investment Funds. In connection with each in-Service withdrawal or Plan Loan under this Article IX, the Participant's investments in each Investment Fund shall be liquidated pro rata from each Investment Fund (excluding the mutual fund window) as of the applicable Valuation Date, except as otherwise provided in Section 9.4(f)(v).

(e) Valuation. The value of a Participant's Account for purposes of any in-Service withdrawal or Plan Loan under this Article IX shall be determined as of the Valuation Date coincident with or preceding the date of the Plan Loan or withdrawal, and no interest or other earnings shall be credited on the amount of such withdrawal from such Valuation Date to the date the proceeds of the withdrawal or Plan Loan are received by the Participant or transferred, if applicable, to an Eligible Retirement Plan designated by the Participant.

(f) Death. If a Participant should die prior to the payment of any withdrawal or the disbursement of the proceeds of any Plan Loan requested under this Article IX, the Participant's withdrawal or Plan Loan request shall be void as of the date of death.

(g) Pro-Rata Withdrawal. For avoidance of doubt, a withdrawal pursuant to Sections 9.1, 9.2 and 9.3 shall include a pro-rata portion of the income and realized and unrealized gains allocable to each type of contribution distributed, unless otherwise provided.

# ARTICLE X

## ADMINISTRATION OF THE PLAN

10.1 In General. The administration, management and operation of the Plan shall be allocated among the Benefits Committee, the Investment Committee (U.S.), the Administrative Committee and the Plan Administrator, and their respective delegates, agents and appointees in the manner and with the responsibilities described in this Article X. Each of the aforementioned entities shall be an "administrator" within the meaning of Section 3(16)(A) of ERISA and a "named fiduciary" within the meaning of Section 402(a) of ERISA with respect to each Committee's responsibilities described in this Article X.

10.2 The Mastercard Savings Plan Employee Benefits Committee. The most senior officer in the Total Rewards department and the Treasurer of the Company (or substantially similar replacement titles) shall serve as the designated members of the Benefits Committee which shall consist of no less than three (3) and no more than twelve (12) members and the designated members of the Benefits Committee referred to above, shall appoint the other members of the Committee. The Benefits Committee shall also appoint the members of the Investment Committee (U.S.) and the Administrative Committee and any delegated Committee. Committee members shall serve without compensation at the pleasure of the Benefits Committee. Vacancies on any of the Committees shall be filled by the remaining members of the Benefits Committee. An individual may resign as a member of the Committee on prior written notice to the Committee. The Benefits Committee shall report to the Board at such times and in such manner as the Board may request or require. The Committee may adopt such rules and appoint such subcommittees as it deems desirable for the administration of the Plan.

10.3 Meetings. The Committee shall hold meetings upon such notice, at such place or places, and at such intervals as it may from time to time determine. Meetings of a Committee may be held in person, by telephone, through other suitable communications media or in any combination thereof.

10.4 Quorum and Voting. If the number of members of the Committee in office at the relevant time is an odd number, then a majority of such members shall constitute a quorum for the transaction of business. If the number of members of the Committee in office at the relevant time is an even number, then one-half of such members shall constitute a quorum for the transaction of business. Any action taken by a majority of the members of a Committee by written consent or at a meeting (including a telephonic meeting) at which a quorum is present shall constitute for all purposes of the Plan an act of the Committee. The Committee shall have the authority to ratify and approve any prior actions taken on its behalf by a prior Committee or by any officers or employees of an Affiliated Company. The Committee may authorize one or more of its members to execute any document or documents on behalf of the Committee.

10.5 Expenses.

(a) General Rule. The reasonable expenses incident to the operation of the Plan, including the compensation of the Trustee, attorney, fiduciaries, and for such other technical and clerical assistance as may be required, shall be paid from the Trust Fund in

accordance with applicable law; *provided*, *however*, that the Company, in its sole discretion, may decide to pay or reimburse the Trust Fund for all, or a portion of, such expenses.

(b) Committee Expenses. The members of the Committee shall serve without compensation for services as such. All expenses of the Committee shall be paid out of the Trust Fund, unless paid by the Company. Such expenses shall include any expenses incidental to the functioning of the Committee, including, but not limited to, fees of independent accountants, enrolled actuaries, legal counsel, investment advisors and other specialists and other expenses as provided in Section 10.6.

10.6 Allocation of Fees and Expenses.

(a) General Rule. Except to the extent Plan fees and expenses related to Account maintenance, transaction and investment fund management and maintenance, as set forth in this Section 10.6, are paid by the Employer directly, or indirectly, from forfeitures as directed by the Committee, such fees and expenses shall be paid from the Plan as set forth in this Section 10.6. The Employer may pay a lower portion of the fees and expenses allocable to the Accounts of Participants who are no longer Employees or who are not Beneficiaries, unless doing so would result in discrimination.

(b) Account Maintenance. Account maintenance fees and expenses may include but are not limited to, administrative, Trustee, government annual report preparation, audit, legal, nondiscrimination testing and fees for any other special services. Account maintenance fees shall be charged to Participants on a per Participant basis provided that no fee shall reduce a Participant's Account balance below zero.

(c) Transaction. Transaction fees and expenses may include, but are not limited to, investment fund election change and loan fees. Transaction fees shall be charged to the Participant's Account involved in the transaction provided that no fee shall reduce a Participant's Account balance below zero.

(d) Investment Fund Management and Maintenance. Management and maintenance fees and expenses related to investments under the Plan shall be charged at the investment fund level and reflected in the net gain or loss of each fund.

(e) QDRO Processing. Effective as of July 5, 2005, a fee for processing and determining the qualified status of a domestic relations order shall be charged to the Account of the Participant on behalf of whom the QDRO is processed.

10.7 Powers and Duties of The Mastercard Savings Plan Employee Benefits Committee.

(a) General Authority. The Benefits Committee shall have responsibility for general oversight of the Plan and specifically shall (i) have the power to appoint the members of each Committee under the Plan; (ii) have oversight of the performance of the other Committees under the Plan and their delegates and (iii) have authority to make all settlor decisions related to the Plan. The Benefits Committee shall have the power and duty to take all actions and

to make all decisions necessary or proper to carry out its responsibilities under the Plan. All determinations of the Committee as to any question involving the responsibilities under the Plan, including without limitation interpretation of the Plan, or as to any discretionary items to be taken under the Plan, shall be solely at the discretion of the Committee and shall be final, conclusive and binding on all persons claiming to have any right or interest in or under the Plan.

(b) Additional Powers and Duties. In addition to any implied powers and duties with which the Committee shall be empowered to carry out the provisions of the Plan, the Committee shall have the following specific powers and duties to:

(i) construe and interpret the terms and provisions of the Plan and all documents that relate to the Plan and to decide any and all matters arising thereunder relating to the responsibilities set forth in Section 10.7(a), including the right to remedy possible ambiguities, inconsistencies or omissions;

(ii) to evaluate as necessary the performance and policies of the Administrative Committee; and

(iii) to evaluate as necessary the performance of the Investment Committee (U.S.) and any Employee engaged in the management and administration of the Plan or Trust Fund.

10.8 Powers and Duties of the Administrative Committee.

(a) General Authority. The Administrative Committee shall have responsibility for reviewing, and the powers and duty to review, in accordance with Section 10.12(b), appeals of adverse benefit determinations by the Plan Administrator. The Administrative Committee shall have the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibility, powers and duty under the Plan. All determinations of the Administrative Committee as to any question involving its responsibility, powers and duties under the Plan, including, without limitation, interpretation of the Plan, or as to any discretionary items to be taken under the Plan, shall be solely at the discretion of the Administrative Committee and shall be final, conclusive and binding on all persons claiming to have any right or interest in or under the Plan. Benefits under the Plan shall be paid only if the Administrative Committee decides, in its discretion, that the applicant is entitled to them; and

(b) Additional Powers and Duties. In addition to any implied powers and duties with which the Administrative Committee shall be empowered to carry out its responsibility under the Plan, the Administrative Committee shall have, in connection with such responsibility, the power and duty to:

(i) construe and interpret the terms and provisions of the Plan and all documents which relate to the Plan and to decide any and all matters arising thereunder consistent with such responsibility;

(ii) investigate and make such factual or other determinations as shall be necessary or advisable for the resolution of appeals of adverse determinations under the Plan pursuant to Section 10.12(b); and

(iii) evaluate as necessary the performance of the Plan Administrator and any Employee engaged in the administration of the Plan in accordance with Section 10.10 of the Plan.

10.9 Powers and Duties of the Investment Committee (U.S.).

(a) General Authority. The Investment Committee (U.S.) shall have responsibility for (i) adopting, following and maintaining an investment policy for the Plan; (ii) supervising the investment of the Plan's assets in accordance with the Plan's investment policy; (iii) deciding the classes of assets to be held by the Plan; (iv) selecting the Investment Funds and making investment decisions regarding Plan assets, to the extent such decisions are not delegated to the Participants under the Plan's terms; (v) evaluating the performance of and terminating Investment Funds; (vi) selecting any investment manager and/or advisor to assist the Committee in evaluating the investment policy or any Investment Funds under the Plan; and (vii) to regularly monitor and evaluate the fees paid by the Plan with the Plan's assets. The Investment Committee (U.S.) shall have the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities under the Plan.

(b) Additional Powers and Responsibilities. In addition to any implied powers and duties which may be needed to carry out the provisions of the Plan, the Investment Committee (U.S.) shall have the following specific powers and duties:

(i) determine the number of Investment Funds that will be offered under the Plan and to add and delete Investment Funds;

(ii) appoint, remove or change, from time to time, persons constituting "Investment Managers," as defined in Section 3(38) of ERISA, to manage the assets of the Trust Fund, and to delegate to such Investment Managers the exclusive authority to manage (including the power to acquire and dispose of) all or such portion of the Trust Fund as the Investment Committee (U.S.) shall designate at any time or from time to time as constituting such Investment Fund or as may be allocated to such Investment Fund by Participants;

(iii) investigate and make factual determinations with regard to any matter related to the Trust Fund;

(iv) make and enforce such rules and regulations as it shall deem necessary or proper for the efficient investment of the Trust Fund; and

(v) appoint the Trustee or Trustees and evaluate the performance of such Trustees.

10.10 Powers and Duties of the Plan Administrator.

(a) General Authority. The Plan Administrator shall have responsibility for the interpretation and construction of the Plan and final authority with respect to operation and administration of the Plan, including the day-to-day responsibility for the operation and administration of the Plan. The Plan Administrator shall have the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities, powers and duties under the Plan. All determinations of the Plan Administrator as to any question involving its responsibilities, powers and duties under the Plan, including, without limitation, interpretation of the Plan, or as to any discretionary items to be taken under the Plan, shall be solely at the discretion of the Plan Administrator and shall be final, conclusive and binding on all persons claiming to have any right or interest in or under the Plan. Benefits under this Plan shall be paid only if the Plan Administrator decides, in its discretion, that the applicant is entitled to them.

(b) Additional Powers and Duties. In addition to any implied powers and duties which may be needed to carry out the provisions of the Plan, the Plan Administrator shall have the following specific powers and duties to:

(i) make and enforce such rules and regulations as it shall deem necessary or proper for the efficient administration of the Plan;

(ii) construe and interpret the terms and provisions of the Plan and all documents which relate to the Plan and to decide any and all matters arising thereunder, including the right to remedy possible ambiguities, inconsistencies or omissions;

(iii) investigate and make such factual or other determinations as shall be necessary or advisable for the administration of the Plan or for the determination of benefits or benefit eligibility under the Plan;

(iv) determine the eligibility for benefits under the Plan by investigation and review of the facts or otherwise;

(v) monitor and supervise the activities of the Plan record keeper and other third-party administrators appointed for the Plan;

(vi) review benefit claims in accordance with Section 10.12(a) and approve or deny any claim for benefits pursuant to Section 10.12(c);

(vii) review domestic relations orders and determine whether any such domestic relations order constitutes a QDRO;

(viii) approve Plan Loans, hardship withdrawals, other in-service withdrawals or Plan distributions;

(ix) determine the eligibility for benefits under the Plan;

(x) compute the Account or the amount which shall be payable to any Participant, Spouse, Beneficiary or alternate payee in accordance with the provisions of the Plan or review the computation or amount computed by any third- party administrator;

(xi) supervise the Employees of the Company who are retained in connection with the operation of the Plan;

(xii) determine which Plan expenses shall be charged to the Trust Fund;

(xiii) to review the payment of Plan benefits and authorize disbursements from the Trust Fund;

(xiv) establish and administer rules and procedures with respect to all matters relating to the election and use of the Investment Funds;

(xv) maintain all records necessary for the administration of the Plan which are not maintained by the Trustee;

(xvi) change or to modify the method of accounting for the Plan or the Trust Fund;

(xvii) employ counsel, consultants, independent accountants or enrolled actuaries to aid in carrying out its powers and duties hereunder;

(xviii) determine the fact of a Participant's death and of any Beneficiary's right to receive the deceased Participant's interest based upon such proof and evidence as it deems necessary; and

(xix) take responsibility for the creation and dissemination of all communications required to participants and beneficiaries under the Plan including notices and reports required by ERISA and the Code.

(a) Voting and Investment Direction. The Plan Administrator shall be responsible for supervising the implementation of all investment directions by Participants and their Beneficiaries and alternate payees and the actions necessary to permit the exercise by Participants, Beneficiaries and alternate payees of voting and other rights, if any, with respect to any Investment Fund. Furthermore, the Plan Administrator shall use his or her best efforts to ensure the confidentiality of all information relating to a Participant's investments and the exercise of voting and other rights; *provided* that the Plan Administrator determines that doing so is in the interests of all other Participants, Beneficiaries and Alternate Payees.

(b) Multiple Capacities. The Plan Administrator or any other fiduciary designated by the Committees or the Plan Administrator may serve in more than one fiduciary capacity with respect to the Plan.

(c) Residual Authority. Effective January 1, 2010, any power, duty or responsibility with respect to Plan administration and operation not specifically allocated hereunder shall reside with the Administrative Committee.

10.11 Delegation of Authority. Subject to the applicable provisions of ERISA, the Committee, the Investment Committee (U.S.) and the Plan Administrator may each delegate any fiduciary or other responsibilities allocated to them under the terms of the Plan and may appoint one or more fiduciaries to provide for the administration of the Plan, including, without limitation, a Plan record keeper. The Committee, the Investment Committee (U.S.) and the Plan Administrator may authorize or delegate one or more persons (i) to perform the routine administrative functions, (ii) to sign any statements of the Committee, the Investment Committee (U.S.) or the Plan Administrator, (iii) to deliver instructions to the Trustee in accordance with the guidelines established by the Committee, the Investment Committee (U.S.) or the Plan Administrator and (iv) to deliver notices and other communications to Participants, Spouses, Beneficiaries or other persons.

10.12 Benefit Claims and Appeals. Benefit claims and appeals shall comply with all applicable provisions of 29 CFR § 2560.503-1.

(a) Benefit Claim. In the event any person or his or her authorized representative (the "*Claimant*") disputes the amount of, or his or her entitlement to, any benefits under the Plan or their method of payment, such Claimant shall be required to file a claim in writing with the Plan Administrator for the benefits to which he or she believes he or she is entitled, setting forth the reason for his or her claim. The Claimant shall have the opportunity to submit written comments, documents, records and other information relating to the claim and shall be provided, upon request and free of charge, reasonable access to and copies of all documents, records or other information relevant to the claim. The Plan Administrator will consider the claim and within ninety days of receipt of such claim (or within forty-five days if the claim involves a determination of Disability), unless special circumstances exist, the Plan Administrator will inform such person of its decision with respect to the claim. In the event of special circumstances, the response period can be extended for an additional ninety days (or thirty days if the claim involves a determination of Disability), as long as the Claimant receives before the end of the initial ninety-day period (or initial forty-five-day period if the claim involves a determination of Disability), written notice advising of the special circumstances and the date by which the Plan Administrator expects to make a determination (the "*Extension Notice*"). If the Plan Administrator denies the claim, the Plan Administrator will give to such person (i) a written notice setting forth the specific reason or reasons for the denial of the claim, including references to the applicable provisions of the Plan on which the determination was based, (ii) a description of any additional material or information necessary to perfect such claim along with an explanation of why such material or information is necessary, (iii) appropriate information as to the procedure to be followed for review of such claim by the Administrative Committee, including time limits applicable to such procedures, and (iv) a statement of the Claimant's right to commence a civil action under Section 502(a) of ERISA following an adverse benefit determination on appeal.

(b) Appeal of Denial. Any Claimant whose claim is denied by the Plan Administrator and who wishes to appeal such denial must request a review of the Plan Administrator's decision by filing a written request with the Administrative Committee for such

review within sixty days after his or her receipt of the written denial of the claim. Such request for review shall contain, and the review by the Administrative Committee shall consider, all comments, documents, records and other information relating to the claim that the Claimant wishes the Administrative Committee to review, without regard as to whether such information was submitted or considered in the initial review of the claim by the Plan Administrator. In connection with that review, the Claimant shall be provided, upon request and free of charge, reasonable access to and copies of all documents, records or other information relevant to the claim. Written notice of the Administrative Committee's decision shall be provided to the Claimant within sixty days (or within forty-five days if the appeal involves a determination of Disability) following receipt of the request for review by the Administrative Committee. In the event of special circumstances, the response period can be extended for an additional sixty days (or an additional thirty days if the appeal involves a determination of Disability), as long as the Claimant receives an Extension Notice before the end of the initial sixty-day period (or initial forty-five-day period if the appeal involves a determination of Disability). Any decision of the Administrative Committee shall be in writing and shall include (i) the specific reasons for the adverse determination, (ii) references to applicable Plan provisions on which the determination was based, (iii) a statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claim and (iv) a statement of the Claimant's right to bring an action under Section 502(a) of ERISA following an adverse benefit determination on review and a description of the applicable limitations period under the Plan.

(c) Limitation of Action. A Claimant wishing to seek judicial review of an adverse benefit determination under the Plan, whether in whole or in part, must file any suit or legal action, including, without limitation, a civil action under Section 502(a) of ERISA, no later than the earlier of (i) one year after the date the final decision on the adverse benefit determination on review is issued or should have been issued under Section 10.12(b) and (ii) the last day on which such legal action could be commenced under the applicable statute of limitations under ERISA (including, for this purpose, any applicable state statute of limitations that applies under ERISA to such legal action). Failure to file a suit or legal action by the applicable deadline set forth in the prior sentence shall cause the Claimant to lose any rights to bring such an action. If any such judicial proceeding is undertaken, the evidence presented shall be strictly limited to the evidence timely presented to the Administrative Committee. Notwithstanding anything in the Plan to the contrary, a Claimant must exhaust all administrative remedies available to such Claimant under the Plan before such Claimant may seek judicial review pursuant to this Section 10.12(c) and Section 502(a) of ERISA.

10.13 Indemnification. The Employer shall indemnify and hold harmless each member of the Committee against any and all claims, losses, damages, expenses, including legal fees and other expenses of litigation, and liability arising from any action or failure to act, except when the same is finally determined by a court of competent jurisdiction to be due to the gross negligence or willful misconduct of such member.

10.14 Reliance on Reports and Certificates. The Committee shall be entitled to rely conclusively upon all tables, valuations, certificates, opinions and reports furnished by the Company, any accountant, controller, counsel, the Trustee or other person who is employed or engaged for such purposes.

10.15 Participants' Own Participation. The Plan Administrator and any member of the Committee shall not act on, vote on or otherwise influence any decision specifically relating to his own participation under the Plan.

10.16 Qualified Domestic Relations Orders. The Committee shall establish, and may modify from time to time, reasonable procedures to determine the qualified status of any domestic relations order, as defined in Section 414(p) of the Code. Such procedures may restrict the right of any Participant to receive amounts potentially subject to a Qualified Domestic Relations Order for such periods as the Committee may provide.

# ARTICLE XI

## TRUST FUND; INVESTMENT FUNDS

11.1 Trust Agreement. A Trustee shall be designated by the Investment Committee (U.S.), and a Trust Agreement shall be executed between the Company and such Trustee, under the terms of which a Trust Fund shall be established to receive and hold contributions and other income, to invest the assets of the Trust Fund and to pay the expenses of, and the benefits provided by, the Plan.

11.2 Investment of Trust Fund. It is the intention of the Company to retain no authority or responsibility over the management, acquisition or disposition of Plan assets. The Trust Fund shall be invested among certain Investment Funds selected for such purpose by the Investment Committee (U.S.) in accordance with the Plan's investment and funding policy. Investment Funds may include vehicles managed by the Company or an Affiliated Company, including, without limitation, open-ended investment companies registered under the Investment Company Act of 1940, as amended ("*Mutual Funds*"), separately managed accounts and unregistered commingled funds. Effective as of July 5, 2005, or as soon as practicable thereafter as shall be determined by the Plan Administrator, the Investment Funds in the Plan that are available to Participants shall include a mutual fund window through which families of Mutual Funds are available, including, without limitation, Mutual Funds that are managed by the Company or an Affiliate. The Investment Committee (U.S.) may add or remove an Investment Fund without amending the Plan.

11.3 Investment of Account.

(a) Choice of Investment Funds. Each Participant shall be permitted to elect the Investment Fund or Funds in which his or her existing Account Balance shall be invested. Subject to Section 11.3(b), a Participant shall be permitted on each Business Day, to reallocate his or her Account Balance between and among the Investment Funds. Such reallocation shall be effected in accordance with the Appropriate Procedure. The Plan Administrator shall advise, or make provisions to advise, the Trustee of all elections made by Participants pursuant to this Section 11.3. All elections with respect to the investment of any amount invested in accordance with Section 11.3(a) shall be made in such minimum percentages of each Investment Fund as the Plan Administrator shall from time to time determine.

(b) Uses and Limitations.

(i) The Plan Administrator shall have the authority to adopt any rules and procedures and take any and all actions as it deems necessary or appropriate, with respect to all matters relating to the election and use of the Investment Funds. Without limiting the generality of the foregoing, the Plan Administrator shall have the authority, without prior notice to any Participant and in accordance with criteria that are uniformly applied to all similarly-situated Participants, (v) to limit the frequency or number of trades between and among any or all Investment Funds, (w) to require Participants to effect reallocations between and among any or all of the Investment Funds via U.S. mail, (x) to suspend reallocations between and among any or all of the Investment Funds for up to six months, (y) to delay effecting transfers between and among

any or all of the Investment Funds for one or more days and (z) to decline to implement transfers between and among any or all of the Investment Funds, if the Plan Administrator determines that any such action is necessary or advisable (A) in light of unusual market conditions, (B) in response to technical or mechanical problems with the Appropriate Procedure or the Plan's record keeper, (C) in connection with any suspension of normal trading activity on the New York Stock Exchange, (D) to prevent trading that the Plan Administrator determines to be for the purpose of taking advantage of short-term fluctuations in the securities market or any other activity that the Plan Administrator may determine is detrimental to the Plan or to other Participants, or (E) as a result of a violation by a Participant of any provision of the Plan (including, without limitation, this Section 11.3) or any rule established by the Plan Administrator.

(ii) Any redemption fee imposed by an Investment Fund on any transaction by a Participant (including, without limitation, a reallocation, sale, purchase, exchange or transfer) shall be charged, to the extent practicable as determined by the Plan Administrator, to the Account of the Participant entering into the transaction. Under no circumstances shall such redemption fee, or any portion thereof, be charged to the Accounts of other Participants.

(iii) Notwithstanding anything in the Plan to the contrary, a Participant shall not be permitted to transfer all, or any portion, of his or her Account between or among the Investment Funds or otherwise use the Investment Funds at a time or in a manner that is prohibited by, or that does not comply with, the rules, regulations or prospectuses of the Mutual Funds, unregistered commingled investment vehicles and separately managed accounts underlying the Investment Funds, to the extent applicable to the Participant, as determined by the Plan Administrator.

11.4 Investment of Future Contributions.

(a) Election. Each Eligible Employee shall be permitted to elect the Investment Fund or Funds in which his or her future Elective Deferrals, and After-Tax Contributions shall be invested. Subject to Section 11.3(b), on any Business Day, a Participant may change his or her investment elections with respect to the allocation of future Elective Deferrals, and After-Tax Contributions. All elections pursuant to this Section 11.4 shall be made by utilizing the Appropriate Procedure and shall be in such minimum percentages of each Investment Fund as the Plan Administrator shall from time to time determine.

(b) Allocation. Elective Deferrals and After-Tax Contributions made by a Participant shall be invested in the Investment Fund or Funds selected by the Participant in accordance with this Section 11.4 as soon as practicable after the date such amounts are contributed to the Trust Fund. Catch-up contributions, Match Contributions, Profit-Sharing Contributions (if any) and Rollover Contributions shall be invested pro rata in the Investment Funds selected by the Participant in accordance with Section 11.4(a) as soon as practicable after the date such amounts are contributed to the Trust Fund.

(c) Default Fund. If an Eligible Employee who participates in the Plan (including an Eligible Employee who participates by reason of Section 4.1(b)), but fails to elect for any reason, using the Appropriate Procedure, the Investment Fund or Funds in which his or her future Elective Deferrals and After-Tax Contributions are to be invested, his or her future

Elective Deferrals, After-Tax Contributions, catch-up contributions and Match Contributions shall be invested in a default Investment Fund specified by the Plan Administrator.

11.5 Valuation of Accounts. The value of each Account shall be determined as of the Valuation Date coincident with or preceding any date of reference. As of each Valuation Date, the Trustee shall determine the value of the Trust Fund and each Investment Fund, and the Plan Administrator shall cause the value of the Account maintained for each Participant, Beneficiary or Alternate Payee to be determined based upon such valuation. The valuation methodology used by the Trustee for purposes of valuing the Trust Fund shall be reasonable in light of prevailing commercial practices for defined contribution plans that utilize daily valuations and daily transfers and shall take into account all contributions, withdrawals, distributions, charges, income, gains and losses to the Trust Fund from the prior Valuation Date.

11.6 Non-Reversion. Except as provided in Section 11.7, all contributions when made to the Trust Fund and all property of the Trust Fund, including income from investments and all other sources, shall be retained for the exclusive benefit of Participants, their Beneficiaries and Alternate Payees and shall be used to pay benefits provided hereunder or to pay expenses of administration of the Plan and the Trust Fund to the extent not paid by the Company.

11.7 Return of Certain Contributions. All contributions to the Trust Fund by an Employer are conditioned upon deductibility under Section 404 of the Internal Revenue Code. Any provisions of the Plan to the contrary notwithstanding, in the case of any contribution to the Trust Fund that is made by an Employer as a result of a mistake of fact or that is not deductible under Section 404 of the Internal Revenue Code, such contribution, to the extent made by a mistake of fact or to the extent that the deduction for such contribution is disallowed, shall be returned to the Employer; *provided*, *however*, that a contribution shall be returned within one year after it is mistakenly made or one year after such deduction is disallowed, as the case may be. Any contribution refunded as provided above shall only be adjusted to reflect its proportionate share of the Trust Fund's loss, if any, and shall not be adjusted to reflect its proportionate share of the Trust Fund's gain, if any.

11.8 Source of Benefits. The Trust Fund shall be the sole source of benefits under this Plan, and each Employee, Participant, joint or contingent annuitant, Beneficiary, Alternate Payee or any other person who shall claim the right to any payment or benefit under this Plan shall be entitled to look only to the Trust Fund for the payment of benefits. Except as may be otherwise provided by ERISA or other applicable law, the Employer shall have no liability to make or continue from its own funds the payment of any benefit under the Plan.

# ARTICLE XII

## AMENDMENT OR TERMINATION

12.1 Amendment to the Plan.

(a) General Rule. The Board shall have the right to modify or amend, prospectively and retroactively, the Plan. The authority of the Board to act in accordance with the previous sentence may be delegated by the Board to one or more committees thereof, to the Mastercard Savings Plan Employee Benefits Committee or to one or more officers of the Company or any other Affiliated Employer. Any action by the Board will be undertaken either by resolution of the Board, duly adopted at a meeting thereof, or by written consent of the Board in lieu of a meeting, in any case in accordance with the by-laws of the Company and applicable state law. Any such action delegated to an officer will be evidenced by a written certificate or certification executed by such officer. Any action by the Committee will be undertaken in accordance with Article XII.

(b) Additional Amendment Authority. Notwithstanding anything in Section 12.1(a) to the contrary, (i) prior to October 1, 2007, the Mastercard Savings Plan Employee Benefits Committee shall have the right to unanimously approve legally required or "non-material" changes to the Plan and (ii) effective after November 30, 2007, the Chief Administrative Officer of the Company or the successor thereto (the "*CAO*") or, if the CAO is not available, the next most senior officer in the human resources department of the Company who is available shall have the right to approve all amendments to the Plan that the CAO or such other officer determines to be necessary, appropriate or desirable based on applicable law or a non-material amendment. Effective after October 15, 2016, the most senior officer in the human resources department shall have the right to approve all amendments to the Plan that he or she determines to be necessary or appropriate or desirable based on applicable law or a non-material amendment. For purposes of this Section 12.1(b), a "non-material" amendment is defined as an amendment having an impact on the Plan that does not exceed $5,000,000 annually.

(c) Alternate Provisions. Each Employer may at any time, with the approval of the Board of Directors, adopt alternate provisions with respect to itself in lieu of any other provisions of the Plan.

12.2 Termination. The Plan may be terminated in whole or in part by the Board at any time. Any such action by the Board will be undertaken in the manner described in Section 12.1. Written notification of such action shall be given to each Employer, the Trustee and each member of the Committee setting forth the termination date. After termination of the Plan, no further contributions shall be made hereunder. However, the Committee shall remain in existence and all provisions of the Plan shall remain in force which are necessary in the opinion of the Committee, other than the provisions for contributions; and the Trust Agreement shall remain in existence, and all of the provisions thereof shall remain in force which are necessary in the opinion of the Committee, other than the provisions relating to the contributions under the Plan.

12.3 Vesting; Accounts; Distribution.

(a) Vesting. In the event that (i) the Plan shall be terminated, (ii) the Internal Revenue Service, the Board or the Committee determines that a partial termination of the Plan has occurred, or (iii) any Employer completely discontinues contributions to the Plan, then (A) the Accounts of all Participants, in the case of a Plan termination, or (B) the Accounts of those Participants affected by the partial termination or complete discontinuance of contributions, in the case of a partial termination or complete discontinuance of contributions, shall be fully vested and nonforfeitable.

(b) Accounts.

(i) Until distributed to the Participant in accordance with Section 12.3(c), each Participant's Account shall continue to be valued in accordance with the provisions of Article XI. For purposes of such valuations, the date as of which the contributions are discontinued or the date set forth as the termination date of the Plan shall be deemed a Valuation Date. Included in any such valuation shall be expenses incurred in effectuating such termination, partial termination or discontinuance (such as the fees and retainers of the Plan's Trustee, actuary, accountant, custodian, counsel, administrator or other specialist).

(ii) In the event that the Plan completely terminated, unallocated forfeitures, or any other amounts held in the suspense account of the Plan, shall be credited to the Employer Account of each Participant who is a Participant as of the date of termination in the same proportion as his or her Compensation for the Plan Year of termination bears to the Compensation of all Participants eligible to receive an allocation upon termination.

(c) Distribution Upon Plan Termination. Participants shall receive a lump sum distribution of their Accounts following the allocation described in Section 12.3(a) as soon as practicable after Plan termination; *provided* that the Employer does not establish or maintain a successor plan. For purposes of this Section 12.3, a successor plan is any defined contribution plan maintained by the Employer; *provided*, *however*, that if at all times during the twenty-four-month period beginning twelve months before the Plan termination, fewer than two percent of the Employees who were eligible to participate in the Plan as of the date of its termination are eligible to participate under the other defined contribution plan, such plan is not a successor plan. A plan is a successor plan only if it exists at any time during the period beginning on the date of Plan termination and ending twelve months after distribution of all assets from the terminated Plan.

12.4 Plan Participation by Employers.

(a) Withdrawal by Participating Employer. Any Employer may at any time, by resolution of its board of directors, withdraw from the Plan and Trust Fund, and it shall thereby be deemed to have established a separate plan in respect of its Employees (whose terms are identical to the terms of this Plan as in effect immediately prior to such withdrawal, except that the term "Board of Directors" therein shall mean the board of directors of such withdrawing Employer). In such event the funds held by the Trustee in respect of Employees of such Employer

shall be determined pursuant to Code Section 414(l). Such funds may then be segregated and shall constitute a separate trust fund (to be administered under a separate trust agreement whose terms are identical to the terms of the Trust Agreement established hereunder, as in effect immediately prior to such segregation). The decision of the Trustee shall be final as to the assets to be allocated to the separate plan and trust created in accordance herewith.

(b) Termination by Participating Employer. Any Employer shall have the right at any time, by resolution of its board of directors, to terminate the Plan as applied to its Employees. Any such notice shall be treated as a notice of withdrawal from the Plan and Trust Fund under Section 12.4(a) and the provisions thereof applicable upon termination of the Plan shall be effective as to any separate plan and trust provided for under Section 12.4(a) in the case of any such withdrawal. Written notice of such action shall be signed and dated by an executive officer of the Employer and delivered to the Company. If the effective date of such action is not specified, it shall be effective on, or as soon as reasonably practicable, after the date of delivery. Any such termination by an Employer shall not affect the application of the Plan to the Employees of any other Employer.

(c) Account Maintenance. Upon any Employer's withdrawal from the Plan in accordance with Section 12.4(a) or 12.4(b), the Committee may direct, in accordance with ERISA and the Code, that any or all of the Accounts of the affected Participants (who are Employees of such Employer) may continue to be maintained by the Plan or, after payment of or provision for expenses and charges and appropriate adjustment of the Accounts of all such Participants as described in Section 10.6, the Committee may direct, subject to ERISA and the Code, that the balances of such Accounts be transferred, subject to Section 12.5, to a successor defined contribution plan that is qualified under Code Section 401(a).

12.5 Mergers, Consolidations and Transfers. The Plan shall not be automatically terminated by the Company's acquisition by, or merger into, any other company, but the Plan shall be continued after such merger, *provided* that the successor company agrees to continue the Plan. All rights to amend, modify, suspend, or terminate the Plan shall be transferred to the successor company, effective as of the date of the merger. The merger or consolidation with, or transfer of assets and liabilities to, any other qualified retirement plan shall be permitted only if each Participant would receive a benefit immediately after such merger, consolidation or transfer of assets and liabilities (determined as if the Plan had then terminated) that is equal to or greater than the benefit he or she would have received immediately before any such transaction (determined as if the Plan had then terminated); *provided*, *however*, that this sentence shall not be construed as requiring the full vesting of all Accounts in connection with any event described in this Section 12.5.

# ARTICLE XIII

## GENERAL PROVISIONS

13.1 No Guarantee of Employment. The Plan shall not be deemed to constitute a contract between the Company and any person or to be a consideration for, or an inducement for, the employment of any person by the Company. Nothing contained in the Plan shall be deemed to give any person the right to be retained in the service of any Affiliated Company or to interfere with the right of any Affiliated Company to discharge or to terminate the Service of any Employee at any time without regard to the effect such discharge or termination may have on any rights under the Plan.

13.2 Limitation of Rights. Neither the establishment of the Plan, any modification thereof, nor the creation of any fund, trust or account, nor the payment of any benefits shall be construed as giving (a) any Participant, or any other person any legal or equitable right against an Employer, the Committee or the Trustee, unless such right shall be specifically provided for in the Plan or granted by affirmative action of the Committee or an Employer in accordance with the terms and provisions of the Plan; or (b) any Participant or any other employee of an Employer the right to be retained in the service of an Employer and all Participants and other Employees shall remain subject to discharge, with or without cause, to the same extent as if the Plan had never been adopted.

13.3 Payments to Minors and Incompetents. If a Participant, Beneficiary or Alternate Payee entitled to receive any benefits hereunder is a minor or is deemed by the Plan Administrator or is adjudged to be legally incapable of giving valid receipt and discharge for such benefits, the benefits shall be paid to such persons as the Plan Administrator shall designate or to the duly appointed guardian. Such payments shall, to the extent made, be deemed a complete discharge of any liability for such payment under the Plan.

13.4 Nonalienation of Benefits.

(a) General Rule.

(i) No Participant, Spouse, Beneficiary, Alternate Payee or other person shall have the right to assign, transfer, alienate, pledge, encumber or subject to lien any benefits to which he or she is entitled under the Plan, and benefits under the Plan shall not be subject to attachment, garnishment or other legal process. Any attempted assignment, transfer, alienation, pledge or encumbrance of benefits or subjection of benefits to lien or adverse legal process of any kind shall not be recognized by the Committee, which, in such case, may direct that such benefits be held or applied for the benefit of such Participant, Spouse, Beneficiary or other person in such manner and in such proportion as the Committee deems advisable.

(ii) If any Participant or other payee shall attempt to assign, transfer or dispose of any such right, or should such right be subjected to attachment, execution, garnishment, sequestration or other legal, equitable or other process, it shall automatically pass to such person or persons as may be appointed by the Committee from among the Beneficiaries, if any theretofore designated by the Participant (where the benefit involved was payable to the

Participant), and the spouse and blood relative of such Participant or other payee; provided, however, that the Committee in its sole discretion may re-appoint the Participant or other payee to receive any payment thereafter becoming due either in whole or in part. Any appointment made by the Committee hereunder may be revoked by the Committee at any time and a further appointment made by it.

(a) Limitation. The creation, assignment or recognition of a right to any benefit payable with respect to a Participant (i) pursuant to a QDRO or (ii) in a manner consistent with Treasury Regulation Section 1.401(a)-13(b)(2) related to enforcement of federal tax levies shall not be treated as an assignment or alienation prohibited in this Section 13.4. Notwithstanding the provisions of Section 13.4(a), a Participant's benefits under the Plan may be reduced to satisfy liabilities of the Participant to the Plan due to (i) the Participant being convicted of committing a crime involving the Plan, (ii) a civil judgment (or consent order or decree) entered by a court in an action brought in connection with a violation of such Participant's fiduciary duties with respect to the Plan or (iii) a settlement agreement between the Secretary of Labor or the Pension Benefit Guaranty Corporation and the Participant in connection with a violation of the fiduciary provisions of ERISA; provided, however, that the court order establishing such liability shall require that the Participant's benefits under the Plan be applied to satisfy the liability.

13.5 Evidence of Survivor. If the Plan Administrator, or the Trustee with the assistance of the Plan Administrator, cannot make payment of any amount to a Participant, Beneficiary or Alternate Payee within one year (effective April 1, 2007) after such amount becomes payable because the identity or whereabouts of such Participant, Beneficiary or Alternate Payee cannot be ascertained, notwithstanding the mailing of a notice to such Participant, Beneficiary or Alternate Payee by certified mail to his last known address, the Plan Administrator, at the end of such six-month period, may direct that all unpaid amounts which would have been payable to such Participant, Beneficiary or Alternate Payee be forfeited and treated as a forfeiture under Section 7.6. In determining whether such one-year period has elapsed, the Plan Administrator may establish rules to be applied on a uniform and nondiscriminatory basis concerning how such periods shall be counted. Notwithstanding the foregoing, the forfeited benefits of any Participant, Beneficiary or Alternate Payee shall be reinstated and payment of such benefits shall commence upon the filing at any time of a claim for such benefits by such Participant, Beneficiary or Alternate Payee or no later than sixty days after the date on which the Participant, Beneficiary or Alternate Payee is identified.

13.6 Reimbursement to Plan for Certain Payments. The Plan Administrator reserves the right to recover on behalf of the Plan payments made to a Participant, Beneficiary or Alternate Payee in excess of the benefits payable under the Plan. The Plan Administrator also reserves the right to withhold the amount of such excess payment from future benefits payable to such person.

13.7 Limitation of Liability and Legal Actions.

(a) No Litigation. Except as otherwise provided in accordance with ERISA, as a condition of participation in the Plan, each Employee agrees that neither an Employer, the Committee nor the Trustee shall in any way be subject to any suit or litigation or to any legal liability for any cause or reason or thing whatsoever, in connection with the Plan and Trust Fund

or their operation, except for its or their own negligence or willful misconduct, and each such Employee hereby releases each Employer, its officers and agents, the Committee and the Trustee from any and all such liability or obligation.

(b) Necessary Parties. Except as otherwise provided in accordance with ERISA, in any action or proceedings involving all or any portion of the Trust Fund, or the administration thereof, each Employer, the Committee and the Trustee shall be the only necessary parties. No person in the employ of (or formerly employed by) an Employer, or any Beneficiary or other person having or claiming to have an interest in the Trust Fund or under the Plan, shall be entitled to any notice of process; nor shall such persons be entitled to participate in any such action or proceedings. Any final judgment entered in any such action or proceeding which is not appealed or appealable shall be binding and conclusive on the parties thereto, and all persons having or claiming to have an interest in the Trust Fund or under the Plan.

13.8 Interest in Assets. No Participant, Beneficiary or other person shall have any legal or equitable right or interest in the funds set aside by an Employer, or otherwise received or held under the Plan, or in any assets of the Trust Fund, except as expressly provided in the Plan.

13.9 Severability. If any provision of the Plan or any regulation adopted thereunder is deemed or held to be unlawful or invalid for any reason, the remaining provisions of the Plan or regulations thereunder, shall not be adversely affected unless such determination shall render it impossible or impractical for the continued operation of the Plan. In such event, the appropriate parties shall immediately adopt a new provision or regulation to replace the one held unlawful or invalid.

13.10 Titles and Headings. The titles to Articles and headings of Sections in the Plan are for convenience of reference only and, in case of any conflict, the text of the Plan, rather than such titles and headings, shall control.

13.11 Electronic Media. Notwithstanding anything in the Plan to the contrary, pursuant to ERISA and the Code, the Committee and the Plan Administrator may each, to the extent that the Committee or Plan Administrator deems necessary, appropriate or desirable, use electronic media to satisfy disclosure, recordkeeping and consent obligations imposed on the Plan.

13.12 Governing Law. To the extent not preempted by ERISA, the provisions of the Plan shall be construed according to the laws of the State of New York applicable to agreements to be wholly performed therein.

# ARTICLE XIV

## TOP-HEAVY PLAN REQUIREMENTS

14.1 Top-Heavy Plan.

(a) General Rule. Notwithstanding any other provisions of the Plan to the contrary, the Plan shall be subject to this Article XIV for any Plan Year if it is determined to be a Top-Heavy Plan (as such term is used in Section 14.1(b)) as of the most recent valuation date within a twelve-month period ending on the determination date (the "*Determination Date*"). The provisions of this Article XIV shall be reasonably construed by the Plan Administrator to comply with Code Section 416.

(b) Conditions. A Plan is a "Top-Heavy Plan" for any Plan Year if any of the following conditions exists:

(i) The Plan is not part of a Required Aggregation Group or Permissive Aggregation Group and the Top-Heavy Ratio for the Plan exceeds sixty percent.

(ii) The Plan is part of a Required Aggregation Group but not part of a Permissive Aggregation Group and the Top-Heavy Ratio for the Required Aggregation Group exceeds sixty percent.

(iii) The Plan is part of a Required Aggregation Group and a Permissive Aggregation Group and the Top-Heavy Ratio for the Permissive Aggregation Group exceeds sixty percent.

(c) Application of Section. Notwithstanding any other provision in the Plan, the provisions of this Article XIV shall apply and supersede all other provisions in the Plan during each Plan Year with respect to which the Plan is determined to be a Top-Heavy Plan.

14.2 Top-Heavy Ratio. For purposes of this Article XIV, the "*Top-Heavy Ratio*" is a fraction (i) the numerator of which is the sum of the Present Value of the Section 416 Accrued Benefits for all Key Employees and the sum of the Defined Contribution Account Balances under the aggregated defined contribution plan or plans for all Key Employees as of the Determination Date and (ii) the denominator of which is the sum of the Present Value of the Section 416 Accrued Benefits and the Defined Contribution Account Balances under the aggregated defined contribution plan or plans for all Employees as of the Determination Date.

14.3 Minimum Employer Contribution.

(a) General Rule. If the Plan is a Top-Heavy Plan for a Plan Year, each Non- Key Employee in such Plan Year who:

(i) (A) participates in a defined benefit plan maintained by an Affiliate that provides that the minimum benefit requirements applicable to top-heavy plans shall be satisfied by such defined benefit plan and (B) is an Employee on the last day of such Plan

Year shall accrue an Annual Retirement Benefit under such defined benefit plan for such Plan Year in the manner contemplated by Code Section 416 equal to the defined benefit minimum, as determined in accordance with Treasury Regulation Section 1.416-1, reduced by any contributions for such Non-Key Employee for such Plan Year under the Plan or any other defined contribution plans in the Required Aggregation Group, in the manner contemplated by Treasury Regulation Section 1.416-1, M-12; or

(ii) (A) does not participate in a defined benefit plan maintained by an Affiliate that provides that the minimum benefit requirements applicable to top-heavy plans shall be satisfied by such defined benefit plan and (B) is an Employee on the last day of such Plan Year shall receive a contribution under the Plan in the manner contemplated by Code Section 416 in an amount equal to the lesser of (x) three percent of the Participant's Compensation and (y) the highest contribution percentage of any Key Employee under the Plan, as determined in accordance with Treasury Regulation Section 1.416-1, M-7, reduced by any contributions for such Non-Key Employee for such Plan Year under the Plan or any other defined contribution plans in the Required Aggregation Group. Effective as of January 1, 2002, employer matching contributions under the Plan or any other defined contribution plan of an Affiliated Company shall be taken into account for purposes of satisfying the defined minimum contribution requirement of this Section 14.3(a)(ii) in the manner contemplated by Code Section 416(c)(2). Match Contributions that are used to satisfy the minimum contribution requirements shall be treated as matching contributions for purposes of the actual contribution percentage test and other requirements of Code Section 401(m).

(b) Calendar Year. For purposes of this Section 14.3, a calendar year shall not be taken into account if the Plan was not a Top-Heavy Plan for any Plan Year ending within such calendar year Period of Service.

(c) No Key Employees. For purposes of satisfying the minimum benefit requirement of this Section 14.3, in determining years of Service with the Employer, any Service with the Employer shall be disregarded to the extent that such Service occurs during a Plan Year when the Plan benefits (within the meaning of Code Section 410(b)), no Key Employee or former Key Employee.

14.4 Minimum Vesting. A Participant shall become fully vested in his or her Account Balance as of the earliest of (i) his or her attainment of Retirement Age while an Employee of an Employer, (ii) the date of his or her death while he or she is an Employee of an Employer, and (iii) his or her completion of a three-year Period of Service.

14.5 Definitions. For purposes of this Article XIV, the following terms shall have the meanings indicated:

(i) "*Annual Retirement Benefit*" means a benefit payable annually in the form of a level single life annuity (with no ancillary benefits) beginning at age sixty-five. If the benefit commences at a date before or after attainment of age sixty-five, each Participant who is a Non-Key Employee must receive an amount that is the actuarial equivalent of the minimum benefit commencing at age sixty-five. If the form of benefit is other than a level single life annuity, each Participant who is a Non-Key Employee must receive an amount that is actuarially equivalent

to the level single life annuity. The minimum benefit described in Section 14.3(a) shall not be adjusted to take into consideration the availability of preretirement ancillary benefits under the Plan.

(ii) "*Compensation*" for purposes of Section 14.3 shall have the meaning set forth in Section 6.5.

(iii) "*Defined Contribution Account Balance*" means, in accordance with Section 416 of the Code, the sum of (i) the aggregate balance of the Account Balances of an Employee plus the accounts of such Employee under other applicable plans of the Required Aggregation Group as of the Determination Date, (ii) any contribution allocated to such Account Balances and other accounts after the most recent Determination Date and (iii) the aggregate distributions made with respect to such Account Balances and other accounts during the one-year period ending on the Determination Date and not reflected in the value of the Account Balances and other accounts as of the most recent Determination Date under clause (i) above. The preceding sentence shall also apply to distributions made (A) after a termination of Service or (B) under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Section 416(g)(2)(A)(i) of the Code. In the case of a distribution made for a reason other than a termination of employment, death, or Disability, this provision shall be applied by substituting "five-year period" for "one-year period". The Account Balance of any individual who has not performed services for an Employer during the one-year period ending on the Determination Date shall not be taken into account.

(iv) "*Key Employee*" has the meaning assigned to such term in Section 416(i) of the Code.

(v) "*Non-Key Employee*" means any Employee who is not a Key employee.

(vi) "*Permissive Aggregation Group*" means the Required Aggregation Group plus any other qualified plans maintained by the Employer which would continue to satisfy the requirements of Code Sections 401(a)(4) and 410(b) when considered as a group.

(vii) "*Present Value of the Section 416 Accrued Benefits*" means, in accordance with Section 416 of the Code, the present value of the cumulative accrued benefits of certain Employees under the applicable defined benefit plans of the Required Aggregation Group, plus any payments under such plans distributed in the one-year period ending on the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Code Section 416(g)(2)(A)(i). In the case of a distribution made for a reason other than termination of employment, death, or Disability, this provision shall be applied by substituting "five-year period" for "one-year period". The Present Value of Section 416 Accrued Benefits of any individual who has not performed services for an Employer during the one-year period ending on the Determination Date shall not be taken into account."

(viii) "*Required Aggregation Group*" means the group composed of (a) each qualified plan maintained by the Employer in which at least one Key Employee participates, or participated in the Plan Year containing the Determination Date, or any of the four preceding Plan Years, regardless of whether the plan has been terminated, and (b) any other qualified plan maintained by the Employer which enables a plan described in clause (a) during the period tested to meet the requirements of Code Section 401(a)(4) or 410(b).

IN WITNESS WHEREOF, Mastercard International Incorporated, acting through its duly recognized representative, has caused this amendment to be executed on behalf of the Corporation this 19th day of December, 2023.

By: *Michael Lennartz*
Michael Lennartz
Executive Vice President, Total Rewards

**APPENDIX A - EMPLOYERS**

Card Services USA, Inc.
MasterCard International Incorporated
MasterCard Advisors, L.L.C.
MasterCard Technologies, LLC
Orbiscom Inc.
Truaxis, Inc.
C-Sam, Inc. (effective February 24, 2014)
Omney, Inc. (effective December 1, 2014)
Applied Predictive Technologies (effective January 1, 2016)
Brighterion, Inc. (effective January 1, 2018)
Ethoca LLC (effective January 1, 2020)
Transactis, Inc. (effective January 1, 2020)
Traina Interactive Corp. (effective April 30, 2020)
Session M, Inc. (effective July 1, 2020)
RiskRecon, Inc. (effective July 1, 2020)
Trans-Fast Remittance LLC (effective January 1, 2021)
Ekata, Inc. (effective January 1, 2022)
Finicity Corporation (effective January 1, 2022)
Arcus FI (effective July 1, 2022)
CipherTrace Inc. (effective July 1, 2022)
Truata LLC (effective January 1, 2024)

**APPENDIX B - Participants Employed by Watch Hill Partners ("Watch Hill")**

Notwithstanding any other provision of the Plan, in connection with the closing of the transaction between Watch Hill Partners L.P. and the Company or an Affiliate (the "*Closing Date*"), the following new Appendix B is added to the Plan, effective as of the dates indicated:

1. Watch Hill shall become an Employer as of the Closing Date.

2. (a) After the Closing Date, employees of Watch Hill as of the Closing Date who become Employees of an Affiliated Company following the Closing Date (a "*Watch Hill Employee*") shall be given credit for their service with Watch Hill prior to the Closing Date for purposes of eligibility (as provided in Article III) and vesting (as provided in Article VI).

(b) Effective as of July 1, 2007, (the "*Watch Hill Merger Date*"), the assets and liabilities of the Watch Hill Partners 401(k) and Profit-Sharing Plan (the "*Watch Hill Plan*") and the trust thereunder are merged into the Plan and Trust Fund in a trust-to-trust transfer in accordance with Code Section 414(l). Service with Watch Hill shall be considered as Service under the Plan, subject to the rules set forth in the definition of Service in Article II.

3. Effective as of the Watch Hill Merger Date, the portion of the Account of a Watch Hill Employee attributable to assets transferred to the Plan from the Watch Hill Plan shall be fully vested and nonforfeitable.

**APPENDIX C - Truaxis, Inc. 401(k) Profit Sharing Plan**

C.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix C is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix C, to Truaxis Participants with respect to the portion of their Account attributable to the Truaxis 401(k) Profit Sharing Plan (the "*Truaxis Plan*"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix C.

C.2 Conflicts Between Plan and Appendix. This Appendix C, together with the Plan, comprises the Plan with respect to a Truaxis Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix C, the terms and provisions of this Appendix C shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

C.3 Service and Vesting.

(a) A Truaxis Participant shall be credited with Service consisting of (i) the number of years of service credited to such Truaxis Participant under the Truaxis Plan prior to December 31, 2012, plus (ii) the greater of (A) the Service that would be credited to such Employee pursuant to Article II of the Plan with respect to the Plan Year ending on December 31, 2013 and (B) the service that would be credited to such Employee under the terms of the Truaxis Plan with respect to the Plan Year ending on December 31, 2013, plus (iii) all Service commencing after December 31, 2013 and ending on such Employee's Termination from Service Date, determined in accordance with Article II of the Plan.

(b) On account of the differences in the vesting computation period (the "*Vesting Computation Period*") between the Plan and the Truaxis Plan, a Truaxis Participant who (i) completes 1000 Hours of Service between January 1, 2013 and December 31, 2013 and (ii) is an Employee for the 12-month period beginning on the anniversary of his or her Employment Commencement Date in 2013 through the anniversary of such Employment Commencement Date in 2014 shall receive credit for two years of Service.

C.4 Plan Merger. Effective as of the Truaxis Merger Date, the assets and liabilities of the Truaxis Plan and the trust thereunder shall be merged into the Plan and Trust Fund.

C.5 Definitions. The following words and phrases as used in this Appendix C shall have the following meanings:

(a) "*Truaxis Participant*" means a Participant who, as of the Truaxis Merger Date, was a participant in the Truaxis Plan and has an account balance thereunder.

(b) "*Truaxis Merger Date*" means October 7, 2013.

# APPENDIX D - Orbiscom, Inc. 401(k) Plan

D.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix D is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix D, to Orbiscom Participants with respect to the portion of their Account attributable to the Orbiscom, Inc. 401(k) Plan (the "*Orbiscom Plan*"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix D.

D.2 Conflicts Between Plan and Appendix. This Appendix D, together with the Plan, comprises the Plan with respect to an Orbiscom Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix D, the terms and provisions of this Appendix D shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

D.3 Service. Effective July 1, 2010, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of an Orbiscom Participant who was an employee of Orbiscom, Inc. prior to the closing of the acquisition of Orbiscom, Inc. by the Company or an Affiliated Company, years of service credited to such Orbiscom Participant by Orbiscom, Inc. prior to such closing; *provided* that such service was not previously credited as Service under the Plan.

D.4 Vesting. Effective June 1, 2011, an Orbiscom Participant who was an employee of Orbiscom, Inc. prior to the closing of the acquisition of Orbiscom, Inc. by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall be fully vested in his or her Account.

D.5 Plan Merger. Effective as of the Orbiscom Merger Date, the assets and liabilities of the Orbiscom Plan and the trust thereunder shall be merged into the Plan and Trust Fund.

D.6 Definitions. The following words and phrases as used in this Appendix D shall have the following meanings:

(a) "*Orbiscom Participant*" means a Participant who, as of the Orbiscom Merger Date, was a participant in the Orbiscom Plan and has an account balance thereunder.

(b) "*Orbiscom Merger Date*" means June 1, 2011.

## APPENDIX E - Employees of Applied Predictive Technologies

E.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix E is to set forth the special provisions, effective as of the dates indicated herein, that shall apply to (i) former Applied Predictive Technologies 401(k) Plan (the "APT Plan") Participants with respect to that portion of their Accounts attributable to the APT Plan; and (ii) active Applied Predictive Technologies, Inc. ("APT") Employees who become Eligible Employees under the Plan. Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix E.

E.2 Conflicts Between Plan and Appendix. This Appendix E, together with the Plan, comprises the Plan with respect to former APT Plan Participants, and active APT Employees who become Eligible Employees under the Plan. In the event of any inconsistency between the provisions of the Plan and this Appendix E, the terms and provisions of this Appendix E shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

E.3 Service. Effective January 1, 2016, Service shall include, for purposes of determining the vested portion of the Account of a former APT Plan Participant who was an employee of APT prior to the acquisition of APT by the Company years of Service credited to such former APT Plan Participant by APT (i) prior to such closing, and (ii) from such closing to December 31, 2015; *provided* that such service was not previously credited under the Plan.

E.4 Vesting. Effective December 31, 2015, a former APT Plan Participant who was an employee of APT prior to (i) the closing of the acquisition of APT by the Company, or (ii) on December 31, 2015, shall be fully vested in his corresponding accounts established for each such former APT Plan Participant under the Plan.

E.5 Employer Match Contributions. APT Employees shall not be eligible for Employer Match Contributions.

Effective January 1, 2018, this Section E.5 is eliminated from the Plan.

E.6. Company Contributions. For each calendar month within the Plan Year, the Company shall contribute to the Company Contribution Account of each eligible APT Employee a discretionary amount. Each APT Employee's Company Contribution shall be made in the same dollar amount to all APT Employees each calendar month. An APT Employee shall only receive a Company Contribution for a calendar month in which such Participant is actively employed on the first day of such month.

Effective January 1, 2018, this Section E.6 is eliminated from the Plan.

E.7 APT Plan Assets.

Elective Deferrals. As of December 31, 2015, liabilities equal to the aggregate elective deferral account balances, as adjusted through the Termination Date in accordance with the terms of the APT Plan, of each active APT Employee who becomes an Eligible Employee shall be transferred to the Plan in a direct Rollover Contribution and credited to corresponding accounts established for each such active APT Employee under the Plan.

Nonelective Contributions. As of December 31, 2015, each active APT Employee who becomes an Eligible Employee may elect (in accordance with election procedures established by the Plan Administrator) to have their nonelective contributions, as adjusted through the Termination Date in accordance with the terms of the APT Plan, distributed in a direct Rollover Contribution to the Plan.

Effective January 1, 2018, this Section is renumbered as E.5.

E.8. Loans. As of December 31, 2015, any outstanding loan that had been made to a former APT Plan Participant under the APT Plan shall be maintained on and after the Termination Date under the Plan until all amounts of principal and interest thereon have been repaid. The terms and conditions relating to such outstanding loans shall continue as in existence prior to the Termination Date.

Effective January 1, 2018, this Section is renumbered as E.6.

E.9 Definitions. The following words and phrases as used in this Appendix E shall have the following meanings:

(a) "*APT Employee*" means any individual that is a common-law employee of Applied Predictive Technologies, Inc.

(b) “*APT Plan*” means the Applied Predictive Technologies 401(k) Plan, as amended and restated, effective as of January 1, 2009 including all amendments adopted thereto.

(c) “*APT Plan Participant*” means a Participant who, as of the Termination Date, was a participant in the APT Plan and has an account balance thereunder.

(d) “*Termination Date*” means December 31, 2015.

## APPENDIX F - Brighterion, Inc. 401(k) Profit Sharing Plan and Trust

F.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix F is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix F, to Brighterion Participants with respect to the portion of their Account attributable to the Brighterion, Inc. 401(k) Profit Sharing Plan and Trust (the "*Brighterion Plan*"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix F.

F.2 Conflicts Between Plan and Appendix. This Appendix F, together with the Plan, comprises the Plan with respect to a Brighterion Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix F, the terms and provisions of this Appendix F shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

F.3 Service. Effective as of the Brighterion Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Brighterion Participant who was an employee of Brighterion, Inc. prior to the closing of the acquisition of Brighterion, Inc. by the Company or an Affiliated Company, years of service credited to such Brighterion Participant by Brighterion, Inc. prior to such closing.

F.4 Vesting. Effective January 1, 2018, a Brighterion Participant who was an employee of Brighterion, Inc. prior to the closing of the acquisition of Brighterion, Inc. by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall be fully vested in the portion of the Account attributed to the Brighterion Plan.

F.5 Loans. As of December 31, 2017, any outstanding loan that had been made to a Brighterion Participant under the Brighterion Plan shall be maintained on and after January 1, 2018 until all amounts of principal and interest thereon have been repaid. The terms and conditions relating to such outstanding loans shall continue in existence prior to December 31, 2017.

F.6. In-Service Distributions. For in-service distributions due to a Brighterion Participant's Disability from the portion of a Brighterion Participant's Account attributable to the Brighterion Plan, the definition of *"Disability"* shall mean the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months; further, the permanence and degree of such impairment will be supported by medical evidence satisfactory to the Committee.

F.7 Distribution Options. Effective January 1, 2018, in addition to the distribution options set forth in Section 8.3 of the Plan, Brighterion Participants may irrevocably elect to receive their distribution of the portion of their Account attributable to the Brighterion Plan in the form of a non-recurring partial payment or a nontransferable annuity contract. Such election with regard to a Brighterion Participant's Account attributable to the Brighterion Plan shall be considered a separate election allowed in addition to any election made with regard to the remainder of the Brighterion Participant's vested Account.

F.8. Plan Merger. Effective January 1, 2018, the assets and liabilities of the Brighterion Plan and the trust thereunder shall be merged into the Plan and Trust Fund.

F.9 Definitions. The following words and phrases as used in this Appendix F shall have the following meanings:

(a) "*Brighterion Participant*" means a Participant who, as December 31, 2017, was a participant in the Brighterion Plan and has an account balance thereunder.

(b) "*Brighterion Merger Date*" means August 11, 2017

# APPENDIX G - Ethoca LLC 401(k) Profit Sharing Plan and Trust

G.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix G is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix G, to Ethoca Participants with respect to the portion of their Account attributable to the Ethoca LLC 401(k) Plan (the "Ethoca Plan"). This Appendix G is effective as of January 1, 2020. Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix G.

G.2 Conflicts Between Plan and Appendix. This Appendix G, together with the Plan, comprises the Plan with respect to an Ethoca Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix G, the terms and provisions of this Appendix G shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

G.3. Service. Effective as of the Ethoca Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Ethoca Participant who was an employee of Ethoca LLC prior to the closing of the acquisition of Ethoca LLC by the Company or an Affiliated Company, years of service credited to such Ethoca Participant by Ethoca LLC prior to such closing.

G.4. Vesting. Effective January 1, 2020, an Ethoca Participant who was an employee of Ethoca LLC prior to the closing of the acquisition of Ethoca LLC by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall be fully vested in the portion of the Account attributed to the Ethoca Plan.

G.5. In-Service Distributions. For in-service distributions due to an Ethoca Participant's Disability from the portion of an Ethoca Participant's Account attributable to the Ethoca Plan, the definition of *"Disability"* shall mean the least restrictive of the following: (a) the Plan's definition of Disability or (b) the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months; further, the permanence and degree of such impairment will be supported by medical evidence satisfactory to the Committee.

G.6. Cash-Outs and Automatic Rollovers. Effective for Benefit Starting Dates on or after the effective date of the Plan Merger specified in Section G.7. of this Appendix G, if as of the Valuation Date described in Section 8.2(c)(i), the Vested Account Balance of an Ethoca Participant's Account attributable to the Ethoca Plan does not exceed $1,000, if payable to the Participant or his or her surviving Spouse, or $5,000, if payable to a non-Spouse Beneficiary, then the Ethoca Participant's Account attributable to the Ethoca Plan shall be distributed as soon as feasible following the Valuation Date in a Direct Rollover to an individual retirement account previously designated by the Plan Administrator, unless the Ethoca Participant or his or her surviving Spouse has elected that such amount be distributed (A) in a Direct Rollover to an Eligible Retirement Plan specified by the Ethoca Participant, his or her surviving Spouse or his or her non-Spouse Beneficiary or (B) in a lump sum directly to the Ethoca Participant, his or her surviving Spouse or his or her non-Spouse Beneficiary.

G.7. Plan Merger. Effective January 1, 2020, the assets and liabilities of the Ethoca Plan and the trust thereunder shall be merged into the Plan and Trust Fund.

G.8. Definitions. The following words and phrases as used in this Appendix G shall have the following meanings:

(a) *"Ethoca Participant"* means a Participant who, as of December 31, 2019, was a participant in the Ethoca Plan and has an account balance thereunder.

(b) *"Ethoca Merger Date"* means January 1, 2020.

**APPENDIX H - Insperity, Inc. 401(k) Plan (Transactis Participants)**

H.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix H is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix H, to Transactis Participants with respect to the portion of their Account attributable to the Insperity, Inc. 401(k) Plan (the "Insperity Plan"). This Appendix H is effective as of January 1, 2020. Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix H.

H.2 Conflicts Between Plan and Appendix. This Appendix H, together with the Plan, comprises the Plan with respect to a Transactis Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix H, the terms and provisions of this Appendix H shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

H.3. Service. Effective as of the Transactis Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Transactis Participant who was an employee of Transactis, Inc. prior to the closing of the acquisition of Transactis, Inc. by the Company or an Affiliated Company, years of service credited to such Transactis Participant by Transactis, Inc. prior to such closing.

H.4. Vesting. Effective January 1, 2020, a Transactis Participant who was an employee of Transactis, Inc. prior to the closing of the acquisition of Transactis, Inc. by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall remain fully vested in the portion of the Account attributed to the Insperity Plan.

H.5. True Up. The Plan Administrator may, to the extent Transactis, Inc. has not done so, make a true-up contribution for each Transactis Participant at or after the end of the 2019 Plan Year to the extent necessary to ensure that the total Employer Matching Contribution as defined under the Insperity Plan for the 2019 Plan Year equals 100% of each Transactis Participant's elective deferrals (including catch-up contributions) made to the Transactis Plan for the 2019 Plan Year capped at 2% of the Transactis Participant's Compensation as defined under the Insperity Plan for the 2019 Plan Year.

H.6. Qualified Non-Elective Contributions. Any Qualified Non-Elective Contributions made to the accounts of Transactis Participants under the Insperity Plan shall remain fully vested.

H.7. Plan Merger. Effective January 1, 2020, the assets and liabilities of the Insperity Plan attributable to the Transactis Participants and the related portion of the trust thereunder shall be merged into the Plan and Trust Fund.

H.8. Definitions. The following words and phrases as used in this Appendix H shall have the following meanings:

(a) *"Transactis Participant"* means a Participant who, as of December 31, 2019, was an employee of Transactis, Inc. and was a participant in the Insperity Plan and has an account balance thereunder.

(b) *"Transactis Merger Date"* means 2/3/2020.

## APPENDIX I - Session M, Inc. 401(k) Plan

I.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix I is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix I, to Session M Participants with respect to the portion of their Account attributable to the Session M, Inc. 401(k) Plan (the "Session M Plan"). This Appendix I is effective as of July 1, 2020. Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix I.

I.2 Conflicts Between Plan and Appendix. This Appendix I, together with the Plan, comprises the Plan with respect to a Session M Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix I, the terms and provisions of this Appendix I shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

I.3. Service. Effective as of the Session M Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Session M Participant who was an employee of Session M, Inc. prior to the closing of the acquisition of Session M, Inc. by the Company or an Affiliated Company, years of service credited to such Session M Participant by Session M, Inc. prior to such closing.

I.4. Vesting. Effective July 1, 2020, a Session M Participant who was an employee of Session M, Inc. prior to the closing of the acquisition of Session M, Inc. by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall become fully vested in the portion of the Account attributed to the Session M Plan.

I.5. Qualified Non-Elective Contributions. Any Qualified Non-Elective Contributions made to the accounts of Session M Participants under the Session M Plan shall remain fully vested.

I.6. In-Service Distributions – Age 65. The portion of a Session M Participant's Account attributable to the Session M Plan shall be available for in-service distribution upon a Session M Participant's attainment of age 65.

I.7. In-Service Distributions – Disability. For in-service distributions due to a Session M Participant's Disability from the portion of a Session M Participant's Account attributable to the Session M Plan, the definition of "*Disability*" shall mean the least restrictive of the following: (a) the Plan's definition of Disability, or (b) the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; further, Disability of a Session M Participant shall be determined by a licensed physician, but if the condition constitutes total disability under the federal Social Security Act, the Plan Administrator may rely upon such determination for purposes of this Section I.7.

I.8. Plan Merger. Effective July 1, 2020, the assets and liabilities of the Session M Plan and the trust thereunder shall be merged into the Plan and Trust Fund.

I.9. Definitions. The following words and phrases as used in this Appendix I shall have the following meanings:

(a) *"Session M Participant"* means a Participant who, as of June 30, 2020, was an employee of Session M, Inc. and was a participant in the Session M Plan and has an account balance thereunder.

(b) *"Session M Merger Date"* means July 1, 2020.

**APPENDIX J - Coronavirus Aid, Relief and Economic Security Act ("CARES Act") Provisions**

J.1. Purpose; Effective Date; Use of Terms. The purpose of this Appendix J is to set forth the provisions of the CARES Act, effective as of the dates indicated herein, that shall apply under the Plan. Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix J.

J.2. Conflicts Between Plan and Appendix. In the event of any inconsistency between the provisions of the Plan and this Appendix J, the terms and provisions of this Appendix J shall supersede the provisions of the Plan to the extent necessary to eliminate such inconsistency.

J.3. Coronavirus-Related Distribution. Through December 31, 2020 and by using the Appropriate Procedure, a Participant who certifies that he or she is a Qualified Individual may request a distribution from his or her Vested Account Balance under the Plan of up to $100,000 ("Coronavirus-Related Distribution"). *Provided*, that a Qualified Individual is subject to an aggregate limit of $100,000 in Coronavirus-Related Distributions from all employer-sponsored qualified retirement plans in which the Qualified Individual participates and all IRAs he or she maintains. *Further provided*, that a Qualified Individual shall be solely responsible for ensuring that he or she does not exceed the $100,000 Coronavirus-Related Distribution aggregate limit. A Coronavirus-Related Distribution shall not be subject to 20% mandatory federal income tax withholding or the 10% additional tax on early distributions.

J.4. Recontribution of Coronavirus-Related Distribution. Using the Appropriate Procedure, a Qualified Individual who has received a Coronavirus-Related Distribution may recontribute some or all of such Coronavirus-Related Distribution to his or her Account under the Plan. *Provided*, that any such recontribution must be completed no later than three years after the date that the Coronavirus-Related Distribution was received by the Qualified Individual. Any such recontribution shall be treated as a direct trustee-to-trustee transfer such that the portion of the Coronavirus-Related Distribution that is recontributed to the Plan shall not be subject to federal income tax.

J.5. Coronavirus-Related Loan Limit. For Plan Loans made between March 27, 2020 through September 22, 2020, the amount of any Plan Loan for a Participant who certifies that he or she is a Qualified Individual shall be governed by the following rules:

(a) Each Plan Loan must be for an amount equal to at least $1,000 (or such other amount as shall be determined by the Committee in its sole discretion).

(b) The amount of any Plan Loan, when added to the outstanding balance of a Participant's other Plan Loan, if any, may not exceed the lesser of:

(i) One hundred percent of the value of the Participant's Vested Account Balance as of the date of the last Plan statement sent to such Participant, adjusted for any subsequent withdrawals; and

(ii) $100,000, reduced by the excess, if any, of:

(A) The highest outstanding balance of a Participant's Plan Loans during the one-year period ending the day before a new Plan Loan is to be made, over

(B) The outstanding balance of a Participant's Plan Loans on the day before the day the new Plan Loan is to be made, *provided however*, that in the event a Participant has a Plan Loan that is deemed distributed and that has not been repaid, the maximum amount available for a subsequent Plan Loan to such Participant shall be reduced by the unpaid amount, including accrued interest, of the Plan Loan that is deemed distributed.

(c) For the purpose of determining any outstanding Plan Loan balances, the Plan Administrator may use the amortization schedule included in the Participant's loan agreement, unless the Plan Administrator has reason to know of a material discrepancy between the amount set forth on the amortization schedule and the actual outstanding Plan Loan balance. All qualified plans (including this Plan) of the Employer or of any Affiliated Company shall be considered as a single plan for purposes of determining the maximum *amount* of loan permitted in accordance herewith; *provided, however*, that the limit set forth in Section J.5.(b)(ii) shall be based on the Participant's Account in the Plan.

J.6. Definitions. The following words and phrases as used in this Appendix J shall have the following meanings:

(a) "*CARES Act*" means the Coronavirus Aid, Relief and Economic Security Act enacted on March 27, 2020.

(b) "*Qualified Individual*" means a Participant who:

(i) Is diagnosed with SARS-CoV-2 or with COVID-19 by a test approved by the Centers for Disease Control and Prevention (including a test authorized under the Federal Food, Drug, and Cosmetic Act);

(ii) Has a Spouse or dependent (as defined in Code Section 152) who is diagnosed with SARS-CoV-2 or with COVID-19 by a test approved by the Centers for Disease Control and Prevention (including a test authorized under the Federal Food, Drug, and Cosmetic Act);

(iii) Experiences adverse financial consequences as a result of being quarantined, being furloughed or laid off, having work hours reduced, having a reduction in pay or self-employment income, or having a job offer rescinded or the start date for a job delayed due to SARS-CoV-2 or COVID-19;

(iv) Experiences adverse financial consequences as a result of his or her Spouse or a member of his or her household (*i.e.*, someone who shares the Participant's principal residence) being quarantined, being furloughed or laid off, having work hours reduced, having a reduction in pay or self-employment income, or having a job offer rescinded or the start date for a job delayed due to SARS-CoV-2 or COVID-19;

(v) Experiences adverse financial consequences as a result of the Participant's, his or her Spouse's or a member of his or her household being unable to work due to lack of childcare due to SARS-CoV-2 or COVID-19;

(vi) Experiences adverse financial consequences as a result of closing or reduction of hours of a business that the Participant, his or her Spouse or a member of the Participant's household owns or operates due to SARS-CoV-2 or COVID-19; or

(vii) Satisfies any other factor or factors listed in any guidance by the Treasury Department and/or Internal Revenue Service that may be taken into account in determining whether a Participant is a Qualified Individual as a result of experiencing adverse financial consequences.

**APPENDIX K - Traina Interactive Corp. 401(k) Plan**

K.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix K is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix K, to Traina Interactive Participants with respect to the portion of their Account attributable to the Traina Interactive Corp. 401(k) Plan (the "Traina Interactive Plan"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix K.

K.2 Conflicts Between Plan and Appendix. This Appendix K, together with the Plan, comprises the Plan with respect to a Traina Interactive Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix K, the terms and provisions of this Appendix K shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

K.3. Service. Effective as of the Traina Interactive Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Traina Interactive Participant who was an employee of Traina Interactive Corp. prior to the closing of the acquisition of Traina Interactive Corp. by the Company or an Affiliated Company, years of service credited to such Traina Interactive Participant by Traina Interactive Corp. prior to such closing.

K.4. Vesting. Effective April 30, 2020, a Traina Interactive Participant who was an employee of Traina Interactive Corp. prior to the closing of the acquisition of Traina Interactive Corp. by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall become fully vested in the portion of the Account attributed to the Traina Interactive Plan.

K.5. Qualified Non-Elective Contributions. Any Qualified Non-Elective Contributions made to the accounts of Traina Interactive Participants under the Traina Interactive Corp. Plan shall remain fully vested.

K.6. In-Service Distributions – Age 59½. The portion of a Traina Interactive Participant's Account attributable to the Traina Interactive Corp. Plan shall be available for in-service distribution upon a Traina Interactive Participant's attainment of age 59½.

K.7. Plan Merger. Effective April 30, 2020, the assets and liabilities of the Traina Interactive Plan and the trust thereunder shall be merged into the Plan and Trust Fund.

K.8. Definitions. The following words and phrases as used in this Appendix K shall have the following meanings:

(a) *"Traina Interactive Participant"* means a Participant who, as of April 30, 2020, was an employee of Traina Interactive Corp. and was a participant in the Traina Interactive Plan and has an account balance thereunder.

(b) *"Traina Interactive Merger Date"* means April 30, 2020.

**APPENDIX L - Insperity, Inc. 401(k) Plan (RiskRecon Participants)**

L.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix L is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix L, to RiskRecon Participants with respect to the portion of their Account attributable to the Insperity, Inc. 401(k) Plan (the "Insperity Plan"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix L.

L.2 Conflicts Between Plan and Appendix. This Appendix L, together with the Plan, comprises the Plan with respect to a RiskRecon Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix L, the terms and provisions of this Appendix L shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

L.3. Service. Effective as of the RiskRecon Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a RiskRecon Participant who was an employee of RiskRecon, Inc. prior to the closing of the acquisition of Session M, Inc. by the Company or an Affiliated Company, years of service credited to such RiskRecon Participant by RiskRecon, Inc. prior to such closing.

L.4. Vesting. Effective July 1, 2020, a RiskRecon Participant who was an employee of RiskRecon, Inc. prior to the closing of the acquisition of RiskRecon, Inc. by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall become fully vested in the portion of the Account attributed to the Insperity Plan.

L.5. Plan Merger. Effective July 1, 2020, the assets and liabilities of the Insperity Plan attributable to RiskRecon Participants and the related portion of the trust thereunder shall be merged into the Plan and Trust Fund.

L.9. Definitions. The following words and phrases as used in this Appendix L shall have the following meanings:

(a) *"RiskRecon Participant"* means a Participant who, as of June 30, 2020, was an employee of RiskRecon, Inc. and was a participant in the Insperity Plan and has an account balance thereunder.

(b) *"RiskRecon Merger Date"* means July 1, 2020.

## APPENDIX M - Trans-Fast Remittance LLC 401(k) Profit Sharing Plan

M.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix M is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix M, to Trans-Fast Participants with respect to the portion of their Account attributable to the Trans-Fast Remittance LLC 401(k) Profit Sharing Plan ("Trans-Fast Plan"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix M.

M.2 Conflicts Between Plan and Appendix. This Appendix M, together with the Plan, comprises the Plan with respect to a Trans-Fast Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix M, the terms and provisions of this Appendix M shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

M.3. Service. Effective as of the Trans-Fast Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Trans-Fast Participant who was an employee of Trans-Fast Remittance LLC prior to the closing of the acquisition of Trans-Fast Remittance LLC by the Company or an Affiliated Company, years of service credited to such Trans-Fast Participant by Trans-Fast Remittance LLC prior to such closing.

M.4. Vesting. Effective January 1, 2021, a Trans-Fast Participant who was an employee of Trans-Fast Remittance LLC prior to the closing of the acquisition of Trans-Fast Remittance LLC by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall become fully vested in the portion of the Account attributed to the Trans-Fast Plan.

M.5. In-Service Distributions. For in-service distributions due to an Trans-Fast Participant's Disability from the portion of an Trans-Fast Participant's Account attributable to the Trans-Fast Plan, the definition of *"Disability"* shall mean the least restrictive of the following: (a) the Plan's definition of Disability or (b) the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months; further, the permanence and degree of such impairment will be supported by medical evidence satisfactory to the Committee.

M.6. Forms of Payment. For distributions to a Trans-Fast Participant who has incurred a Termination from Service Date, in addition to the forms of payment described in Section 8.3(a), a Trans-Fast Participant may irrevocably elect to receive his or her distribution of the portion of his or her Account attributable to the Trans-Fast Plan in substantially equal annual installments payable over a period that does not exceed the longest period described in Section 8.1(b)(ii).

M.7. Plan Merger. Effective January 1, 2021, the assets and liabilities of the Trans-Fast Plan attributable to Trans-Fast Participants and the related portion of the trust thereunder shall be merged into the Plan and Trust Fund.

M.8. Definitions. The following words and phrases as used in this Appendix M shall have the following meanings:

(a) *"Trans-Fast Participant"* means a Participant who, as of December 31, 2020, was an employee of Trans-Fast Remittance LLC and was a participant in the Trans-Fast Plan and has an account balance thereunder.

(b) *"Trans-Fast Merger Date"* means January 1, 2021.

**APPENDIX N - Ekata, Inc. 401(k) Plan**

N.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix N is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix N, to Ekata Participants with respect to the portion of their Account attributable to the Ekata, Inc. 401(k) Plan ("Ekata Plan"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix N.

N.2 Conflicts Between Plan and Appendix. This Appendix N, together with the Plan, comprises the Plan with respect to an Ekata Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix N, the terms and provisions of this Appendix N shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

N.3. Service. Effective as of the Ekata Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of an Ekata Participant who was an employee of Ekata, Inc. prior to the closing of the acquisition of Ekata, Inc. by the Company or an Affiliated Company, years of service credited to such Ekata Participant by Ekata, Inc. prior to such closing.

N.4. Vesting. Effective January 1, 2022, an Ekata Participant who was an employee of Ekata, Inc. prior to the closing of the acquisition of Ekata, Inc. by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall become fully vested in the portion of the Account attributable to the Ekata Plan.

N.5. In-Service Distributions. For in-service distributions due to an Ekata Participant's Disability from the portion of an Ekata Participant's Account attributable to the Ekata Plan, the definition of *"Disability"* shall mean the least restrictive of the following: (a) the Plan's definition of Disability or (b) the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months; further, the permanence and degree of such impairment will be supported by medical evidence satisfactory to the Committee.

N.6. Plan Merger. Effective January 1, 2022, the assets and liabilities of the Ekata Plan attributable to Ekata Participants and the related portion of the trust thereunder shall be merged into the Plan and Trust Fund.

N.7. Definitions. The following words and phrases as used in this Appendix N shall have the following meanings:

(a) *"Ekata Participant"* means a Participant who, as of December 31, 2021, was an employee of Ekata, Inc. and was a participant in the Ekata Plan and has an account balance thereunder.

(b) *"Ekata Merger Date"* means January 1, 2022.

**APPENDIX O - Helpside Inc. 401(k) Plan (Finicity Participants)**

O.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix O is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix O, to Finicity Participants with respect to the portion of their Account attributable to the Helpside Inc. 401(k) Plan ("Helpside Plan"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix O.

O.2 Conflicts Between Plan and Appendix. This Appendix O, together with the Plan, comprises the Plan with respect to a Finicity Participant who is an Eligible Employee or who is a terminated employee of Finicity with a vested account balance in the Helpside Plan. In the event of any inconsistency between the provisions of the Plan and this Appendix O, the terms and provisions of this Appendix O shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

O.3. Service. Effective as of the Finicity Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of a Finicity Participant who was an employee of Finicity Corporation on the day prior to the closing of the acquisition of Finicity Corporation by the Company or an Affiliated Company, years of service credited to such Finicity Participant by Finicity Corporation prior to such closing.

O.4. Vesting. Effective January 1, 2022, a Finicity Participant who was an employee of Finicity Corporation on the day prior to the closing of the acquisition of Finicity Corporation by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall become fully vested in the portion of the Account attributable to the Helpside Plan.

O.5. In-Service Distributions. For in-service distributions due to a Finicity Participant's Disability from the portion of a Finicity Participant's Account attributable to the Helpside Plan, the definition of *"Disability"* shall mean the least restrictive of the following: (a) the Plan's definition of Disability or (b) the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months; further, such Disability shall be determined by a licensed physician provided, however, that if the condition constitutes total disability under the federal Social Security Acts, the Plan Administrator may rely upon such determination for purposes of this Section O.5.(b).

O.6. Direct Trustee-to-Trustee Transfer. Effective January 1, 2022, the assets and liabilities of the Helpside Plan attributable to Finicity Participants and terminated employees of Finicity with vested account balances in the Helpside Plan and the related portion of the trust thereunder shall be transferred to the Plan and Trust Fund directly from the Helpside Plan and related portion of the trust thereunder.

O.7. Definitions. The following words and phrases as used in this Appendix O shall have the following meanings:

(a) *"Finicity Participant"* means a Participant who, as of December 31, 2021, was an employee of Finicity Corporation and was a participant in the Helpside Plan and had an account balance thereunder.

(b) *"Finicity Merger Date"* means January 1, 2022.

## APPENDIX P - TriNet 401(k) Plan (CipherTrace Inc. Participants)

P.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix P is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix P, to CipherTrace Participants with respect to the portion of their Account attributable to the TriNet 401(k) Plan ("TriNet Plan"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix P.

P.2 Conflicts Between Plan and Appendix. This Appendix P, together with the Plan, comprises the Plan with respect to an CipherTrace Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix P, the terms and provisions of this Appendix P shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

P.3. Service. Effective as of the CipherTrace Merger Date, Service shall include, solely for purposes of determining the vested portion of the Account (but not for purposes of determining benefit accruals) of an CipherTrace Participant who was an employee of CipherTrace Inc. prior to the closing of the acquisition of CipherTrace Inc. by the Company or an Affiliated Company, years of service credited to such CipherTrace Participant by CipherTrace Inc. prior to such closing.

P.4. Vesting. Effective July 1, 2022, a CipherTrace Participant who was an employee of CipherTrace Inc. prior to the closing of the acquisition of CipherTrace Inc. by the Company or an Affiliated Company and who was an Employee immediately following such acquisition shall become fully vested in the portion of the Account attributable to the TriNet Plan.

P.5. In-Service Distributions. For in-service distributions due to a CipherTrace Participant's Disability from the portion of an CipherTrace Participant's Account attributable to the TriNet Plan, the definition of *"Disability"* shall mean the least restrictive of the following: (a) the Plan's definition of Disability or (b) a physical or mental condition other than death which renders a CipherTrace Participant incapable of performing any employment; further, the Committee may require a CipherTrace Participant to provide evidence of his/her entitlement to disability benefits under the federal Social Security Act.

P.6. Plan Merger. Effective July 1, 2022, the assets and liabilities of the TriNet Plan attributable to CipherTrace Participants and the related portion of the trust thereunder shall be merged into the Plan and Trust Fund.

P.7. Definitions. The following words and phrases as used in this Appendix P shall have the following meanings:

(a) *"CipherTrace Participant"* means a Participant who, as of June 30, 2022, was an employee of CipherTrace Inc. and was a participant in the TriNet Plan and has an account balance thereunder.

(b) *"CipherTrace Merger Date"* means July 1, 2022.

# APPENDIX Q

## Sequoia One 401(k) Plan (Truata LLC Participants)

Q.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix Q is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix Q, to Truata Participants with respect to the portion of their Account attributable to the Sequoia One 401(k) Plan ("Sequoia One Plan"). Except as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix Q.

Q.2 Conflicts Between Plan and Appendix. This Appendix Q, together with the Plan, comprises the Plan with respect to a Truata Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix Q, the terms and provisions of this Appendix Q shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

Q.3. In-Service Distributions. For in-service distributions due to a Truata Participant's Disability from the portion of a Truata Participant's Account attributable to the Sequoia One Plan, the definition of *"Disability"* shall mean the least restrictive of the following: (a) the Plan's definition of Disability or (b) a determination by the Social Security Administration that a Truata Participant is disabled under Section 223(d) of the Social Security Act for purposes of eligibility for Social Security benefits.

Q.4. Automatic Rollovers. Effective for Benefit Starting Dates on or after the Truata Merger Date specified in Section Q.6. of this Appendix Q, if, as of the Valuation Date described in Section 8.2(a) and for purposes of Section 8.2(c)(i), the Vested Account Balance of a Truata Participant's Account attributable to the Sequoia One Plan is $5,000 or less, then the Truata Participant's Account attributable to the Sequoia One Plan shall be distributed as soon as administratively feasible following the Valuation Date in a Direct Rollover to an individual retirement account previously designated by the Plan Administrator, unless the Truata Participant has elected that such amount be distributed (A) in a Direct Rollover to an Eligible Retirement Plan specified by the Truata Participant or (B) in a lump sum directly to the Truata Participant.

Q.5. Plan Merger. Effective January 1, 2024, the assets and liabilities of the Sequoia One Plan attributable to Truata Participants and the related portion of the trust thereunder shall be merged into the Plan and Trust Fund.

Q.6. Definitions. The following words and phrases as used in this Appendix Q shall have the following meanings:

(a) *"Truata Participant"* means a current or former Participant who, as of the Truata Merger Date, has an account balance under the Sequoia One Plan.

(b) *"Truata Merger Date"* means January 1, 2024.

4864-5550-7718, v. 1

**Amendment One to the Mastercard Savings Plan**

The Mastercard Savings Plan (the "Plan"), as amended and restated as of January 1, 2023, is hereby amended as set forth below.

1. **Effective as of January 1, 2024, a new sentence is added to the end of Section 7.6 that reads as follows:**

Effective as of January 1, 2024, forfeitures shall be used, first, to reduce Match Contributions and, thereafter, any remaining forfeitures shall be used to reduce reasonable expenses of Plan administration; all forfeitures in the Plan as of December 31, 2024 shall be allocated no later than December 31, 2025; and all forfeitures in the Plan during any Plan Year beginning on or after January 1, 2025 shall be allocated no later than December 31 of the following Plan Year.

Except as set forth herein, the Plan remains in full force and effect.

IN WITNESS WHEREOF, Mastercard International Incorporated, acting through its duly authorized representatives, has caused this amended to be executed on behalf of the Corporation this 19 day of December, 2024.

By: *Michael Lennartz*

Michael Lennartz, Executive Vice President, Total Rewards

**Amendment Two to the Mastercard Savings Plan**

The Mastercard Savings Plan (the "Plan"), as amended and restated as of January 1, 2023, is hereby amended as set forth below.

1. **Effective as of January 1, 2024, the definition of *"Plan Administrator"* provided in Section 2.1 of the Plan is deleted in its entirety and replaced with the following:**

   *"Plan Administrator"* means the Executive Vice President, Total Rewards, or such other individual as may be designated from time to time by the Company as the Plan Administrator.

Except as set forth herein, the Plan remains in full force and effect.

IN WITNESS WHEREOF, Mastercard International Incorporated, acting through its duly authorized representatives, has caused this amended to be executed on behalf of the Corporation this 19 day of December, 2024.

By: Michael Lennartz
Michael Lennartz, Executive Vice President, Total Rewards

**Amendment Three to the Mastercard Savings Plan**

The Mastercard Savings Plan (the "Plan"), as amended and restated as of January 1, 2023, is hereby amended as set forth below.

1. **Effective as of January 1, 2025, existing Appendix A is deleted and replaced with the following:**

**APPENDIX A**

**EMPLOYERS**

Card Services USA, Inc.
MasterCard International Incorporated
MasterCard Advisors, N.N.C.
MasterCard Technologies, LLC
Orbiscom Inc.
Truaxis, Inc.
C-Sam, Inc. (effective February 24, 2014)
Omney, Inc. (effective December 1, 2014)
Applied Predictive Technologies (effective January 1, 2016)
Brighterion, Inc. (effective January 1, 2018)
Ethoca LLC (effective January 1, 2020)
Transactis, Inc. (effective January 1, 2020)
Session M, Inc. (effective July 1, 2020)
RiskRecon, Inc. (effective July 1, 2020)
Trans-Fast Remittance LLC (effective January 1, 2021)
Ekata, Inc. (effective January 1, 2022)
Finicity Corporation (effective January 1, 2022)
Aruis FI (effective July 1, 2022)
CipherTrace Inc. (effective July 1, 2022)
Truata LLC (effective January 1, 2024)
Minna Technologies Inc. (effective July 1, 2025)

2. **Effective as of January 1, 2025, a new Appendix R is added to the Plan that reads as follows:**

**APPENDIX R**

**Minna Technologies 401(k) Plan**

R.1 Purpose; Effective Date; Use of Terms. The purpose of this Appendix R is to set forth the special provisions, effective as of the dates indicated herein, that shall apply, except as otherwise provided in this Appendix R, to Minna Tech Participants with respect to the portion of their Account attributable to the Minna Technologies 401(k) Plan ("Minna Tech Plan"). Except

as otherwise indicated, terms used and defined in the Plan shall have the same respective meanings for purposes of this Appendix R.

R.2 Conflicts Between Plan and Appendix. This Appendix R, together with the Plan, comprises the Plan with respect to a Minna Tech Participant who is an Eligible Employee. In the event of any inconsistency between the provisions of the Plan and this Appendix R, the terms and provisions of this Appendix R shall supersede the other provisions of the Plan to the extent necessary to eliminate such inconsistency.

R.3. Plan Merger. Effective October 29, 2025, the assets and liabilities of the Minna Tech Plan attributable to Minna Tech Participants and the related portion of the trust thereunder shall be merged into the Plan and Trust Fund.

R.4. Definitions. The following words and phrases as used in this Appendix R shall have the following meanings:

(a) *"Minna Tech Participant"* means a current or former Participant who, as of the Minna Tech Merger Date, has an account balance under the Minna Tech Plan.

(b) *"Minna Tech Merger Date"* means October 29, 2025.

Except as set forth herein, the Plan remains in full force and effect.

IN WITNESS WHEREOF, Mastercard International Incorporated, acting through its duly authorized representatives, has caused this amendment to be executed on behalf of the Corporation this __5___ day of ___January___, 2025.

By: Michael Lennartz
_______

Michael Lennartz
Executive Vice President, Total Rewards

4931-9347-9772, v. 1

**Amendment Four to the Mastercard Savings Plan**

The Mastercard Savings Plan (the "Plan"), as amended and restated as of January 1, 2023, is hereby amended as set forth below.

1. **Effective as of January 1, 2025, Section 1.6 is deleted and replaced with the following:**

    1.6 Type of Plan. Historically, the Plan was intended to be a profit-sharing plan with a 401(k) feature for all purposes of the Code. Effective July 1, 2018, the Plan was amended to cease all profit-sharing contributions, after which the Plan was intended to be a 401(k) plan for all purposes of the Code. The Plan and Trust Agreement adopted as part of the Plan are intended to qualify as a plan and trust that meet the requirements of Code Sections 401(a) and 501(a) or any other applicable provisions of law.

2. **Effective as of January 1, 2025, the first sentence of the definition of *"Base Pay"* contained in Section 2.1 of the Plan is deleted and replaced with the following:**

    *"Base Pay"* means, with respect to any Plan Year, the amount of base pay or hourly pay, shift differential pay, premium pay (effective January 1, 2012), pay in lieu of accrued but unused vacation, pay continuation during a period of short term disability paid to a Participant by an Employer, and pay during a period of notice of termination paid to a Participant by an Employer.

Except as set forth herein, the Plan remains in full force and effect.

IN WITNESS WHEREOF, Mastercard International Incorporated, acting through its duly authorized representatives, has caused this amended to be executed on behalf of the Corporation this ___5__ day of ___January___, 2025.

By: *Michael Lennartz*

Michael Lennartz, Executive Vice President, Total Rewards